**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

|  |  |  |
|---|---|---|
| **IN RE:** | ) ) ) | **Chapter 11** |
| **YC ATLANTA HOTEL LLC,** | ) ) ) | **Case No. 21-50964-bem** |
| **Debtor,** | ) ) ) | |

---

**ACCESS POINT FINANCIAL, LLC'S EMERGENCY MOTION TO CONVERT TO
CHAPTER 7 OR, IN THE ALTERNATIVE, TO APPOINT CHAPTER 11 TRUSTEE**

---

Comes Now Access Point Financial LLC ("Access Point") pursuant to § 1112 and hereby moves this Court to convert this case to a proceeding under Chapter 7 of the Bankruptcy Code or, in the alternative, to appoint a Chapter 11 Trustee.  In support thereof, Access Point relies on the record and states as follows:

**JURISDICTION**

1.      This Court has jurisdiction over this matter and parties pursuant to 28 U.S.C. §§ 157(b)(2) and 1334.

2.      This is a core proceeding under 28 U.S.C. § 157(b)(2).

3.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**SUMMARY OF REQUESTED RELIEF**

4.      Cause exists under § 1112(b) of the Bankruptcy Code to convert the Debtor's Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code.  Access Point is requesting that this case be converted to one under Chapter 7 of the Bankruptcy Code due to the continued diminution of the estate, the absence of a reasonable likelihood of rehabilitation, gross

mismanagement of the estate, unauthorized use of cash collateral, and the Debtor's failure to comply with an order of the Court.  As detailed below, the Debtor's principals are unable to answer basic questions regarding the operation of the Debtor.  Additionally, the Debtor has used Access Point's cash collateral without authorization in violation of an order of this Court.  In addition to violating this Court's order, the Debtor has violated the Bankruptcy Code by paying pre-petition debts post-petition, against the advice of its counsel.  The Debtor is operating at a loss, does not have any equity in its sole asset, the Clarion hotel property, and has no reasonable likelihood of rehabilitation.  Consequently, this case is due to be converted to one under Chapter 7.

## BACKGROUND

5.      On February 3, 2021 (the "Petition Date"), YC Atlanta Hotel LLC (the "Debtor") filed its voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") (Dkt. No. 1, the "Petition").

6.      The Debtor is currently operating as a Debtor-In-Possession pursuant to Bankruptcy Code §§ 1107 and 1108.  No Trustee or Examiner has been appointed.  There has been no appointment of an Unsecured Creditors' Committee.

**I.    Debtor's 341 Hearing Testimony**

7.      On March 4, 2020, the United States Trustee held the Debtor's 341 meeting of creditors.  The Debtor's representative and managing member, Baldev Johal, was unable to answer simple questions as to whether the business licenses are in good standing, the identity of the authorized signatories on the Debtor's bank accounts, who is leasing property from the Debtor, the number of the Debtor's employees, the Debtor's gross monthly income, or the Debtor's estimated monthly expenses.  This lack of understanding of the Debtor's business operations seems entirely incongruent with Mr. Johal's testimony that the Debtor had gone to "bare bones" operations in

response the United States Trustee's counsel's question as to what cost cutting efforts had been undertaken in advance of the Debtor's Petition.  Mr. Johal's inability to answer these questions exhibit a lack of involvement in day to day operations and spending, which has arguably led to many of the issues in this case.  There is clearly a breakdown in information between the daily operations of the Debtor and its principals and management.

## II. Violation of the Interim Cash Collateral Order and the Unauthorized Use of Cash Collateral

8.    On February 8, 2021, the Debtor filed its *Motion of Debtor-In-Possession for Interim and Final Orders (a) Authorizing the Use of Cash Collateral Pursuant to Section 363(c) of the Bankruptcy Code; (b) Requesting an Expedited Interim Hearing Thereon; and (c) Scheduling a Final Hearing on the Valuation and Use of Cash Collateral* (Dkt. No. 8) (the "Cash Collateral Motion").

9.    On February 10, 2021, Access Point filed its *(1) Objection to Motion of Debtor-In-Possession for Interim and Final Orders (a) Authorizing the Use of Cash Collateral Pursuant to Section 363(c) of the Bankruptcy Code; and (c) Scheduling a Final Hearing on the Valuation and Use of Cash Collateral and (2) Request for Adequate Protection Pursuant to Section 363(e)* (Dkt. No. 15) (the "Access Point Objection").

10.    On February 12, 2021, the Court entered its Interim Cash Collateral Order, which granted the Cash Collateral Motion, but required, *inter alia*, the following:

> The Debtor shall continue to operate and maintain its property and business in accordance with the Budget and this Interim Order, **provided that (i) any expenditure in a particular line item category on the Budget that would cause actual expenditures for that category to exceed the monthly budgeted amount for that category must be approved in advance by each of the Respondents or by the Court . . .**

Interim Cash Collateral Order, ¶ 3(a) (emphasis added).  The Debtor's proposed Budget was prepared and entered with no negotiation to nor edits from Access Point or any other party.  The Interim Cash Collateral Order did not allow the Debtor any budget variances.

11.    Pursuant to the Interim Cash Collateral Order, the Debtor has circulated its Cash Collateral Budget and Profit and Loss Statements weekly.  These reports, detailed and discussed below indicated that the Debtor exceeded the budgeted amount for "RM Royalty Fees/Franchise Fees" by $10,962.76 during the week of February 20 through 26 and exceeded the same category by $6,662.89 for the week of February 27 through March 5, without obtaining the approval of Access or the Court as more fully described in the Motion to Enforce defined below.

12.    On March 11, 2021, Access Point filed its *Emergency Motion to Enforce Compliance With The Court's Interim Cash Collateral Order and for Related Relief* (Dkt. No. 53) (the "Motion to Enforce").  .

13.    On March 14, 2021, the Debtor filed its *Debtor's (i) Response to Access Point's Motion to Enforce Compliance With The Court's Interim Cash Collateral Order And For Related Relief And (ii) Motion to Amend the Interim Order* (Dkt. No. 60) (the "Debtor's Response to the Motion to Enforce").  In this response, the Debtor details other violations of the Interim Cash Collateral Order that were not raised in Access Point's Motion to Enforce.  Specifically, the Debtor admits to paying pre-petition claims post-petition and to paying in excess of the budgeted amount without seeking the approval of Access Point or the Court.[1]

---

[1] Debtor's counsel asserts certain defenses or justifications for its violation of the Interim Cash Collateral Order, but acknowledges that it made payments in excess of the budget without seeking authority from Access Point or the Court.  Such authority is required by the Interim Cash Collateral Order.

14.    A summary of the cash collateral budget overages, according to Debtor's Response

to the Motion to Enforce, are as follows:

    a.  "While the February budget for Commissions was $3,823.25, the Debtor actually spent $18,203.76 on February 24.  It made that payment without seeking advance authority from the Respondents or the Court." Debtor's Response to the Motion to Enforce, Dkt. No. 60 at ¶ 2.

    b.  "While the February budget for Breakfast Costs was $2,200.00, the Debtor actually spent $3,963.95.  It made that payment without seeking advance authority from the Respondents or the Court."  *Id*. at ¶ 8.

    c.  "While the February budget for Guest Supplies was $1,500.00, the Debtor actually spent $2,946.24.  It made those payments without seeking advance authority from the Respondents or the Court." *Id.* at ¶12.

    d.  "[T]he Debtor has incurred $235.82 for post-petition travel/meals in February and March combined, even though there is not an amount budgeted for that category." *Id.* at ¶ 17.

    e.  "While the budget for House Cleaning Supplies was $3,800.00, the Debtor actually spent $4,033.73 in March, so far.  It made those payments to EcoLab without seeking advance authority from the Respondents or the Court." *Id.* at ¶ 18 (footnote omitted).

    f.  "[W]hile the Budget for Franchise Fees was $8,137.06, the Debtor actually spent $13,867.89 in March so far.  It made that payment without seeking advance authority from the Respondents or the Court." *Id.* at ¶ 25.

15.    A summary of the post-petition payments on pre-petition charges, according to

Debtor's Response to the Motion to Enforce, are as follows:

    a.  Commissions: "[I]t appears that some or all of the $18,203.76 was billed on account of pre-petition revenues. . . . At least $5,979.62 of it was pre-petition."  *Id.* at ¶ 5.

    b.  Breakfast: "[I]t appears that a portion of the $3,963.95 was billed on account of pre-petition charges. . . .  At least $1,837.53 of it was pre-petition." *Id.* at ¶ 9.

    c.  Guest Supplies: "[I]t appears that all of the $2,946.24 was billed on account of pre-petition costs.  *Id.* at ¶ 13.

    d.  House Cleaning Supplies: "[I]t appears that all of the $4,033.73 was billed on account of pre-petition costs."  *Id.* at ¶ 19.

     e.  Franchise Fees: Invoice dated February 11, 2021 for $25,153.52.  See *Id.* at ¶ 30.

16.    While there are other overages indicated in the Debtor's Response to the Motion to Enforce (utilities overage of $9,460.40 and sales tax payment of $27,104.91), the Debtor asserts that they were authorized to make such payments.  However, regardless of whether the Debtor was authorized to make such payments, these payments that were made indicate how dire the Debtor's financial condition truly is and the issues surrounding the inability of the Debtor's principals to properly budget expenses and manage the business.

17.    What may be the most concerning aspect in the Debtor's Response to the Motion to Enforce is that the Debtor paid pre-petition claims post-petition "despite contrary input from counsel."  Debtor's Response to the Motion to Enforce, Dkt. No. 60 at ¶¶ 5, 9, 13, and 19.  See also *Id.* at ¶ 33 at note 5 and ¶ 71 ("Although Debtor's counsel advised the Debtor to hold-off on making those payments until the parties had clarity, that message simply got lost in a sea of other input and didn't make it down to the staff level.").  Despite being informed by counsel not to violate the Bankruptcy Code, the Debtor continued to do so.[2]

18.    The March 15, 2021 hearing on the Motion to Enforce has been continued until March 22, 2021 to be considered along with the final hearing on the Cash Collateral Motion.

---

[2] The Debtor also filed a Supplemental Response to Access Point's Motion to Enforce Compliance to Attach Hearing Exhibits which raises other concerns (the "Supplemental Response").  Dkt 62.  For instance, (i) on February 11, 2021 in store withdrawals in the cumulative amount of $10,679.65 were made (Dkt. 62-4, Ex. D1); (ii) four payments via American Express Settlement to Red Lion Hotel (whose loan was paid off in 2019 by Access Point's loan) were made on 2/5/21, 2/8/21, 2/9/21 and 2/10/21 in the cumulative amount of $2,030.85

During the time between March 15 and March 22, the Debtor was supposed to abide by a specific set of allowable payments to which the parties agreed.

19.    However, despite the March 15, 2021 hearing on the Motion to Enforce and further instruction by Debtor's counsel to Debtor on Thursday March 11, 2021 to freeze all expenditures but for payroll (see Exhibit A, E-mail from David Bury, Stone and Baxter, LLP (March 13, 2021, 10:33 EST), on or about March 16, 2021 a payment was made to Sysco in the amount of $1,155.01 which Debtor did not "understand how it went out, as Jamilette and her assistant bookkeeper are the only ones who can make payments." See Exhibit A, E-mail from David Bury, Stone and Baxter LLP (March 16, 2021, 4:09 EST). This lack of the Debtor's institutional controls is apparent when the Debtor has been instructed by counsel no less than two times not to make certain payments (the second instruction being made in response to a pending motion for contempt). A true and correct copy of the e-mails referenced above are attached as Exhibit A.

## III.    Negative Net Income

20.    In addition to being consistently over budget, the Debtor is currently operating at a loss. According to the Profit & Loss statements that are weekly provided to Access Point, which are reported on an accrual basis, the Debtor has had a **net income of *negative* $150,018.22.**

21.    According to Cash Collateral Budget and Profit and Loss Statement, dated February 23, 2021, reporting on the period from February 3, 2021 through February 19, 2021 (collectively, the "February 23 Budget"), the Total Net Income for these weeks on an accrual basis is ***negative* $68,945.80**. A true and correct copy of the February 23 Budget is attached hereto as Exhibit B.

22.    According to the Cash Collateral Budget and Profit and Loss Statement dated March 2, 2021 and reporting on the period from February 20, 2021 through February 26, 2021 (collectively, the "March 2 Budget"), the Total Net Income for this week on an accrual basis is

*negative* **$24,560.48**.  A true and correct copy of the March 2 Budget is attached hereto as <u>Exhibit</u> <u>C</u>. When netted with the previous week's net income, the Debtor has a total net income of *negative* **$93,506.28.**

23.     According to the Cash Collateral Budget and Profit and Loss Statement dated March 9, 2021 and reporting on the period from February 27, 2021 through March 5, 2021 (collectively, the "<u>March 9 Budget</u>"), the Total Net Income for this week on an accrual basis is *negative* **$72,581.96**.  A true and correct copy of the March 9 Budget is attached hereto as <u>Exhibit</u> <u>D</u>.  When netted with the previous week's net income, the Debtor has a total net income of *negative* **$166,088.24.**

24.     According to the Cash Collateral Budget and Profit and Loss Statement dated March 16, 2021 and reporting on the period from March 6, 2021 through March 12, 2021, (collectively, the "<u>March 16 </u>Budget"), the Total Net Income for this week on an accrual basis is $16,070.02.  A true and correct copy of the March 16 Budget is attached hereto as <u>Exhibit E</u>.  This $16,070.02 of positive net income for one week does not materially impact the $166,088.24 of negative net income from the previous weeks, but merely puts the Debtor at a net negative income on an accrual basis of *negative* **$150,018.22.**

25.     The same holds true on a cash basis.  According to the Debtor's Schedule A, it began the case with $53,185.29 cash on hand.  Schedule A/B (Dkt. No. 44) at 3, Part 1, no. 4.  The Debtor has received a cash infusion of $25,000 and an insurance refund of $44,000, which totals to cash on hand of about $122,000.  The Debtor shows cumulative cash through March 12, 2021 as $126,203.79, but no payments have been made to its professionals, for cash collateral, for United States Trustee's fees, or other administrative expenses.

26.     The infusion of the insurance refund and the cash infusion may make the Debtor's financial statements appear as though the Debtor is rehabilitating.  However, a view of the Debtor's Cash Collateral Budgets show that operations have not improved.  The Debtor is not experiencing increased lodging sales or a significant decrease in expenses.  Boiled down, the Debtor is operating at a loss and is not capable of producing sufficient income to reorganize.

## IV.   No Equity in the Debtor's Hotel Property

27.     In addition to consistently operating over budget and at a loss, the Debtor's major asset (the Clarion hotel property) is significantly underwater.  As set forth in the Access Point Objection, the Access Point loans were in default and accelerated.  As of the Petition Date, Access Point is owed no less than $14,303,218.81.  As displayed by the appraisal of CBRE – Valuation & Advisory Services, the property is worth $7,625,000 (the "CBRE Appraisal").  A true and correct copy of the CBRE Appraisal is attached hereto as Exhibit F.  Moreover, the Debtor's appraisal, performed by Buckhead Advisory Group, values the property at $7,820,000 ("BAG Appraisal").  A true and correct copy of the BAG Appraisal can be found at Docket No. 69, Exhibit D7.  As such, it is clear that the value of the hotel is completely eclipsed by the debt owed to Access Point.

## V.   The Property Improvement Plan and the Threat of the Loss of the Clarion Franchise Flag

28.     The CBRE Appraisal also indicates that about $525,000 is necessary to complete the Debtor's property improvement plan.  CBRE Appraisal at pg. 28.  The BAG Appraisal similarly indicates approximately $600,000 is necessary to complete the hotel's property improvement plan. BAG Appraisal, pgs. 44.  The sixth floor of the hotel has been completed and the fifth floor was to be completed within a few days from the CBRE Appraisal, but work had not

started on the first, second, and third floors.  The substantial remaining costs to complete the property improvement plan raises serious questions as to whether the money advanced was utilized to complete the property improvement plan.

29.     If the property improvement plan is not completed, there exists the very real threat that the flag could be pulled from this property by the franchisor, Choice Hotels International, Inc. This would result in the loss of the reservation system, the loss of name recognition, and, ultimately, the loss of income for the Debtor.

30.     Access Point does have a comfort letter with Choice Hotels International, Inc., which would allow the hotel to stay open and under the Clarion flag while transitioning from the Debtor to Access Point in the event of foreclosure, administration by a trustee, etc.

## VI.    Failure to disclose PPP Loan

31.     Additionally, the Debtor failed to schedule and disclose its receipt of a Paycheck Protection Loan in the amount of $338,497 on February 1, 2021 (the "PPP Loan").According to USASpending.gov, the Debtor received the PPP Loan just two days before filing its Petition, yet it is not reflected in the Debtor's schedules.  Additionally, the amount from the loan does not appear to be included in the "Beginning Cash" section of the Debtor's cash collateral budgets. Presumably, these funds have been spent.  On what and to whom is unclear.  A true and correct copy of the USAspending.gov webpage is attached hereto as Exhibit G.

32.     In sum, the Debtor is operating over budget, operating at a loss, and has no equity in its major asset.  Additionally, there is a breakdown in communication and day-to-day management of the Debtor, which has resulted in the unauthorized use of cash collateral, the violation of this Court's order, and violations of the Bankruptcy Code.  Ultimately, the facts above indicate that this is not a case with any chance of success as a Chapter 11.  It is in the best interest

of creditors for the case to be converted to one under Chapter 7 in order to save administrative

expense and ensure the orderly distribution to creditors.

## RELIEF REQUESTED AND BASIS THEREFORE

33.     This case is due to be converted to a Chapter 7 case under Bankruptcy Code

§ 1112(b).  There is substantial or continuing loss to or diminution of the estate.  There is no

reasonable likelihood of rehabilitation.  The Debtor is operating at a loss.  The Debtor has used

cash collateral without authorization.  The Debtor has failed to comply with an order of the Court.

The Debtor has repeatedly failed to comply with directions of its counsel.  Meanwhile, the Debtor

continues to incur fees and costs relating to this case, which will continue to drain its remaining

assets to the detriment of its creditors.

### I.    **This case should be converted to a Chapter 7.**

34.     The Bankruptcy Code provides for the conversion of a Chapter 11 case to a Chapter

7 case upon a showing of cause.  "Conversion to Chapter 7 will streamline the process and will

avoid the costly and perilous confirmation process, avoid continual accrual of quarterly fees, and

avoid any further Debtor's attorney fees being paid from the Chapter 7 bankruptcy estate." *Off.*

*Comm. of Unsecured Creditors v. Moultrie (In re Moultrie)*, 586 B.R. 498, 506 (Bankr. N.D. Ga.

2018).   Section 1112(b)(1) provides:

> on request of a party in interest, and after notice and a hearing, the court shall
> convert a case under this chapter to a case under chapter 7 or dismiss a case under
> this chapter, whichever is in the best interests of creditors and the estate,
> for cause unless the court determines that the appointment under section 1104(a) of
> a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1).

35.     Unless the Debtor can prove certain exceptions, conversion or dismissal is

mandatory under § 1112 if cause is proven.  *Pegasus Wireless Conversion v. Tsao, (In re Pegasus*

45213800 v3                                11

*Wireless Corporation)*, 391 Fed. Appx. 802, 802-03 (11th Cir. 2010) ("With regard to § 1112,

BAPCPA made dismissal or conversion mandatory upon a showing of cause subject to specified

expectation").

36.     Section 1112(b)(4) sets forth 16 illustrations of "cause."    The subsections

applicable to this case are:

> (A) substantial or continuing loss to or diminution of the estate and the absence of a
> reasonable likelihood of rehabilitation;
> (B) gross mismanagement of the estate;
> . . .
> (D) unauthorized use of cash collateral substantially harmful to 1 or more creditors;
> (E) failure to comply with an order of the court . . . .

11 U.S.C. § 1112(b)(4)(A), (B), (D), (E).  Of course, this list is illustrative and non-exhaustive,

and courts have considered non-enumerated causes (see *Warren v. Young (In re Warren)*, 2015

WL 3407244, at *4-6 (B.A.P. 9th Cir. May 28, 2015)).

### A.  <u>The Estate is Experiencing Substantial or Continuing Loss and There is Not a Reasonable Likelihood of Rehabilitation</u>

37.     Whether there is cause to convert under § 1112(b)(4)(A) is a two-fold inquiry.

*Moultrie*, 586 B.R. at 502.  First, the Court must determine whether there has been substantial or

continuing loss to or diminution of the estate.  *Id*.  Second, the Court must determine whether there

is an absence of a reasonable likelihood of rehabilitation.   *Id*.   "The purpose behind section

1112(b)(4)(A) paints the perfect context; Congress wanted to preserve estate assets by preventing

the debtor in possession from gambling on the enterprise at the creditor's expense when there is

no hope of rehabilitation."  *In re Roan Valley, LLC*, 2009 WL 6498188 at *1 (Bankr. N.D. Ga.

2009) (internal quotations omitted).

38.     A debtor operating with declining asset values or who continues to experience

negative cash flow will meet the first inquiry.  *Moultrie*, 586 B.R. 498 at 502.  As detailed above,

the Debtor continues to operate with a negative income each week.  The Debtor has yet to make a substantial profit.  Quite simply, the Debtor is spending more than it is earning to the detriment of Access Point and other creditors.

39.     The Debtor is operating with a negative income, and there is not a reasonable likelihood of rehabilitation.  "The focus is whether the Debtor's business prospects justify continuance of the reorganization effort.  This element can be satisfied by showing a debtor's ability to fund the case is highly uncertain."  *Moultrie*, 586 B.R. 498 at 504.

40.     It is highly unlikely that the Debtor will be able to successfully fund this case.  To date, the Debtor's actual income has been slightly over half of the income amount it budgeted.  The hotel is significantly underwater with continued renovations required to meet the franchisor's standards.  While the Debtor is sure that the hotel market is turning around, it should not be allowed to gamble on the enterprise at Access Point's expense.  Thus, this case should be converted to a Chapter 7.

**B.  The Debtor is Experiencing Gross Mismanagement.**

41.     "Under the Bankruptcy Code, a DIP is vested with significant powers which come with certain responsibilities and duties."  *Moultrie*, 586 B.R. at 504.  Mismanagement of the estate may include failure by a debtor to comply with the requirements of the Bankruptcy Code.  *Id.* (finding that failure to disclose and schedule certain assets and to disclose the sale of timber until after its occurrence warrants finding of "cause" to conversion).

42.     The Bankruptcy Code generally prohibits the Debtor from making any unauthorized payment on a pre-petition debt and allows such payments to be avoided under section 549.  However, despite this prohibition, the Debtor has made several post-petition payments on pre-petition debts.  According to the Debtor's Response to the Motion to Enforce, the Debtor has

paid almost $15,000 of pre-petition debt post-petition, to five different creditors.  It appears that the Debtor has done so despite the Bankruptcy Code and the repeated cautioning and direction of its counsel.

43.     Access Point understands that the demands placed on a bankruptcy debtor during the beginning and continuance of its case may seem arduous, however, these responsibilities and limitations are the required trade-off for the benefits and protections the Bankruptcy Code grants its debtors.  Additionally, Debtors have the wisdom of their counsel to shepherd them through the case.  Here, the Debtor is disregarding the prohibitions of the Bankruptcy Code and the repeated advice of their counsel.  It would like the benefits of the Bankruptcy Code without adhering to the limitations.

44.     The Debtors violations of the Bankruptcy Code displays its gross mismanagement. Estate funds are leaving the estate without authorization and against the advice of the Debtor's counsel.  This fact alone is sufficient cause to convert this case to a Chapter 7 to ensure that the estate is administrated neutrally and fairly to all creditors.

45.     Additionally, the gross mismanagement of the Debtor is evidenced by the inability of the corporate representative to answer basic questions pertaining to the Debtor at the 341 meeting of creditors.  The corporate representative was unable to answer the United States Trustee's counsel's questions regarding whether the business licenses are in good standing, the identity of the authorized signatories on the Debtor's bank accounts, who is leasing property from the Debtor, the number of employees, the Debtor's gross monthly income, or the Debtor's estimated monthly expenses.  Again, these are questions that an involved operator with proper controls would know the answers.

46.     The threat that the Debtor could lose its Clarion flag is another example of the gross mismanagement of the Debtor.  The success of the Debtor is significantly tied to whether it can continue to be a Clarion branded hotel rather than a brand-less hotel.  The Debtor's principals are not ensuring that it is up to the standards to maintain its status as a franchisee.  Due to the gross mismanagement of the Debtor, there is sufficient cause to convert this case to one under Chapter 7.

47.     Lastly, the failure to disclose the PPP loan in the Debtor's schedules qualifies as gross mismanagement.  A debtor must be transparent in its schedules and the failure to do so is indicative of gross mismanagement of the estate.  See *Moultrie*, 586 B.R. at 504-05 (finding that a debtor's failure to disclose certain assets and a timber sale contract was "indicative of the Debtor's gross mismanagement of the estate.").  Similarly, the Debtor in this case has a duty to be transparent and has breached that duty, indicating gross mismanagement.  Thus, there is more than sufficient cause to convert this case.

**C.  The Debtor has Used Cash Collateral Without Authorization.**

48.     In order for a case to be due for conversion due to the unauthorized use of cash collateral, there must be a use of cash collateral that is unauthorized and the use must be substantially harmful to at least one creditor.  11 U.S.C. § 1112(b)(4)(D).  "If the debtor fails to adhere to the requirements of section 363, the debtor's use of cash in which some other person holds an interest may be unauthorized."  *Collier on Bankruptcy,* § 1112.04[5][f], 16th Ed.

49.     The Debtor has clearly used Access Point's cash collateral without authorization. Not only did Access Point not consent to the budget overages nor were they authorized by the Court, but the Debtor never even asked for Access Point's consent.

50.     Access Point has experienced substantial harm due to the use of its cash collateral without authorization.

**D.  The Debtor has Violated the Terms of the Interim Cash Collateral Order.**

51.     Violation of a court order alone is adequate cause to convert a case to a Chapter 7. *Moultrie*, 586 B.R. at 504 N. 7 ("Failure to comply with a Court order is cause for conversion pursuant to § 1112(b)(4)(E)."). "Note that section 1112(b)(4) does not require that the failure be intentional." *Collier on Bankruptcy,* § 1112.04[5][g], 16th Ed. See also.  *In re Babayoff*, 445 B.R. 64, 80 (Bankr. E.D.N.Y. 2011) (this paragraph does not require that the debtor's failure to comply be willful or be the product of bad faith or fraud).

52.     As detailed above, and more fully in the Motion to Enforce and the Debtor's Response to the Motion to Enforce, the Debtor has violated the terms of the Interim Cash Collateral Order.  The Debtor exceeded its budget multiple times without obtaining authorization from Access Point or the Court.  While the violation of the Interim Cash Collateral Order suffices as cause under § 1112(b)(4), in this case, it is but one of many "causes" mandating conversion.

53.     As discussed above, any one of the subsections of § 1112(b)(4) is sufficient cause to convert a case to Chapter 7.  Here, there are at least four different subsections which have been met (continued loss without a reasonable likelihood of rehabilitation, gross mismanagement, unauthorized use of cash collateral harming a creditor, and the violation of a court order).  Thus, conversion is required.  *Pegasus Wireless Conversion v. Tsao*, *(In re Pegasus Wireless Corporation)*, 391 Fed. Appx. 802, 802-03 (11th Cir. 2010) ("With regard to § 1112, BAPCPA made dismissal or conversion mandatory upon a showing of cause subject to specified expectation").

II.    __Alternatively, a Chapter 11 Trustee should be appointed.__

54.    Alternatively, in the event the Court finds that conversion is not appropriate, the Court should appoint a Chapter 11 trustee.  The facts detailed above show that a neutral, disinterested party capable of managing the estate is necessary.

55.    Section 1104(a)(1) of the Bankruptcy Code provides that a Chapter 11 trustee may be appointed, upon request by a party in interest, "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause. . ."  11 U.S.C. § 1104(a)(1).

56.    The plain language of section 1104(a)(1) (specifically, the use of the word "shall") indicates that courts may not look beyond a finding of "cause" in considering appointment of a trustee.  See *In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989) (stating that "[11 U.S.C. § 1104](a)(1) requires the bankruptcy court, upon motion, to appoint a trustee when the movant has proved 'cause,' which the statute defines to include incompetence and gross mismanagement."); *In re National Staffing Servs., LLC*, 2005 WL 3729404 at *2 (Bankr. N.D. Ohio Nov. 21, 2005) (11 U.S.C. § 1104(a)(1) provides for "the mandatory appointment of a trustee upon a specific finding of 'cause.'").

57.    In the alternative, a court can order the appointment of a trustee pursuant to the provisions of section 1104(a)(2).  This subsection provides that a court shall order the appointment of a trustee if "such appointment is in the interests of creditors, any equity security holders, and other interests of the estate. . ." 11 U.S.C. § 1104(a)(2).  When a trustee is appointed "in the interests of creditors," it is not necessary to find that the debtor or management engaged in any misdeeds." *Sharon Steel*, 871 F.2d at 1226.  Under section 1104(a)(2), a court should consider the debtor's trustworthiness; past and present performance; likelihood of successful reorganization;

absence of creditor confidence in current management; and the benefits of appointing trustee balanced against the cost of appointment. *In re Eurospark Indus.*, 424 B.R. 621, 621 (Bankr. E.D. N.Y. 2010).

58.    As detailed above, the principals of the Debtor and its current management are not properly managing the Debtor. There is gross mismanagement, incompetence, lack of creditor confidence, and no likelihood of a rehabilitation of the Debtor. Thus, if the Court finds that dismissal is not appropriate, based on the facts above, it should appoint a Chapter 11 trustee to manage the Debtor.

### III.    Dismissal is not requested.

59.    Whether a case is converted or dismissed is determined by the best interest of the creditors. 11 U.S.C. § 1112(b)(1) ("the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate . . .").

60.    Because of the facts detailed above, this case should be converted to a Chapter 7 rather than dismissed because the continued purview of the Court is in the best interest of the Debtor's creditors. Additionally, there appear to be causes of action against parties related to the Debtor or ownership of the Debtor which the Debtor has not pursued and, if the Debtor is permitted to continue to operate the business outside of bankruptcy, the remaining assets will continue to be drained to the detriment of creditors. Thus, this case should be converted rather than dismissed.

**WHEREFORE**, based upon the foregoing, Access Point requests that the Court convert this case to a Chapter 7 or, in the alternative, appoint a Chapter 11 trustee to manage the assets of the estate.

Respectfully submitted this 18th day of March, 2021.

s/Graham H. Stieglitz
Graham H. Stieglitz
Georgia Bar No. 682047
Adolyn C. Wyatt
Georgia Bar No. 578601
gstieglitz@burr.com
awyatt@burr.com

*Attorneys for Access Point Financial LLC*

BURR & FORMAN LLP
171 Seventeenth Street, N.W., Suite 1100
Atlanta, Georgia  30363
(404) 815-3000

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of March, 2021, I electronically filed ACCESS POINT

FINANCIAL, LLC'S MOTION TO CONVERT TO CHAPTER 7 OR, IN THE ALTERNATIVE,

TO APPOINT CHAPTER 11 TRUSTEE with the Clerk of Court using the CM/ECF system and

a true and correct copy of the foregoing has been served on the following via electronic means

through the Court's electronic filing system and/or via US Mail:

David L. Bury, Jr.
Stone & Baxter, LLP
Suite 800
Fickling & Co. Building
577 Mulberry Street
Macon, GA 31201
dbury@stoneandbaxter.com

YC Fernley Hotel LLC
Attn: Managing Member
5851 South Virginia Street
Reno, NV 89503

Balbir S. Gosal
5851 S. Virginia Street
Reno, NV 89502

Baldev S. Johal
5851 S. Virginia Street
Reno, NV 89502

Vanessa A. Leo
Office of the United States Trustee
362 Richard B. Russell Building
75 Ted Turner Drive SW
Atlanta, GA 30303
Vanessa.A.Leo@usdoj.gov

Andres H. Sandoval
Assistant U.S. Attorney
United States Attorney's Office
75 Ted Turner Drive SW, Suite 600
Atlanta, Georgia 30303
Andres.sandoval@usdoj.gov

Anna M. Humnicky
Small Herrin, LLP
2727 Paces Ferry Road
Building 2, Suite 200
Atlanta, GA 30339
ahumnicky@smallherrin.com

/s/Graham H. Stieglitz
Graham H. Stieglitz
Georgia Bar No. 682047
gstieglitz@burr.com

BURR & FORMAN LLP
171 Seventeenth Street, N.W., Suite 1100
Atlanta, Georgia 30363
Telephone: (404) 815-3000
Facsimile: (404) 817-3244

45213800 v3