**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| IN RE: | : | **Chapter 11** |
| | : | |
| **YC ATLANTA HOTEL LLC,** | : | **Case No.  21-50964-BEM** |
| | : | |
| **Debtor.** | : | |
| | : | |

**DEBTOR'S RESPONSE IN OPPOSITION TO THE MOTIONS TO CONVERT OR TO APPOINT A CHAPTER 11 TRUSTEE**

YC Atlanta Hotel LLC (the "**Debtor**"), Debtor and Debtor-In-Possession in the above-captioned case, responds in opposition to (i) Access Point Financial LLC's *Emergency Motion to Covert to Chapter 7, or In the Alternative, to Appoint Chapter 11 Trustee* (Dkt. 70) and (ii) the United States Trustee's *Motion for Appointment of a Chapter 11 Trustee or In the Alternative Conversion to Chapter 7* (Dkt. 91) (collectively, the "**Motions**"), respectfully showing:

**SUMMARY**

In light of and almost exclusively due to the COVID-19 Pandemic, Access Point made a bad loan and the Debtor arguably made a bad investment barely a year ago in late 2019. Fortunately for the Debtor, the Code is likely far more forgiving to the Debtor than Access Point's investors are to Access Point about what an acceptable reorganization looks like. Further, the Debtor is under no obligation to propose a Plan that will restore Access Point's investors to some pre-pandemic expected return on investment. Rather, the Debtor, which is currently at 37% of its pre-pandemic revenues only needs to get to 50% (projected for October 2021) before it can fully fund a plan for secured and unsecured creditors and 66% (projected for January 2022) before it can fully fund a plan and repay unsecured creditors on an *accelerated* basis. Finally,

1

Access Point knows that the Debtor's principals—who funded an over $3 million down payment barely a year ago—are fully capable of funding all necessary new value under a plan.

Hence, Access Point's relentless attempt to spoil the Debtor's good faith reorganization attempt and portray the Debtor and this case as anything other than what they really are: A highly experienced hotel operator who is caught in, but recovering from, an unprecedented pandemic, who has a substantial safety net through its underlying owners, but who simply requires the creditor-wide reorganizing tools that only the Code provides. After the bar date and likely without an exclusivity extension, the Debtor is poised to confirm a plan that neither equity nor Access Point will like, but which should pay Access Point in full.

As the Debtor will establish at trial, (i) Access Point is attempting to spin an isolated but ultimately harmless couple of missteps—at worst—early in the case into a sudden death gotcha so as to avoid or delay a confirmation outcome that its investors won't prefer and (ii) the United States Trustee is seeking the most extraordinary and potentially destructive remedies that the Code permits, almost exclusively because the United States Trustee made up its mind about the Debtor, its principals, its staff, and even its counsel after a 341 Meeting and can't see it any other way, no matter how much information that the Debtor and its counsel provide.

The Debtor has three primary arguments in response to the Motions.

First, they fail for lack of due process on account of no other creditors receiving notice.

Second, Access Point's cash collateral settlement estops it, either legally or practically, from going to such incredible lengths to prove-up substantial or continuing losses; gross mismanagement; cash collateral violations; and order violations. It is impossible to reconcile the cash collateral settlement or even the settlement announcement with Access Point's Motion.

Third, the evidence will show that there are no substantial or continuing losses; there is

no gross mismanagement; there were no cash collateral violations and, even if there were, they

did not harm, much less substantially harm, Access Point; and, if there was a court order

violation, then, short of this Court determining that the violation was egregious rather than one

driven by an inexperienced Debtor who has now fully transitioned into Chapter 11, it provides no

cause for converting the case or appointing a Chapter 11 trustee.

### STATEMENT OF FACTS AND PROCEDURAL POSTURE

The procedural posture is well-known. Further, the parties have presented their views on

the pertinent facts in prior pleadings, many of which overlap with the two Motions. Finally, the

Debtor addresses the material factual issues in argument. Thus, the Debtor will focus in this

section on the critical factual disputes; miscellany in the two Motions; and additional facts.

1.      The Debtor operates a Clarion Inn airport hotel in Atlanta. Its principals—

primarily Baldev Johal and Balbir Gosal—own, operate, and mange over a dozen hotels across

the country. In advance of testimony, the Access Point Underwriting Memorandum (Trial Exh.

D-10) provides an excellent overview the Debtor and its representatives. Counsel will send an

unredacted version of that Memo to Chambers and the parties prior to the April 6 trial.

2.      Like it did to almost all other hotels around the world, the COVID-19 Pandemic

significantly undermined and damaged the Debtor. Specifically, the Debtor bought the hotel on

November 15, 2019 with a combination of $3 million in liquidity from its principals and $11.4

million in financing from Access Point and more or less closed the hotel in First Quarter 2020

for a substantial overhaul and upgrade, only to have to close down again when COVID hit and

struggle throughout the remainder of 2020 to simply stay in business.

3.     Only after all of its non-bankruptcy restructuring options with Access Point were exhausted did it reluctantly file this case on February 3 as a last resort, at the expense of having to give up eligibility for what would have been a critical $338,497 second PPP loan.

4.     Although the Debtor knew this case would be a difficult case, especially against the backdrop of the Pandemic, it could not have contemplated such a scorched earth and seemingly coordinated effort of Access Point and the UST to oppose the Debtor and its staff.

5.     With that overview, the Debtor will focus on disputed or additional relevant facts:

- Movants' criticisms of the 341 Meeting are overstated and mostly unwarranted.

- Debtor has never misrepresented its payroll or personnel.

- Debtor fully explained in writing the so-called "22 Transactions" on March 26.

- Debtor never admitted that it violated the Interim Order. Rather, it argued that, *only if* this Court rejects its argument about the $25,000 infusion *and* denies its pending Motion (Dkt. 60) to add the pre-petition utility amounts to the Budget, it may have violated the Interim Order based on a misunderstanding by an inexperienced debtor rather than an egregious or brazen disregard for the Order.

- All pre-petition payments were made, at worst, as a result of an early misunderstanding that has been cured; have been resolved via § 549 demands; and, in any event, were limited to non-insider § 506(c) preservation costs.

- Candidly, in the fog of the case's first three weeks, counsel could have, in hindsight, been a little more deliberate in drilling into the Debtor's lower-level staff all of the Code requirements, but it is inaccurate for Movants to accuse the Debtor of having committed the alleged violations after "repeated" instructions. Any and all transitional communication issues have been resolved.

- The $10,679.65 "store withdrawals" that Access Point points to as raising "other concerns" were fully accounted for to the UST as being related to W-2 payroll. All of the supporting paperwork is located at Trial Exh. D-20.

- As counsel explained to Access Point *before* it filed its Motion, the $2,030.85 referenced at footnote 2 did not consist of *payments* to anyone, much less to the former owner of the hotel. From the bank statement, it is obvious that they were *deposits* resulting from the daily American Express room rental settlements.

- It is true that counsel instructed the Debtor to make every effort to cease payments pending the emergency hearing on the Motion to Enforce, but counsel did that as a courtesy in good faith rather than being legally obligated to do so. And the single charge that went out to Sysco for $1,155.01 resulted from *Sysco* taking DIP account information from a prior EFT and making a unilateral withdrawal.

- Access Points' allegations of $150,018.22 in "negative income" result from its inexplicable misinterpretation of the Debtor's weekly reports that show expenditures, only, and on an accrual basis, at that. Of course a report will appear to show negative income if it excludes all receipts and shows just expenditures. It's unclear why Access ignored the reports that show both. See below.

- The evidence will establish that Access Point is simply wrong about Choice, the Clarion flag, and the status of the Property Improvement Plan ("PIP").

- Access Point represented that it would amend its Motion to remove its false allegations regarding bankruptcy, bank, and PPP fraud, but still hasn't done so.

## STANDARD OF REVIEW

Other than the Debtor's burden of establishing the exceptions under § 1112(b)(2), Access Point and the UST have the burden of proof on all issues raised in their respective Motions.

Although the following overview is specific to § 1104, its limiting principles and cautions as to the extraordinary remedy of appointing a Chapter 11 trustee apply equally to conversion under § 1112 because §§ 1104 and 1112 share an emphasis on "for cause" and, if exercised against a debtor, can have significant and dispositive consequences for a debtor. Specifically, in his article on trustees and examiners,[1] Judge Drake summarized the analytical guidelines that this Court should consider in making a "for cause" and best "interests" determination.

First, "congressional history indicates a strong policy in favor of maintaining the debtor as a debtor in possession for purposes of estate administration." Drake at 1. Further, the "legislative history of the Code recognizes that simple mismanagement should not constitute per

---

[1] *See* Chapter 11 Reorganizations (2d ed.), W. Homer Drake, Jr. & Christopher S. Strickland, § 7:6 – Trustee or Examiner (Oct. 2012) (Westlaw at CH11REORG § 7:6) (hereinafter "Drake at __").

se cause for the appointment of a trustee, since nearly all businesses or entities in financial distress suffer some degree of improper management." *Id*. at 2. Thus, "only ***gross mismanagement*** will furnish cause for the appointment of a trustee." *Id*. (emphasis added).

Second, "no decision in a Chapter 11 case is apt to be more critical to the ultimate results achieved in the case than the court's determination to leave the debtor in possession of its assets or, in the alternative, to appoint a trustee." *Id*. at 3 n.1 (quoting 5 Collier ¶ 1104.01). A court's decision under § 1104(a) "forms one of the most important issues in any reorganization proceeding, and it bears many serious consequences." *Id*. at 2. The "trustee's appointment poses a significant event in any reorganization case, and brings with it significant consequences to the rights and remedies of all the parties to the proceeding." *Id*. at 3.

Third, in determining whether to appoint a Chapter 11 trustee, bankruptcy courts "must bear in mind that appointment of trustee may impose ***substantial financial burden*** on a hard-pressed debtor . . . by incurring expenditure of ***substantial administrative expenses*** caused by further ***delay*** in bankruptcy proceedings." *Id*. at 4 (summarizing parenthetically *In re Plaza de Retiro*, 417 B.R. 632 (Bankr. D.N.M. 2009)) (emphasis added).

Fourth, the "authors . . . submit that bankruptcy courts should require ***proof*** of misconduct similar to fraud, dishonesty, incompetence, or gross mismanagement before appointing a trustee" under Section 1104(a)(2)." Drake at 2 (emphasis added).

Fifth, Courts are naturally reluctant "to invoke their discretion to appoint a trustee where current management has a needed expertise in a complex industry, or where it was unclear whether a trustee was any more likely to successfully rehabilitate the debtor than the debtor in possession." *Id*. at 6 n.10 (elaborating on courts' reluctance to appoint in "marginal cases").

Sixth, "at least one court has declined to appoint a trustee where the sole purpose of the motion was to deprive the debtor in possession of its right to the 120 day exclusive period to file a plan." *Id*. (suggesting to Debtor that a motion filed with an ill-motive, rather than a genuine interest in preserving the integrity of the bankruptcy, should be disfavored).

Finally, the "courts have sometimes declined to appoint a trustee under the 'best interests' standard where the intermediate option of appointing an examiner under section 1104(b) proved to be a more palatable option." *Id.* (suggesting to Debtor that appointment of a trustee is an extraordinary option which courts should only employ after exhausting all others).

## ARGUMENT

### I.    The Motions Fail for Lack of Due Process.

Without there being a Court order explicitly ordering or limiting service, neither Access Point nor the UST served their respective Motions on any parties other than those immediately involved (i.e., the Debtor, Access Point, the SBA, the UST, certain of their principals, and their respective counsel) (collectively, the "**Immediate Parties**"). No other creditors or parties-in-interest—including, without limitation, Choice Hotels International, all of the Debtor's employees, and all of the Debtor's trade creditors—have any idea (i) that Access Point and the UST are seeking extraordinary and, essentially, case-dispositive relief on April 6; (ii) how to respond to the Motions; or (iii) how to participate in the April 6 hearing.[2]

Thus, without further notice, the Motions fail under the Rules for lack of due process.

By way of one example, Debtor's counsel spoke to Choice's counsel on March 31. Choice, the Debtor's franchisor, is (other than the Debtor and Access Point) the party who stands to be the most impacted or even harmed by this Court's rulings on the Motions. In fact, Access

---

[2] *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306 (1950) is still the leading due process case for bankruptcy proceedings. In *Mullane*, the Supreme Court explained that "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 314. It continues: "The notice must be of such nature as reasonably to convey the required information . . . and it must afford a reasonable time for those interested to make their appearance . . ." *Id.* (internal citations omitted). Critically, "when notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it . . ." *Id.* at 315.

Point's allegations about Choice, the franchise fee payment, and the potential risk of Choice cancelling the franchise are essential to Access Point's Motion. Nevertheless, Choice's counsel confirmed that neither Choice nor its counsel were aware of the April 6 hearing.

## II.   Access Point Should Be Judicially Estopped From Litigating the Motion.

The parties' final cash collateral settlement is so inconsistent with the allegations raised and relief requested in this Motion that this Court should determine that Access Point is judicially estopped from settling cash collateral and still litigating this Motion.[3] Even if Access Point is not estopped in a formal sense because the settlement gives Access Point the option of litigating its Motion, judicial estoppel principles frame and illuminate this Motion's absurdity, particularly those portions of the Motion dealing with old alleged cash collateral violations.[4]

The contrast is baffling. On the one hand, on March 22, Access Point agreed, in pertinent part, as follows: (i) the Debtor can use well over $670,000 in cash collateral over the subsequent 13 weeks; (ii) the Debtor can renew that usage in additional 13 week increments; (iii) the Debtor can report its usage bi-weekly rather than on a weekly basis; (iv) the Debtor is permitted pretty generous budget variances; (v) the Debtor is entitled to written notices of default and an opportunity to cure; (vi) the Debtor gets a carve-out for professional fees; (vii) the Debtor is permitted to fund its operations via equity infusions without those infusions constituting cash collateral; (viii) the Budget is revised for a few categories (including utilities) in line with actual

---

[3] *See Slater v. United States Steel Corporation*, 871 F.3d 1174, 1181 (11th Cir. 2017) (setting out the following elements of judicial estoppel—"whether (1) the party took an inconsistent position under oath in a separate proceeding, and (2) these inconsistent positions were 'calculated to make a mockery of the judicial system'").

[4] The Debtor's agreement that Access Point can attempt to litigate the Motion, despite the final settlement of cash collateral, neither waives the estoppel defense nor relieves this Court of its independent authority if not duty to protect the integrity of this proceeding via estoppel principles. Indeed, the parties reserved all rights with respect to the Motion based on Access Point's inexplicable refusal to pull the Motion.

expenditures; and (ix) Access will, in all likelihood, agree that the Debtor can pay its pre-petition franchise fees should the Court enter an order granting an assumption proposal with Choice.

On the other hand, and despite entering into an arrangement that is far more generous, forgiving, and accommodating than the parties' short-term arrangement from February 3 to March 22, Access Point is now pointing to alleged *pre-settlement* cash violations as cause to terminate this case for the very Debtor who it just settled cash collateral with on a final basis following the alleged pre-settlement violations. Access Point was under no compulsion to settle cash collateral. Indeed, the Court went to great lengths to provide the parties a full evidentiary cash collateral hearing for March 22. It could have litigated the Cash Collateral Motion and the Motion to Enforce on the merits. Instead, its settlement had the Motion to Enforce withdrawn; had the parties agreeing that the $25,000 was not cash collateral and any payments made with the $25,000 were direct payments from equity rather than payments from the estate; had Access Point waiving sanctions against the Debtor and its principals for alleged violations of the cash collateral order; and had Access Point agreeing to future cash collateral provisions that, if they had been in place during the short interim period, would have prevented or eliminated all or substantially all of the pre-settlement violations that Access Point is still trying to litigate.[5]

Critically, Access Point has now *agreed* to the Debtor's treatment of the $25,000 as a defense to the alleged violations and also wants to terminate this case on the basis of alleged violations that would not be violations or constitute cause if they had occurred post-settlement.

---

[5] Unlike the final arrangement, the interim arrangement was treacherous for the Debtor because it permitted no variances; it judged usage down at the micro line item level; it had no provisions for notice and a cure; and it left the parties open to litigating the central part of the instant dispute: Do equity infusions fall outside of cash collateral and the cash collateral budget? Under the final arrangement, for example, the $25,000 infusion would have eliminated almost all of Access' alleged violations.

Further, and even worse, the proposed Final Order, *employing language proposed by Access Point*, would have the parties agreeing and this Court actually ordering that "[s]erious and potentially irreparable harm to the Debtor, its creditors, and its estate may occur absent authorization for the use of Cash Collateral"; that "terms of the Debtor's use of Cash Collateral appear to be fair and reasonable and within the scope of the Debtor's exercise of reasonable business judgment"; and that "[c]ontinued use of Cash Collateral in accordance with the provisions of this Final Order is therefore in the best interests of Debtor's estate[] and [its] creditors." How then, without making a mockery of this proceeding and violating principles of judicial estoppel, can Access Point ***also allege*** that the Debtor and its "incompetent" management have so grossly mismanaged the Debtor and permitted such "substantial or continuing losses" that they *cannot* be trusted to administer the estate for another day, much less for 13 or more additional weeks?[6] The allegations are not only false on the merits, but they're completely incompatible and incapable of being reconciled with the parties' settlement.

On that basis alone, the Court can and should deny the Motion outright.

### III.    Neither Conversion Nor the Appointment of a Trustee is Warranted.

Access Point and the UST seek conversion or a Chapter 11 trustee. However, partly because of § 1104's and § 1112's common and somewhat overlapping emphasis on "cause" and partly because of Movants' near "shotgun" style pleadings, it's difficult to untangle and address

---

[6] Specifically, Access Point alleges that the Debtor and its management should be terminated because of "continued diminution of the estate; of an "absence of a reasonable likelihood of rehabilitation"; of "gross mismanagement"; of "substantial or continuing losses"; of "negative income"; of "repeated" failures to follow counsel's advice; of the hotel being "significantly underwater"; of an imminent risk of the Debtor losing its franchise; of alleged PPP and bankruptcy disclosure fraud (which was proven false); the Debtor is gambling "on the enterprise at Access Point's expense"; of the Debtor's alleged failure to administer the case "neutrally and fairly [for] all creditors"; management is not "properly managing the Debtor"; of "incompetence"; of "lack of candor"; and of the Debtor "drain[ing remaining assets] to the detriment of creditors." Mot. at 1-19. These disputed allegations are wildly at odds with a Final Cash Collateral Order.

§§ 1104 and 1112 separately. Thus, the Debtor will address each of Movants' alleged "cause,"

generally, and address differences between § 1104 and 1112 if and as they arise. No matter how

the Court addresses the allegations, there is no basis in either Motion for 1104 or 1112 relief.[7]

> **A.** **Debtor did not use cash collateral without authorization; even if it did so very early in the case, Access Point did not suffer any, much less substantial, harm.**

No matter what the parties agreed to procedurally in their final cash collateral settlement,

it's absurd that Access Point settled cash collateral on a final basis on March 22 but is still

insisting over two weeks later on terminating this case based on alleged *pre-settlement* cash

collateral violations. Debtor has two responses. First, as set out extensively in the Debtor's

March 14, 2021 Response (Dkt. 60), the Debtor did not use cash collateral without authorization

and, in all events, cured any alleged unauthorized use with the $25,000 equity infusion. Second,

even if the Debtor used cash collateral without authorization early in the case, there is no basis

for § 1112(b)(4)(D) relief because Access Point did not suffer any harm at all.

> **1.** **Debtor did not use cash collateral without authorization.**

Even if the disputed pre-settlement cash collateral violations are still relevant—they can't

be—the Debtor reiterates that it did not use cash collateral without authorization. On that point,

there is not much else the Debtor can add that it did not already address in its March 14

Response (Dkt. 60), other than as follows. First, the parties have now agreed, pursuant to their

settlement, that "[w]hile the parties have previously disagreed about the characterization of [the

---

[7] The Debtor also notes that Access Point convinced this Court that there is an emergency that initially justified shortening notice from the 21-day minimum notice requirement to barely 5-days' notice, with no other creditors to receive notice at all. The Court then ordered it be shortened from 21-days' notice to 19-days' notice, with only the Immediate Parties actually receiving notice. And then Access Point settled cash collateral subject to documentation, such that it affirmatively agreed that its interests would be well-served by letting an allegedly grossly incompetent Debtor remain in control for at least 13 or more weeks, such that it's now unclear what emergency justifies shortening notice at all or alienating notice to all but the Immediate Parties. It is even less clear why the UST, who sought relief after the settlement announcement, should be heard on 11-days' notice to no parties except the Immediate Parties.

$25,000], the Debtor and Access Point hereby stipulate that any payments made with [the $25,000] will be treated as being directly made by Balbir S. Gosal to the recipients of the payments and will not be considered as a payment into the estate." That resolution eliminates every dime of the alleged violations, leaving only the two issues that Access Point never raised and, per its Motion—*see* ¶16—is still not raising: utility payments and the sales tax payment.[8]

Second, and as to the utility payments, the Debtor moved, as a part of its Response (which was titled, in part, as a "Motion to Amend"), to amend the Interim Cash Collateral Order. Specifically, it requested that the Court "treat this Response as the Debtor's motion to amend the Budget attached to the Interim Order to include the omitted pre-petition § 506(c) utility amounts, to make the Interim Order consistent with the subsequent Utilities Order, and, thus, to avoid a contempt finding on the utilities . . ." Resp. at 56. That Motion was likely never heard or granted because it was tied to the Contempt Motion which was never formally heard on the merits and later ordered as withdrawn. Nevertheless, the Debtor reiterates its still-pending Motion and respectfully requests that the Court grant it. It is not an unreasonable request because (i) the main reason the utility payments exceeded the Budget was because the Debtor neglected, inadvertently, to include the pre-petition amounts in the Budget along with the post-petition amounts; (ii) the Court expressly permitted the Debtor to pay all pre-petition utility amounts by separate Order at Dkt. 36 at 2; and (iii) the payments were critical § 506(c) preservation costs.

---

[8] Access Point quotes extensively at ¶14 from the Debtor's response, pointing to the quoted materials as the Debtor having admitted to making payments in "excess of the budget amount[s] without seeking the approval of Access Point or the Court." See Mot. at ¶13-14. The UST makes the same allegation. *See* Dkt 91 at ¶13. That is simply not true. What the Debtor actually argued at the outset, which Movants ignore, is that "**_unless the $25,000 equity infusion that the Debtor received on February 26, 2021 placed the alleged budget overages outside the Interim Order_**, the Debtor likely violated the Order by failing to seek prior consent to incur those overages. The Debtor's argument is that the $25,000 equity infusion constituted unencumbered funds that are not cash collateral." Response, Dkt. 60 at 2 (emphasis added). Rather than admitting the violations, the Debtor pointed to the $25,000 as a complete defense to them.

Third, and as for the sales tax payment, those funds, as more extensively argued in the Response, were trust funds and, thus, not property of the estate under § 541. And therefore, those funds could not be cash collateral or subject to creditor or Court authorization.

### 2. In any event, Access Point did not suffer any, much less substantial, harm.

Access Point cannot get relief under §§ 1112 or 1104 for unauthorized cash collateral use unless it *also* carries its burden of establishing that it suffered ***substantial*** harm. *See* § 1112(b)(4)(D). Although the Debtor also rebutted that showing in its Response, at length—*see* Response at ¶ 64—Access Point has never even attempted to show any harm, much less substantial harm. Instead, its Motion merely states, without any explanation or support, that it "has experienced substantial harm due to the use of its cash collateral without authorization." Mot. at ¶ 50. How? The bottom line is that the Debtor has, since the Petition Date, strictly limited its expenditures to critical § 506(c) preservation costs: maintaining the flag that Access Point agrees is so critical; paying its employees; buying essential supplies; paying taxes; maintaining insurance; keeping its reservations provider paid; and paying utilities. Further, this is not a case where the Debtor used cash collateral to pay professional fees, intercompany claims, or insider compensation. Access Point is now *better* off than it was on the Petition Date.

### B. Debtor did not violate the Interim Order; even if Debtor violated it, this issue is subsumed by the issue of whether it used cash collateral without authorization.

The issue of whether to convert a case or appoint a Chapter 7 trustee for violations of court orders is the issue where this Court has the most discretion in determining cause. It is not an issue where all court order violations, no matter how significant or difficult to determine, require the Court to order § 1112 relief, *per se*. For the same reasons that the Debtor submits that it did not use cash collateral without authorization, it submits that it did not violate the Interim

Order. However, even if this Court determines that the Debtor did violate the Interim Order, the Debtor respectfully submits that a proper exercise of discretion dictates that § 1112 relief is only appropriate for that violation if the Court determines, as necessary under the prior issue, that Access Point suffered substantial harm from the violation. That is the case for three reasons.

First, it is critical to the integrity of the process that parties comply with all court orders. However, the appropriate sanction for a violation must vary based on the circumstances. Some orders, such as "file your tax return on or before April 15 or your case will be dismissed," are so black and white and beyond any reasonable dispute, that the sanction of dismissal is hardly up for debate. Other orders, such as "you're a year into your case and have failed to file the return after two prior orders—file the return by April 15 or your case will be dismissed and you'll be in contempt of Court," reflect black and white circumstances that also demand escalation against a party who is actively resisting. The circumstances surrounding the Interim Order are serious because compliance issues are always serious, but they are also neither black and white nor indicative of a debtor who is brazenly or repeatedly violating this Court's orders. Indeed, the issue of compliance here is complicated; is subject to a significant dispute and defense that have required extensive briefing and will require fact-intensive testimony; and involves an inexperienced Debtor whose alleged violation occurred early, is a common stumbling block, and has been cured, with the Debtor showing since March 14 that it is hyper-focused on compliance.

Second, unlike other types of court order violations, this particular alleged violation is of a type that is already contemplated by § 1112(b)(4)(D)—cash collateral violations. Thus, unless the Court determines that the Debtor violated the Order in an egregious or grossly negligent manner, § 1112(b)(4)(D) prescribes the materiality threshold for this alleged violation: convert the case or appoint a trustee only if the order violation caused Access Point "substantial harm."

In other words, § 1112(b)(4)(D) subsumes § 1112(b)(4)(E) for this alleged violation, such that the sole issue for § 1112 purposes is whether an unauthorized use caused substantial harm.

Third, Access Point has indicated to this Court via its final cash collateral settlement how this Court should calibrate the remedy if it determines that the Debtor failed to comply. That is, Access Point agreed that any future default, cash collateral termination, or related conversion or grant of stay relief should only occur under an order that provides for budget variances; less demanding reporting; higher-level category compliance; equity infusions (like the $25,000); notices of default; opportunities to cure; and opportunities to be heard. And those remedies would, definitionally, only be employed later in the case when the Debtor should be held to a higher standard of compliance. Further, Access Point agreed in the settlement that it would not pursue the Debtor or its principals for sanctions or contempt findings on account of the alleged violations or otherwise enforce its Contempt Motion. Thus, Access Point's conduct is inconsistent with a party who is now asking the Court to employ its most extraordinary remedies.

Unless the Court determines that the Debtor violated the Order in such an egregious manner that something more than a stern admonition is appropriate, the § 1112(b)(4)(E) compliance issue merges with the § 1112(b)(4)(D) usage issue as to the appropriate § 1112 outcome. As argued above, the absence of any harm makes § 1112 relief inappropriate.

### C. There are no substantial or continuing losses; even if there were, equity is committed to funding the Debtor through and beyond confirmation.

To start, the above judicial estoppel argument applies equally to Access Point's unsupported allegations about "substantial" or "continuing" losses or "diminution to the estate." If Access Point really has fears about "negative income," really thinks the Debtor is gambling "on the enterprise at Access Point's expense," and really thinks that there is diminution, then

why did it settle cash collateral in a manner that permits the Debtor to continue that "gamble" for at least 13 more weeks with additional renewals and address adequate protection of its interest for $17,000 per month when its discovery responses alleged that $27,028.48 is owed?

On the merits, there are no substantial or continuing losses, as Debtor and their expert, Richard Gaudet, will establish on April 6. For now, the Debtor points out that Access Point's "negative income" argument is based entirely on a misunderstanding of the Profit & Loss Statements that it quotes in its Motion. Even though it should be obvious on the face of the Statements, Access Point doesn't seem to understand that the Statements were formatted strictly for compliance with the weekly cash collateral reporting requirement, such that they only show *expenditures*. Revenues, which are essential for calculating whether there is negative income, are excluded from the Statements (although included in the Cash Collateral Budget Report, which Access Point is ignoring for some reason). For example, the Statement for February 3 to February 19 seems to show negative income of $68,945 for that period because the expenditures on an accrual basis for that period totaled exactly $68,945.80. *See* Dkt. 70-2 at 4 (Exh. B of the Motion) (which excludes all revenues and shows only expenses of $68,945.80). The Debtor encourages the Court and Access Point to read Mr. Gaudet's Expert Report at Trial Exh. D-28.

Even if Access Point could establish such losses—it can't—it has made no attempt to satisfy the second part of its burden to establish that there is an *absence* of a reasonable likelihood of rehabilitation. At most, it alleges that "the Debtor is operating at a loss and is not capable of producing sufficient income to reorganize"—a mere reformulation of its losses argument. As more particularly described in Mr. Gaudet's Expert Report, there is not only no *absence* of a likelihood of rehabilitation, but there is a more than reasonable likelihood of it.

First, and again, the Debtor is not operating at a loss and, in fact, is exceeding expectations. Second, RevPAR, the Debtor's key performance metric, has increased by 64% since the Debtor reopened the hotel in June 2020 and by 34% since January 1, 2021.[9] Third, the Debtor's revenue is closely and directly correlated with the airline travel industry, which will continue to recover as reported COVID cases decrease and vaccinations increase. Finally, the Debtor's projections assume that it can fully cash flow and fund a plan, on its own, by an increase from its current percentage of pre-pandemic revenues of 37% to a mere 50% of pre-pandemic revenues. Conservatively, it expects to be at a breakeven for operations *and* plan debt service (50% of pre-pandemic revenue) in Plan Year 1 (October 2021) and at stabilized operations providing excess cash flow for accelerated unsecured debt reduction (66% of pre-pandemic revenue) in or before Plan Year 2 (January 2022). Those factors are hardly gambles.

The *Moultrie* case cited by Access Point states it best: "The focus is whether the Debtor's business prospects justify continuance of the reorganization effort. This element can be satisfied by [the creditor] showing a debtor's ability to fund the case is highly uncertain." *Off. Comm. of Unsecured Creditors v. Moultrie (In re Moultrie)*, 586 B.R. 498, 506 (Bankr. N.D. Ga. 2018). Under that focus, there is a significant and dispositive difference between (i) a debtor who is late in its case, whose business model is permanently broken, and who has no access to alternative funding to float the debtor, on the one hand, and (ii) a debtor who is very early in its case, whose business model is overwhelming and historically sound even if temporarily distressed by extraordinary global macroeconomic conditions, and who *does* have access to alternative

---

[9] For the end of March, the Debtor was at $24.42 RevPAR. Subject to further vetting and adjustments, the Debtor's expert anticipates that the Debtor can, by October 2021, cover all plan payments and, by January 2022, start generating excess cash flow to pay down unsecured claims on an accelerated basis. Essentially, at $28 RevPAR, the Debtor is self-sufficient on all but the unsecured claims; at $31 RevPAR, the Debtor is paying $200K/year toward unsecured claims; and at $34 RevPAR, it is paying unsecured claims by $500K/year. Those are real and improving prospects for the Debtor.

funding, on the other hand. Access Point paints this Debtor as the former when, more than anyone else besides the Debtor, it knows that the Debtor is the latter.

Other than making inaccurate allegations about the Debtor's post-petition financial performance, Access Point makes no effort to explain why this historically very successful hotel—which it was willing provide over $11.4 million in financing to barely a year ago—doesn't deserve an opportunity to test its plan at confirmation and why, instead, it should be immediately liquidated in a Chapter 7 or drained of its precious resources by a Chapter 11 trustee who would destroy cash flow as a less qualified manager for the hotel. Further, Access Point ignores what it also knows to be the case: the principals of the Debtor are committed to funding and easily have the resources to fully fund the hotel pre- and post-confirmation until the Debtor completes its recovery, likely by early 2022.[10] Indeed, granting the Motion would be tantamount to a determination that *all* COVID-impacted hotels—even the better-recovering airport hotels—are not reorganization candidates and should be liquidated in a Chapter 7 out of the gate. Where is Access Point's *Moultrie* evidence that Debtor's "ability to fund the case is highly uncertain"?

The Debtor anticipates filing a plan as soon as possible after the bar date, and in all likelihood during the exclusivity period, that will propose to pay Access Point in full in compliance with § 1129, with more than sufficient creditor support no matter how Access Point votes, and with new value funding from the Debtor's principals to the full extent necessary to guarantee that the Debtor can feasibly make all proposed payments—funding that a Chapter 11 trustee would not have access to. Whereas a Chapter 7 or Chapter 11 trustee will guarantee that

---

[10] The Debtor's principals, who manage over a dozen hotels across the country, invested over $3 million of their own liquidity barely a year ago; continued to fund the hotel pre-petition when COVID was at its worst; provided $25,000 of funding post-petition; and, per the proposed final Budget, have committed to funding more than $126,000 more over just the next 13 weeks if necessary. The Debtor will send Chambers and the parties an unredacted version of the Access Point Underwriting Memo (Exh. D-10) so that the Court can see the financial resources that the principals have available for such new value.

Access Point is the sole beneficiary in any bankruptcy outcome, the Debtor and its principals are the only parties who can include other constituencies as plan beneficiaries, too. Thus, it's impossible for Access Point to prove on April 6 an *absence* of a likelihood of rehabilitation.

### D.  There is no actionable mismanagement, much less gross mismanagement.

For there to be gross mismanagement sufficient to justify extraordinary relief under § 1112, there must be evidence of "extreme ineptitude on the part of management to the detriment of the organization." *In re Mako, Inc.*, 102 B.R. 809, 812 (Bankr. E.D. Okla. 1988) (citing *In re Brown*, 31 B.R. 583 (Bankr. D.D.C. 1983). Similarly, "simple mismanagement" is not enough under § 1112 because "[s]ome mismanagement exists in every insolvency case." *Id*. This Court will determine if there is gross mismanagement based on extensive testimony from the Debtor's core management group: Baldev Johal, Balbir Gosal, Jamilette Caraballo, and Aly Leon. There is no amount of advocacy from Debtor's counsel, or sweeping but unsupported accusations from opposing counsel, that will substitute for the critical credibility determination that this Court will make after hearing from those witnesses for the very first time in this case. For now, counsel will simply state that they are confident that this Court will determine that there is no one—certainly not a Chapter 7 or Chapter 11 trustee—who is more immediately competent, reliable, and trustworthy to administer this case than the Debtor's core group, such that all that the Court will be left to consider as to "incompetence," "mismanagement," and "gross mismanagement" is whether the facts surrounding an early, isolated, and now cured, if not *settled*, cash collateral and § 549 dispute justify alienating equity's $3 million investment and displacing management.

Thus, the Debtor will focus on Movants' stated allegations so-far.

1. **Section 341 Meeting testimony is not an indicator of gross mismanagement.**

A § 341 Meeting—especially the one in this case—is a poor, and certainly not dispositive, indicator of whether the Debtor, *as a whole*, is incompetent or mismanaged, much less grossly mismanaged. That is the case for a host of reasons: (i) it requires a single representative to answer every conceivable and inconceivable question that the UST and creditors might ask, ranging from the very high level down to the very low level; (ii) unlike a Rule 30(b)(6) deposition, the representative has no ability to split up those potential topics among multiple corporate representatives with specific knowledge of them and, for that matter, is under no legal obligation to engage in extensive preparation for such impossibly broad topics; and (iii) the representative is required to submit to the examination under oath and navigate the treacherous tension between perjuring himself and being a cooperative, all knowing witness.[11]

2. **The Pre-Petition payments, if any, are not indicative of gross mismanagement and, further, do not provide any other cause for relief under §§ 1104 or 1112.**

The evidence will show that, to the extent that the Debtor paid any pre-petition expenses, (i) all of those payments occurred very early in the case based on, at worst, a one-time communication problem that has been cured; (ii) the most significant of those payments were utility payments that this Court expressly authorized to be paid[12] or a turnover of trust fund tax

---

[11] The 341 Transcript speaks for itself, but Mr. Johal knew that YC Fernley owns the Debtor and that he, Mr. Gosal, and Ranjit Johal owned Fernley; didn't know the *precise* street address of one of his 12 or so hotels; testified that he understood that all licenses and permits were current to his knowledge (even if he couldn't identify of the top of his head the local licenses and permits that his staff had already provided to the UST at the IDI); didn't know the exact number of employees off the top of his head (even though all of such info had been disclosed in the Schedules, the Employee Motion, and IDI package); knew that there was a long-term month to month restaurant tenant but didn't remember its exact name legal name (in response to a series of questions that was nearly inscrutable); and testified rather practically that it didn't make sense to spend a few hundred dollars to crack a safe that likely had less than that in it. The 341 Transcript shows an honest and earnest witness who was worried about the hazard of guessing.

[12] *See* Utilities Order at 36.

receipts that were not even § 541 estate property; (iii) a number of them were in connection with invoices issued post-petition for pre- and post-petition expenses (which is an understandably confusing delineation for a non-lawyer or inexperienced debtor); (iv) all of the expenditures were reasonable and necessary § 506(c) expenditures; (v) the Debtor made § 549 demands on all of the recipients, with all or virtually all of the recipients agreeing to either return the payments to the Debtor or apply them to post-petition invoices instead; and (vi) the Debtor did not purposefully flout the Rules, did not receive "repeated" contrary instructions from its counsel, and does not have a propensity to make any unauthorized payments going forward.

Whether unauthorized payments provide cause under §§ 1104 or 1112 depends on the circumstances surrounding the payments. A reckless disregard for the rules, after repeated payment problems or a single warning from the Court is one thing. Otherwise, extraordinary §§ 1104 or 1112 relief is inappropriate for one-time payment mistakes that the debtor attempts to cure or for payments that are not egregious or not continuing. *See In re BAJ Corp*., 42 B.R. 595 (Bankr. D. Conn. 1984) and *In re Lively*, 266 B.R. 209 (Bankr. N.D. Okla. 1998) (each suggesting payments of pre-petition debts don't have to be the end of the world for a debtor and don't suggest incompetence or gross mismanagement *per se* as long as they don't continue and actions are taken to remedy them, especially if a harsher remedy would damage the estate and hurt other creditors). The Court's discretion is too broad for a *per se* approach.

### 3. The only credible or imminent threat of the Debtor losing the Clarion franchise is when a trustee appointment triggers a default under the Franchise Agreement.

The only evidence that will be available on April 6 is that the Debtor is on good terms with Choice; that it worked out a pre-petition payment arrangement that, based on preliminary discussions between Choice's counsel and Debtor's counsel as recently as March 31 2021, will likely form the basis of a § 365 assumption of the Franchise Agreement; and that there are no

issues with the PIP and certainly no issues that the Debtor and its principals can't fully fund. Mr. Gosal and Mr. Johal are happy to answer any questions about the flag and the PIP.

Thus, Access Point's PIP argument amounts to nothing more than a misinformed, unsupported, and premature scare tactic about remotely possible *future* gross mismanagement. Ironically, the most likely threat of losing the flag is from the ownership change and, thus, Franchise Agreement default, that would arise from a Chapter 7 or Chapter 11 trustee appointment. Choice chose to partner with the Debtor and its principals, not a third-party trustee.

### 4. Access Point has not amended its Motion to remove its false PPP allegation.

As additional gross mismanagement, Access Point alleged, with minimal if any due diligence, that the Debtor obtained a PPP loan, failed to disclose the PPP loan on its schedules or the funds in its cash collateral budgets, and "[p]resumably" "spent" the funds. Dkt. 70 at ¶31. Essentially then, Access Point and its counsel accused the Debtor and its principals of having committed bankruptcy crimes, bank fraud, and crimes against the United States, all without reaching out to the Debtor or its counsel to confirm the facts. Counsel reached out to Access Point before the March 19 hearing to notify it of the actual facts, but the allegations persisted into the March 19 hearing. The allegations were proven to be false at the March 19 hearing and Access Point's counsel represented to the Court that it would withdraw the false allegations from its Motion. However, over two weeks later, the false allegations remain on the docket.

### 5. Except for a minor typo, the Debtor has never misrepresented its personnel.

The UST alleges that it "appears that the Debtor misrepresented personnel facts and related expenses." Dkt. 91 at ¶27. That is simply not true. As counsel already explained last week and in its March 26 memo to the UST, counsel mistyped when it explained that Ms. Leon is an employee of The Kishan Group and the Debtor directly. Counsel meant to type that she is an

employee of The Kishan Group *rather* than the Debtor directly. Ms. Caraballo is happy to explain to the Court what appears to be the UST's misunderstandings about payroll reporting.

### E. The so-called "Unexplained Financial Transactions," which the Debtor explained on March 26, do not provide cause for relief under §§ 1112 or 1104.

It is unclear from the UST's Motion if the UST is seeking relief for the so-called "Unexplained Financial Transactions." Is the UST suggesting that the Debtor has failed to timely "provide information" to the UST that the UST "reasonably requested" under § 1112(b)(4)(H)? Is the UST suggesting, under § 1112(b)(4)(F), that there is an "unexcused failure to satisfy timely any filing or reporting requirement" under the Code? We really can't know because the UST's Motion contains many sweeping statements and accusations that are not tied to any specific hook under §§ 1112 or 1104. In any event, the Debtor submits that, just as it promised it would at Dkt. 88, it submitted an extensive and thorough memo to the UST on March 26 that explained each and every one of the 22 transactions (*see* Trial Exh. D-25), a memo which supplemented the candid and near daily explanations that the Debtor and its counsel have tirelessly provided to the UST since the Petition Date. Rather than initiate any formal discovery requests under Rule 2004 or otherwise, the UST has inundated the Debtor and its counsel since the Petition Date with question after question after question. The Debtor has answered them. The Debtor also amended its Schedules and Statements on April 2 and 5. The Debtor will file a Supplemental Status Report before the trial that outlines and explains each amendment.

**IV.    Neither Conversion Nor Appointment is In the Best interests of Anyone, Including the Debtor, Access Point, Other Creditors, and Equity.**

The Debtor reserves its right to establish at trial the exceptions provided under § 1112(b)(2) regarding "unusual circumstances" (COVID-19),[13] the reasonable likelihood of plan confirmation (see above), the reasonable justification for the instant circumstances (an earnest but inexperienced Debtor), and how all of the alleged "cause" has been cured or will be cured in a reasonable time (see above). For now, the Debtor emphasizes what should be beyond dispute, even for Access Point and the UST: liquidating, or alienating equity and management of, a Debtor who is already well on its way to recovering from the Pandemic—its nearly exclusive cause of distress and reason for seeking bankruptcy protection in the first place—would be an unmitigated disaster for all involved. Unless this Court has no faith in this Debtor after the evidence closes, this case should continue to confirmation in or about mid-2021, whereat the Debtor anticipates proposing to pay Access Point in full, with more than sufficient new value.

**CONCLUSION**

For all of the above-stated reasons, and based on the evidence that the Debtor will present on April 6, the Debtor respectfully requests that this Court deny the two Motions.

Respectfully submitted this 5th day of April, 2021.

STONE & BAXTER, LLP
BY:
/s/ *David L. Bury, Jr.*
Ward Stone, Jr.
Georgia Bar No. 684630

---

[13] The central unusual circumstance that is not common to Chapter 11 debtors, generally, even if it is immediately common to them on a temporary basis, is the COVID-19 pandemic. That is an unprecedented circumstance that is completely outside of the Debtor's and others' control. If it is not recognized, as it should be, as an unusual circumstance, then the only other alternative is to conclude that all Chapter 11 debtors whose distress and cause for filing is the Pandemic should have their right to seek reorganization alienated in favor of an immediate liquidation or Chapter 11 trustee appointment. That can't possibly be the right answer or in the best interests of the Debtor and its creditors.

David L. Bury, Jr.
Georgia Bar No. 133066
Thomas B. Norton
Georgia Bar No. 997178

577 Mulberry Street, Suite 800
Macon, Georgia 31201
(478) 750-9898; 478) 750-9899 (fax)      Counsel for Debtor
wstone@stoneandbaxter.com
dbury@stoneandbaxter.com
tnorton@stoneandbaxter.com

G:\CLIENTS\YC Atlanta Hotel, LLC\Motion to Convert\Response to Conversion Motions (04.01.21).docx

## CERTIFICATE OF SERVICE

This is to certify that on this date I served a copy of the forgoing *Response* using the

CM/ECF system, which system sent an electronic notification of and a link to a copy of the

*Response* on all parties who are participating in this case via CM/ECF.

This 5th day of April, 2021.

*/s/ David L. Bury, Jr.*
David L. Bury, Jr.
Georgia Bar No. 133066

Stone & Baxter, LLP
577 Mulberry Street, Suite 800
Macon, GA 31201
(478) 750-9898; (478) 750-9899 (fax)
dbury@stoneandbaxter.com      Counsel for Debtor