UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| | : | |
| YC ATLANTA HOTEL LLC, | : | Case No.  21-50964-BEM |
| | : | |
| Debtor. | : | |
| | : | |

**DEBTOR'S RESPONSE TO ACCESS POINT FINANCIAL'S LIMITED RESPONSE TO DEBTOR'S STATUS REPORT REGARDING CASH COLLATERAL**

The Debtor responds to the *Limited Response* (Dkt. 124) filed by Access Point so that the Court has both parties' position on the status of cash collateral, respectfully showing:

1. On April 1, the Debtor filed its *Status Report*. Dkt. 112.

2. Candidly, there were issues regarding the negotiation of the final order and which later resulted in a failed settlement. However, except for a single reference,[1] the Debtor very purposefully, and in good faith, omitted those issues from the Status Report.

3. Rather, the sole purpose of the Status Report was to raise an issue that neither party anticipated and which, as the Court indicated on April 6 at the hearing, the Court assumed the parties had worked out without the need for Court assistance—that issue being what, if any, cash collateral authority the Debtor had while the parties finalized the order.

4. Concerned by late afternoon on April 1 that the settlement might collapse, the Debtor was candid in its Report about four limited matters: (i) Debtor had proposed a one-week

---

[1] The Status Report indicated that the Debtor was still optimistic that the parties could agree on a final order by April 6 without needing intervention on the issue of interim usage while the parties finalized the order. The Debtor did suggest that "irresolvable issues related to and arising in connection with the March 29 Chapter 11 filing of the Debtor's parent—YC Fernley Hotel LLC (Case No. 21-52543)" might necessitate intervention. So as to protect fragile negotiations, the Debtor didn't elaborate. Dkt. 112 at ¶16.

1

interim gap Budget without a response from Access Point despite a follow-up from the Debtor; (ii) Debtor sought authority to complete an elevator repair which Access Point rejected pending the negotiations; (iii) Debtor sought authority to complete a fire alarm repair which Access Point ignored; and (iv) Debtor had essentially frozen all expenditures during the uncertain gap period other than making the March 26 payroll and making some small dollar but essential purchases.

5. In short, the Debtor raised the interim usage issue, only, while keeping the other issues off the docket, optimistic that the parties might be able to spare this Court from another barrage of accusations in a case that was already overrun with them. The Debtor even kept all of those issues out of its April 6 *Brief in Response* (Dkt. 128), still laboring under its optimism that the parties would work out their issues privately.

6. Unfortunately, Access Point decided that airing the parties' grievances on the docket was appropriate. Thus, the Debtor has no choice but to respond.

7. First, some critical background that Access Point leaves out of its Response which, in substantial part, threw an otherwise good faith settlement into disarray:

- In the afternoon on March 19 (following the status conference), Graham Stieglitz reached out to David Bury about resolving the March 22 hearing on cash collateral.

- In that conversation, which was friendly and productive, Mr. Stieglitz emphasized the parties' so-far, and counsel quotes, "good faith" discussions.

- Following late night negotiations that carried over through the morning on Saturday, the parties reached a settlement subject to documentation. As a part of that settlement, Access Point insisted on the Debtor releasing Access Point from all claims and defenses, without any reference to the timing of such claims—a blanket release. In fact, the settlement terms reflect almost every possible creditor-friendly condition that this Court could have granted after a hearing on the merits and then some.

- On March 22, the parties announced to the Court the general settlement terms.

2

- However, on March 23, through blind luck, Debtor's counsel learned,[2] without disclosure from Access Point, that Access Point had submitted an advertisement dated March 19—the same day the parties thought they were discussing settlement in "good faith"—to auction the 100% membership interest in the Debtor held by YC Fernley Hotel LLC ("**YC Fernley**"). A copy of the ad is attached at Trial Exh. D-21.

- Specifically, Access Point scheduled the auction for April 9 at 1 p.m. via a Zoom meeting to be conducted from Burr & Forman's Atlanta office (i.e., three days after the already-scheduled April 6 hearing).

- Daily Dac accepted and published the March 19 advertisement on Sunday March 21; sent an email subscription blast about the auction to all of its subscribers on March 23; and ran the ad on its website through March 29 or 30.

- It cancelled the ad on or shortly after March 29, the date that Debtor's counsel informed Access Point's counsel about YC Fernley's March 29 bankruptcy filing.

- To be sure, neither Access Point nor its counsel ever told the Debtor or its counsel about the pending auction, including, most disappointingly, during the weekend settlement discussions that would have had the Debtor releasing all claims against Access Point, including any claims in connection with the April 9 auction. It also never told the Debtor or its counsel about the auction while the parties spent the week of March 22 working out the form of a final order and 13-week budget.

- Further, neither Access Point nor its counsel informed the Court of the pending auction when it announced the settlement on March 22, even though Access Point and its counsel (i) knew they had submitted the ad during the Friday negotiations; (ii) knew the ad was running as early as March 21, (iii) knew the ad was running during the March 22 hearing, all unbeknownst to the Debtor and all other parties; (iv) knew that a final cash collateral order was forthcoming which the April 9 auction would likely alienate, at least for the Debtor and its principals; (v) knew that the settlement would require the principals of the Debtor to fund a $28,000 payment[3] just days before they'd lose their $3 million ownership interest in and control of the Debtor; and (vi) knew that the release provisions in the order, which would have been entered prior to April 9, would likely shield them from any claims arising from the auction.

---

[2] A Stone & Baxter attorney who is not assigned to this case opened an email subscription invitation from www.DailyDac.com on March 23 and tried it out. The first thing he noticed was an auction advertisement by Burr & Forman for Access Point, advertising a UCC auction for YC Fernley Hotel LLC's 100% membership interest in the Debtor. He knew enough about this case to know to alert his colleagues.

[3] Mr. Johal or Mr. Gosal would have wired the first adequate protection payment directly to Access Point from their personal funds. Thus, if the auction had gone through, Access Point would have been able to not only take all of its cash collateral in its capacity as, using Mr. Stieglitz's term, the "residual owner" of the Debtor, but *also* get an extra $28,000 freebie from the alleged guarantors of the Debtor's obligations.

3

- On April 1, Mr. Bury spoke to Mr. Stieglitz and Valerie Richmond. Specifically, Mr. Bury expressed the Debtor's reservations about entering into a global cash collateral resolution in the face of a pending auction, particularly given that Access Point negotiated that resolution without revealing the auction (that it had scheduled during that negotiation); given that an April 9 auction would transfer all control of the Debtor and the case from existing management and equity to a creditor whose goal was to defeat the case; and given that the cash collateral resolution required a sweeping release of Access Point.

- The advertisement is drafted in a manner that, without any prior stay relief from this Court, places a demand on the Debtor (defined as the "Borrower" in the ad) to pay Access Point in full to avoid the auction. It states as follows:

  Until the earlier of (1) the effectuation of the public sale of the above described Collateral or (2) the execution of a contract for the sale of the Collateral, Borrower [defined as "YC Atlanta Hotel LLC"] shall have the right to redeem the Collateral by payment or fulfillment of all obligations under the Notes, together with payment of all additional expenses incurred by Secured Party. The Borrower is entitled to an accounting of the unpaid indebtedness owing by Borrower to Secured Party which accounting may be obtained free of charge by contacting counsel for the Secured Party per the above."

- Access Point's counsel indicated to Debtor's counsel on April 1 that auction notices addressed to the Debtor were placed in the mail on March 29, 2021. By all accounts, Access Point preferred to nail down a final cash collateral order by Friday, March 26 before mailing out the notice of the April 9 auction on March 29.

8.  Second, there are allegations in the Response about what caused the settlement to fail. Of course, anytime a settlement fails, one side almost always blames the other side. Here, Access Point decided to lodge that blame on the docket and with this Court, alleging that, while it "worked diligently to resolve the cash collateral issues," the "Debtor attempted to make a material departure from the agreed upon terms of the agreement and would not agree to be bound by its original terms." Dkt. 124 at ¶2. Similarly, it alleges that "Debtor *wrecked* the finalization efforts of the proposed cash collateral order . . . by materially altering the terms of the parties'

4

agreement related to the use of cash collateral." *Id*. at ¶ 10 (emphasis added).

9.  On the one hand, those allegations are not only untrue, but they're also so inflammatory that they demand a detailed response. On the other hand, the Debtor is confident that the Court has no interest in any more of a blow by blow than it has already gotten.

10. Thus, the Debtor will simply state that it and its counsel tried to restore lost confidence among the parties after learning about the April 9 auction and to resurrect the settlement—it even offered on April 5 to let the auction issue go and move on—but it didn't work. The parties' correspondence, which the Debtor will keep off the docket, speaks for itself.

The parties do agree on one thing, at least, which is that a final hearing on cash collateral is necessary. That said, the Debtor states for the record that it is still perfectly willing, like it was late in the evening on April 5, 2021, to return to the announced cash collateral arrangement.[4]

Respectfully submitted this 21st day of April, 2021.

STONE & BAXTER, LLP
BY:

/s/ *David L. Bury, Jr.*
Ward Stone, Jr.
Georgia Bar No. 684630
David L. Bury, Jr.
Georgia Bar No. 133066
Thomas B. Norton
Georgia Bar No. 997178

577 Mulberry Street, Suite 800
Macon, Georgia 31201
(478) 750-9898; 478) 750-9899 (fax)       Counsel for Debtor
wstone@stoneandbaxter.com
dbury@stoneandbaxter.com
tnorton@stoneandbaxter.com

---

[4] The Debtor and Access Point have agreed on a final form of order for the interim usage through April 23, but still need one more consent before the Debtor can upload the Order.

## CERTIFICATE OF SERVICE

This is to certify that on this date I served a copy of the forgoing *Response* using the CM/ECF system, which system sent an electronic notification of and a link to a copy of the *Response* on all parties who are participating in this case via CM/ECF.

This 21st day of April, 2021.

/s/ *David L. Bury, Jr.*
David L. Bury, Jr.
Georgia Bar No. 133066

G:\CLIENTS\YC Atlanta Hotel, LLC\Motion to Convert\Response to Response (for upload 04.21.21).docx