

**IT IS ORDERED as set forth below:**

**Date: May 19, 2021**

_____

**Barbara Ellis-Monro**
**U.S. Bankruptcy Court Judge**

_____

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| IN RE:<br><br>YC Atlanta Hotel, LLC,<br><br>     Debtor. | CASE NO. 21-50964-BEM<br><br>CHAPTER 11 |

## ORDER DENYING APPOINTMENT OF A CHAPTER 11 TRISTEE AND APPOINTING AN EXAMINER

On March 18, 2021, Access Point Financial, LLC ("APF") filed an *Emergency Motion to Convert to Chapter 7 or, in the Alternative, to Appoint a Chapter 11 Trustee* [Doc. 70] in the instant case.[1] Subsequently on March 24, 2021, the United States Trustee ("UST") filed a *Motion for Appointment of a Chapter 11 Trustee or in the Alternative Conversion to Chapter 7* [Doc. 91] (together, the "Motions" filed by the "Moving Parties"). Debtor filed a *Response in*

---

[1] APF amended its original *Emergency Motion to Convert to Chapter 7 or, in the Alternative, to Appoint a Chapter 11 Trustee* on April 5, 2021. [Doc. 125].

*Opposition to the Motions to Convert or Appoint A Chapter 11 Trustee* on April 5, 2021 (the "Response") [Doc. 120].

On April 6-8, 2021, the Court held an evidentiary hearing on the Motions  limited to the topic of appointment of a Chapter 11 Trustee. Continued evidentiary hearings were held on April 23 and 26 which considered all requests for relief in the Motions. Debtor, APF and the UST (the "Parties") submitted evidence at each of the Hearings and presented closing arguments on April 28, 2021. The Small Business Administration ("SBA") attended each day of the hearing and argued its position with respect to the Motions on April 28, 2021.  After careful consideration of the documents and testimony admitted into evidence[2], the argument of counsel and the record in this case, for the reasons set forth below, the Court denies the Motions, but directs the appointment of an examiner pursuant to 11 U.S.C. § 1104(d).

## I.    FACTS

### a.    Background

Debtor YC Atlanta Hotel, LLC ("Debtor") was formed in 2019.  Its members are Mr. Balbir Gosal and Mr. Baldev Johal ("Mr. Gosal" and "Mr. Johal", are together, the "Managers").  Debtor is wholly owned by YC Fernley Hotel, LLC[3] ("YC Fernley") which is owned by the Managers and Mr. Ranjit Johal ("Mr. R. Johal"), Mr. Johal's brother[4].  Testimony

---

[2] The following exhibits were admitted into evidence: APF exhibits 1-4, 6, 7, 12, 16, 18-22, 24, 31, 33, 34, 37, 39, and 1001; Debtor's exhibits 1, 2, 6, 7, 9-20, 22-25, 29, 32-35, 32-37, and 40; UST exhibits 14, 15, and 18-20. (Exhibits will hereafter be referred to as, "APF Ex.", "D. Ex." and "UST Ex.".)  The Parties stipulated to admission of the following additional exhibits: D. Exs. 3, 4, 38, 41, 42 and UST Ex. 17.  The exhibits admitted are set forth at Doc. 142.

[3] The Court takes judicial notice that YC Fernley filed its own chapter 11 case on March 29, 2021, no. 21-52543, after APF began to foreclose YC Fernley's member interests which are pledged to APF.

[4] The Court issued an oral ruling on Debtor's objection that Ms. Leon's testimony about the discussions with counsel surrounding the preparation of the Original Schedules was privileged because Ms. Leon was Debtor's agent or the functional equivalent of an employee of Debtor and, as a result, the attorney client privilege protected those conversations.  The Court, in ruling, incorrectly stated that Mr. R. Johal was Mr. Gosal's brother. In fact, Mr. R. Johal is Mr. Johal's brother. The Court corrects that statement in the oral ruling pursuant to Fed.R.Civ.P. 60(a).  In all other respects the ruling is unchanged.

established that the Managers, Mr. R. Johal and Lakhvir Sodhi ("Ms. Sodhi" and collectively, the "Core Group"), in various arrangements of the individuals and through several different entities, own 12-14 hotels.  Many of the hotels are owned by single asset LLCs and comprise the YC group[5] of entities. The Kishan Group ("TKG") which is owned by Mr. R. Johal, his wife Berinda and Ms. Sodhi, who is Mr. Gosal's partner, also owns two hotels.  The Core Group has been in the hotel business for approximately 20 years, with TKG having been formed in 2002. Each of the Managers and Mr. R. Johal testified that the Core Group has been successful in buying and operating hotels for 20 plus years, has won awards for best franchisee and has successfully completed approximately 12 property improvement programs ("PIP"). In addition to the YC group of companies, LaTrobe Management ("LaTrobe"), which was formed in 2019, provides day to day accounting services to many, if not all, of the entities, including Debtor.[6]  The Core Group manages its hotels through these two entities, TKG and LaTrobe.  Debtor, TKG, LaTrobe and the Core Group's other entities will be referred to, collectively, as the "Enterprise Entities".

Mr. Gosal, Mr. Johal and Mr. R. Johal all testified and described the relationship between TKG and the other Enterprise Entities. Mr. Gosal characterized the relationship as like a big brother little brother relationship where the big brother helps the little brother in terms of various expertise that is used for all Enterprise Entities.  Mr. Johal described the relationship as one that developed as a partnership and at any given time some are ahead and some are behind but that it will wash out and there will be success overall long term.  Mr. R. Johal testified that TKG was the first company and the YC group came later, but that the Enterprise Entities are all

---

[5] The YC entities identified at the hearing are as follows: Debtor, YC Anchorage, YC Coconut Grove, YC Fairbanks, YC Fernley, YC Juneau, YC Pemberley, YC Rivergold, YC Seward, and YC Texas. These names may be shorthand, but represent separate entities that own hotel property in various locations across the United States. Reference was also made to TKG Executive Suites and Gosal Inv., LLC however the evidence did not show if either of these entities own hotel properties.
[6] LaTrobe is owned fifty percent (50%) by Mr. Gosal and fifty percent (50%) by Shaan Johal, Mr. Johal's nephew.

interconnected with the same team managing all the properties.  He further testified that members

of the Core Group have a great deal of trust in each other, and transactions are based on this trust.

Debtor bought the property located at 1418 Virginia Ave., College Park, GA 30337

(the "Property") on November 15, 2019.  The purchase price for the Property, which at the time

was branded as the Red Lion Hotel®, was financed largely by two loans from APF in the amounts

of $9,236,000 for the Property and $2,200,000 for furniture, fixtures and equipment as well as a

PIP renovation in conjunction with changing the brand of the hotel to a Clarion Hotel®, a Choice

Hotel® franchise. [APF Exs. 4, 22]. The Managers also paid $3,600,000 toward the purchase price

in large part by way of: (1) a 1041 exchange in which YC Fernley sold its only asset – raw land in

Nevada, and (2) transfers into Debtor by YC Rivergold and YC Pemberly in the amounts of

$735,000 and $300,000 respectively.  Mr. Johal, who provides the financial analysis regarding

properties to purchase, testified that the Property generated revenue of $400,000 a month year over

year and that it was, in his estimation, a very good investment.  The Property's yearly revenue

prior to purchase and prior to the COVID-19 pandemic was approximately $4.7 million.

After the purchase, the hotel was not operational, or minimally operational, in

January 2020 due to the PIP renovations.  In March and April of 2020, the Property was required

to close because of the COVID-19 pandemic and local emergency orders.  Each of the Managers

and Mr. R. Johal testified that they had never experienced anything like the pandemic and that they

were in "survival mode" during 2020.  Debtor's revenue is tied completely or almost completely

to air traffic at Atlanta Hartsfield-Jackson International Airport.  Air travel declined between 60%

and 70% during the pandemic.

Jason Weir ("Mr. Weir") is the general manager of the Property.  Mr. Weir has 28

years of hotel experience, but this is his first general manager position.  Mr. Weir was employed

as front office staff at a Hyatt® property prior to working in the front office of the Red Lion Hotel® and then becoming general manager at the Property. He has been employed by Debtor since November of 2019 but has only been the general manager since June of 2020. His daily duties include maximizing revenue, reviewing budgets, taking and securing occasional cash and check payments, managing nineteen full-time employees[7], and managing housekeepers[8] and engineers. He has had to balance the issues presented with COVID-19 and ongoing renovations during his tenure.

During March and April, the Managers pursued all options for funding available, including paycheck protection loans and disaster relief loans offered by the SBA.  On April 20, 2020, Debtor received $161,000 through the paycheck protection program funded by the SBA ("PPP"). [UST Ex. 15]. On May 27, 2020 Debtor received a disaster relief loan ("EIDL") from the SBA. Ms. Aly Leon, an employee of TKG, testified that the PPP loan was used one hundred percent (100%) for payroll and has been forgiven. The SBA obtained a second position lien on account of the EIDL and is listed in Debtor's amended schedules with a $150,000 debt secured by a second position lien against the Property.  [D. Ex. 29, p. 11, 12].

Ms. Wimmer, APF's representative, testified that Debtor has not made any payments since March 31, 2020.  Debtor entered into a forbearance agreement with APF which was effective on April 1, 2020 but executed by the Managers on July 8, 2020.  The first amended forbearance agreement effective July 1, 2020 was executed on September 21, 2020.  Each of the forbearance agreements allowed Debtor to cease interest payments on the amounts owed to APF, but still required principal payments be made. The amended agreement expired on September 30,

---

[7] Mr. Weir testified that this number changes frequently and that he would like to hire more staff.
[8] Mr. Johal testified that, at present, Debtor does not employ housekeeping staff, but uses a service provider to staff these positions.

2020. [APF 20]. Each of the forbearance agreements state that Debtor does not have resources sufficient to make payments as and when they come due.  In November 2020, the APF mortgage loan matured and demand was made on Debtor. On January 21, 2021, APF sent a ten-day attorneys' fee letter[9] for both loans to Debtor. [APF Ex. 39]. The evidence showed that the letter was delivered to Debtor on January 22, 2021. The Managers were not immediately aware of the receipt of the correspondence. Thus, the bankruptcy case was filed on an emergency basis and preparations for filing were rushed.

### b.  Intercompany Relationships and Transfers

TKG and Debtor have the same office address in Reno, Nevada and Debtor's records are kept at that office. TKG provides some services to Debtor in the form of mentoring and training of Mr. Weir by Mr. R. Johal, who has substantial experience in business management. TKG also provides liaison services for the Managers to request and record intercompany transfers. Ms. Jamilette Caraballo ("Ms. Caraballo"), the supervising accountant[10] at LaTrobe, testified that the Managers make intercompany transfer requests by email, usually sent to TKG and then forwarded to her, but occasionally sent directly to her. Once such an email is received, Ms. Caraballo confirms it by including it in an intercompany transfer ledger and submitting the request to Ms. Leon, if a check is to be printed or, to Ms. Sodhi to make the transfer.  Ms. Sodhi has access to the Enterprise Entities' accounts and is a signatory on the debtor in possession ("DIP") bank accounts as she was on Debtor's prepetition bank accounts.  Mr. Gosal testified that Ms. Sodhi reviews all accounts payable and has identified instances of improper requests for payment. Mr. R. Johal testified that Ms. Sodhi has operational experience in the hotel industry which is valuable

---

[9] O.C.G.A § 13-1-11 provides that if a note provides for attorneys' fees, then upon notice and the failure to pay the obligation in full within ten days attorney's fees are collectible as part of the debt owed.

[10] Debtor also works with a CPA and on occasion Ms. Caraballo will ask the Debtor's CPA questions about booking certain items.

in finding any such improper invoices. Mr. Gosal testified further that Ms. Sodhi is very good at managing this process and provides exceptional oversight and administrative assistance to Debtor. Further, if Mr. Weir or Ms. Caraballo is unable Mr. Gosal to approve a large transaction the request is sent to Ms. Sodhi.

TKG, through Ms. Leon, works closely with Mr. Gosal as a liaison between the Managers and various parties including Mr. Weir, Debtor's bank and certain lenders. In this capacity she worked with Wells Fargo Bank to remove the administrative hold on Debtor's accounts and to open its DIP accounts.  Ms. Leon also assisted Debtor with information from governmental agencies regarding PPP loans and EIDL loans and assisted Debtor with its PIP loan. Additionally, Ms. Leon allocates Home Depot charges occurring on the two accounts used by the Enterprise Entities among all the entities based upon which location received the goods or services purchased. Ms. Leon provides services to other Enterprise Entities as well.  Neither Ms. Leon nor Ms. Caraballo has any authority to make decisions for Debtor and neither has signing authority. There is no contract between Debtor and TKG, and TKG does not receive any compensation for any of the services it provides to Debtor.

LaTrobe employs four accountants as well as Ms. Caraballo, and as previously stated, LaTrobe provides accounting services to Debtor and other Enterprise Entities.  Ms. Caraballo and Mr. Weir testified that they speak daily to discuss expenses that need to be paid for the Property. Mr. Gosal testified that LaTrobe also provides management services through him and his work with the PIP and that these services are not traditionally included in a management fee charged by a management company. In contrast to TKG, LaTrobe has a contract with Debtor. The Management Agreement, entered into on November 14, 2019, has a ten-year term, unless otherwise terminated by either party, and an evergreen provision for yearly extensions thereafter

unless otherwise terminated. Through the agreement, the Managers of Debtor granted LaTrobe sole and exclusive right to operate, direct, manage and supervise hotel operations without interference. LaTrobe also acts as an agent of Debtor, with duties that include: 1. managing the hotel in an economical and efficient manner; 2. paying bills and taxes; 3. administering hotel policies and providing general accounting functions; 4. hiring, firing, and paying employees; 5. establishing room rates; 6. negotiating and entering into contracts and agreements on behalf of the hotel owner; 7. renewing permits and licenses; 8. procuring operating equipment and supplies; 9. making/installing normal and capital repairs, rebuilds, replacements, and improvements. [D. Ex. 32]. For its services, LaTrobe was to be paid an amount equal to 5% of each applicable month's gross revenues, which would be paid in arrears. *Id*. Mr. Weir testified that he hires and fires employees and Mr. Gosal testified that room rates are set by various methods. Thus, it appears that LaTrobe does not perform all of the services set forth in the agreement.  Further, Debtor's pleadings state that TKG provides management services to Debtor. [Ex. D 29, p. 43].

### c.  Payments to LaTrobe

Ms. Caraballo and Mr. Gosal testified about payments made to LaTrobe during the period from November 2019 through December 2020. According to Debtor's exhibit 33, during that time, Debtor paid Latrobe $59,589.45 on account of the management fee on revenue of approximately $1.6 million.  Debtor also paid LaTrobe $55,000 for accounting services. [D. Ex. 33].  Thus, in the year prior to filing, Debtor paid LaTrobe $114,589.44. [D. Ex. 29, 33]. Mr. Gosal and Ms. Caraballo both testified that payments to LaTrobe were made based on the circumstances presented by COVID-19, and that the agreed upon 5% management fee was reduced to 4%,[11] as the parties believed the dramatic change in anticipated versus actual revenues required an

---

[11] The management fee payments shown on Debtor's exhibit 33 are calculated based on the 4% rate on revenue of $1,600,000. Fifty-nine thousand dollars is 3.7% of $1,600,000.

adjustment. Ms. Caraballo testified that any reference to a 5% fee in filings or exhibits submitted by Debtor reflects what LaTrobe should have been paid but was not. Indeed, instead of receiving an anticipated $235,000 for services in a normal year, LaTrobe was not paid any amount until June 2020 and accepted less based on the extraordinary circumstances. The one percent (1%) reduction in the management fee, based on Debtor's income from November of 2019 through December of 2020, resulted in a $16,196.87 reduction in amounts paid to LaTrobe. [D. Ex. 33].

Debtor's monthly operating reports reflect that a $3,500 fee has been charged for LaTrobe's accounting services postpetition, but not yet paid. [D. Ex. 11, 38]. This amount is consistent with Mr. Gosal's testimony about the cost of LaTrobe's accounting services to Debtor but is not consistent with Debtor's exhibit 33 which shows that LaTrobe was charging Debtor $5,000 per month. Assuming the appropriate charge is $3,500 LaTrobe has been overpaid for accounting services since December 2019. Ms. Caraballo and Mr. Gosal each testified that LaTrobe transferred $60,000 to Debtor for operational costs on October 19, 2020, although Ms. Caraballo characterized the transfer as a loan while Mr. Gosal characterized it as an example of how the Enterprise Entities all help each other. [UST Ex. 15].

### d. YC Fairbanks Transfer

It is undisputed that a total of $335,000 was transferred prepetition from Debtor to YC Fairbanks, which owns and operates a hotel in Alaska. The funds were transferred on three dates: on March 27, 2020 $160,000 was transferred, on March 30, 2020 $25,000 was transferred, and on May 1, 2020 $150,000 was transferred. [D. Ex. 29, p. 38]. Mr. Johal's testimony was that discussions with APF regarding a workout or forbearance began in May or June of 2020. On November 13, 2020, YC Fairbanks transferred $50,000 to Debtor. While the testimony was that a

total of $98,000 was transferred such that the current intercompany receivable is $237,000, it is unclear when the other amount/amounts were transferred.  [UST Ex. 15, D. Ex. 29].

The Managers testified that the hotel owned by YC Fairbanks was suffering; cruise ships had been halted into the area due to COIVD-19 and tourism in the area came to a standstill. The season for YC Fairbanks is very limited—from May 15 to September 15—and it historically generates significant income, but in May 2020 no income could be generated as there were no cruise ships going to Alaska.  The Managers were under the impression that the economic shutdown would be temporary as everything from the media and news claimed that the country would be quarantining for a specific amount of time—two weeks or two months—but that the complete halt of the economy would be short-lived. Based on this, given the very short high season in Alaska and out of concern for employees and the potential for the YC Fairbanks hotel to shut down completely, the Managers chose to transfer the funds from Debtor to YC Fairbanks. These transfers were not memorialized by any contract, note, or payable instrument. There is no documented repayment plan, interest rate, or obligation for YC Fairbanks to repay Debtor.  The Managers testified that they were operating in an unprecedented time, they did what they thought had to be done to save a hotel that was crucial to the functioning of all the Enterprise Entities and Mr. Gosal at any rate, would do it again if necessary. The Managers believed they made the best decision with the information they had at the time. Mr. Johal testified that if Debtor's survival depended on repaying the currently outstanding amount of $237,000, they would find a way to do so.

Ms. Wimmer testified that APF viewed the demand letter and the forbearance agreements as emergencies and were cause for concern.  She further testified that when APF

learned of the transfers to YC Fairbanks her concern was even greater than it had previously been; and she noted that she does not believe the Managers are the best stewards of the estate.

### e. Bank Statements, Home Depot Invoices, Bank of America, American Express and CitiCard Accounts

The UST's counsel inquired about payments made to TKG and YC Anchorage over the year prior to Debtor's bankruptcy filing. Ms. Caraballo and Ms. Leon testified that these two Enterprise Entities have accounts with Home Depot that allow each of the Enterprise Entities to make purchases at local Home Depot stores and that all such charges are reconciled based upon the location of the Home Depot store. The charges are then allocated to the individual Enterprise Entity that purchased the goods or services. Ms. Leon testified that she has access to Home Depot invoices online and that she allocates purchases by location and that each Enterprise Entity pays for its own purchases. Although the UST argued that the amounts for these charges do not reconcile, the payments to the Enterprise Entities reflected on the Amended Statement of Financial Affairs on account of Home Depot purchases reconcile with the payments the UST inquired about with Debtor [D 25] and the Debtor's Wells Fargo bank account.[12] It is not clear whether the payments reconcile with invoices from the stores because there are no Home Depot invoices of record. Similarly, charges on TKG's and the Managers' Bank of America credit card and CitiCard were used on occasion to purchase items for Debtor and then were paid by Debtor. The same is true for TKG's American Express card.[13] Again, based on the evidence submitted, it is unclear if the transfers from Debtor to affiliates and insiders are correct and reconcile with the amounts

---

[12] Compare D. Exs 25, 29 and UST Ex. 15.
[13] The record and D. Ex. 25 show that Hardeep Johal, Mr. Johal's nephew, assisted with initial operations of Debtor specifically, while Debtor was transitioning general managers. Mr. Hardeep Johal paid for expenses on his Bank of America card, for which he was later reimbursed.

reported in Debtor's Amended SOFA and Schedules, as no invoices were submitted to corroborate the amounts transferred.

### f. Transfers to Debtor from other Enterprise Entities

Debtor provided the UST with its Initial Debtor Interview Package on or about February 17, 2021. [D. Ex. 24]. Documents contained in the package included YC Fernley's 2019 federal tax return showing intercompany transfers of $1,078,444 and Debtor's January 31, 2021 balance sheet and profit and loss statement showing intercompany transfers of $1,047,890.30. Debtor's exhibit 32 is a summary of all such transfers, which includes the $60,000 transfer to Debtor from LaTrobe, the transfer from Debtor to YC Fairbanks, and a transfer to Debtor on November 15, 2019 of $845,000 from YC Rivergold[14] for part of the purchase price for the Property. Overall, in the year preceding the filings, a total of $1,062,797 was transferred to Debtor from Enterprise Entities, this amount includes $1,035,000 transferred to Debtor for purchasing the Property. While the record is replete with testimony that more money has been transferred into Debtor via intercompany transfers than out, the net amount transferred to Debtor over the last year was $27,979. [D. Ex. 32]. Other than Mr. Johal's statement regarding the YC Fairbanks transfer, there was no testimony regarding recovery of these amounts during the chapter 11 case.

### g. Debtor's Schedules, Statement of Financial Affairs, and Amendments

Debtor filed its original schedules and statement of financial affairs on February 26, 2021. (the "Original Schedules and SOFA"). [D. Ex. 1, APF Ex. 18]. Ms. Leon was very involved in compiling information for the Original Schedules and SOFA while Ms. Caraballo was not significantly involved. In these, Debtor scheduled cash on hand in the amount of $53,185.29,

---

[14] The closing statement [APF Ex. 22] confirms that $735,000 was used for the purchase of the Property. Ms. Caraballo testified that $110,000 was later transferred from YC Rivergold to Debtor for use in operations. The Schedules do not reflect this additional purpose and merely state the total amount was for the purchase of the Property.

accounts receivable in the amount of $7,329.62 within 90 days or less, and $21,886.78 greater than 90 days for a total of $29,126.40.  Debtor scheduled insider debt of $26,717, owed to Mr. Johal for counsel's retainer and presumably the filing fee for this case, to LaTrobe in the amount of $21,658.21 for accounting services, and to TKG in the amount of $1,543.48 for use of accounts to make purchases.  Debtor also disclosed transfers to LaTrobe within 90 days of $21,760.51 and within a year of $117,130.39.  Further, Debtor disclosed transfers within a year to TKG in the amount of $253,097.76 for Debtor's use of TKG's Home Depot and American Express accounts. Debtor did not disclose the YC Fairbanks transfer.

Debtor amended the Original Schedules and SOFA (the "Amended Schedules and SOFA") [D. Ex. 29] to correct certain information and to add intercompany transfers that had not been included initially. Mr. Johal testified that Debtor does not treat intercompany transfers the same as debts owed to third parties; rather the intercompany obligations are paid only after all third-party obligations, do not accrue interest, and are not memorialized by promissory notes. Rather, Ms. Caraballo keeps a ledger of all intercompany accounts. Mr. Johal testified that the intercompany accounts are in a grey area. They are not debt because they are not owed to third parties nor are they equity. As a result, they were not included on the Original Schedules and SOFA.  In the Amended Schedules and SOFA, [D. Ex. 29] intercompany debts were listed as disputed for these same reasons.

The Original Schedules show Debtor paid LaTrobe $117,130.39 in 2020. In the Amended Schedules this amount was reduced to $114,589.44. Mrs. Caraballo explained that the change was due to a payment made in January 2021 on account of a December invoice, but that check was ultimately not deposited or paid because Debtor's old bank account was frozen due to the filing. The Amended Schedules and SOFA also replaced valuations reported as unknown with

specific values that were obtained by Debtor through employment of an appraiser.[15]  Ms. Caraballo was much more involved in the preparation of the Amended Schedules and SOFA than she had been in preparation of the Original Schedules and SOFA.

    In addition to the changes made in the Amended Schedules and SOFA, there were many questions to Ms. Caraballo and the Managers about the discrepancies in historical data from various reports and about booking a casualty insurance check as a setoff to expenses.  The amount of cash on hand and income changed due to the reclassification of an insurance payout in the amount of $44,365.70 in insurance proceeds. The testimony of Mrs. Caraballo is that the insurance check was misclassified and misreported in the Original Schedules, as she thought it was an insurance refund for overpayment of workers' compensation. Once she learned the funds were a payout on account of a claim for a damaged elevator, she recategorized the funds as a "recapture" so that the payment was reflected in the accounting system as zero and did not affect profit and loss reporting. Mrs. Caraballo testified that if not correctly listed as a recapture against a future expense, it would have been reported as revenue.  In relation to the insurance check, APF believes that the addition of an equity infusion of $25,000, discussed more fully herein, and insurance payout artificially inflates the amount of cash on hand by $69,365.70. APF argues that the true cumulative cash is $43,687.26 while Debtor shows cumulative cash through March 12, 2021 as $126,203.79. APF also points out that no payments have been made to Debtor's professionals, for adequate protection, for UST fees, or for other administrative expenses.

    Another example of a discrepancy about which the Court heard testimony was the reported income from 2019. Debtor's exhibit 33 reflects income of $1,411,466.77 for 2019, while Debtor's exhibit 1, the Original Schedules and SOFA, reports $1,366,627.42.  Ms. Caraballo

---

[15] Debtor obtained authority to retain an appraiser by Order entered March 8, 2021. [Doc. 46].

explained that there can be differences based on adjustments made before she had "closed her books."

In the Amended Schedules and SOFA, the amount of cash on hand on the petition date was reduced to $38,724.47 and the amount of accounts receivable was increased to $69,466.56. Mr. Johal testified that these two changes can be explained by the time of day when the numbers were reviewed. Specifically, he stated that Debtor originally provided balances from the beginning of the day on the petition date as opposed to the end of the day on the petition date. A reflection of the cash on hand would be different at the end of the day because it would fully capture all transactions, as bank balances are updated during the day. He also stated that the value of receivables is more accurate at night because room charges are settled at night; if they have not yet been processed by Debtor, they are accounted for differently.[16]

### h. Testimony at the § 341 Meeting of Creditors

Debtor's meeting of creditors was held on March 4, 2021 and continued to April 7, 2021 and April 29, 2021. Mr. Johal testified as the representative of Debtor but was unable to answer basic questions such as whether the business licenses are in good standing and are required to operate the hotel, the identity of the authorized signatories on Debtor's bank accounts, the number of Debtor's employees, Debtor's gross monthly income, the name of any entities leasing property of Debtor, lease terms, or Debtor's estimated monthly expenses. [APF Ex. 19]. At the hearing, Mr. Johal testified that he did not want to assume anything and unless he knew each answer with exactitude he did not guess, so he stated that he did not know when questioned at the 341 meeting. Mr. Johal further testified that the day of the meeting was one of the worst of his life

---

[16] See D. Ex. 1 at pg. 22 listing accounts receivable of $29,126.40 in comparison to D. Ex. 29, pg. 4 listing accounts receivable of $69,466.56.

as he felt wholly unprepared for the detail that would be required to respond to questions. Mr. Gosal testified that he is the operations persons and has more day to day involvement with Debtor while Mr. Johal is the financial person. Mr. Gosal testified that he had a conflict with the 341 meeting date, but had he known the 341 meeting would become such an issue he would have found a way to attend. Mr. Gosal further testified that he is in charge of managing Debtor.

### i. Cash Collateral Position, Interim Order & Contempt Motion

It is undisputed that APF is undersecured. Appraisals of the Property from APF and Debtor were admitted into evidence. [D. Ex. 7, APF Ex. 21]. The difference in amount between the two is $195,000. This is attributable in part to a difference in opinion on the cost of the remaining PIP work needed. The appraisers also disagreed with respect to how quickly and to what extent the economic recovery from the COVID-19 pandemic will affect the travel and lodging industries in the immediate and longer term. For purposes of the Motions presently before the Court, a determination of an exact value of the Property is not necessary and it suffices to say the Property is worth approximately one-half of APF's proof of claim amount.[17]

Given that APF is undersecured and objected to use of cash collateral because Debtor could not provide adequate protection of its furniture, fixtures, and equipment collateral, the Court, in the first interim cash collateral order placed very strict conditions on Debtor's use of cash collateral. [D. Ex. 2]. The interim order did not allow for line-item variances without permission from APF or the Court.

On March 11, 2021 APF filed an *Emergency Motion to Enforce Compliance with the Court's Interim Cash Collateral Order and for Related Relief* alleging that Debtor had made payments to creditors on account of prepetition debt in violation of the first interim cash collateral

---

[17] The Court notes that Debtor disputes the amount of APF's proof of claim, but that is not presently before the Court.

order (the "Motion to Enforce") [Doc. 53]. In its response to the Motion to Enforce, Debtor disclosed additional payments that should not have been made under the first interim cash collateral order and budget. [APF Ex. 15].

At the initial hearing on the Motion to Enforce, the Court directed Debtor to provide APF with the amounts that were absolutely necessary for operations for a one-week period, because the Court had previously scheduled an evidentiary hearing on cash collateral to be held in one week. In its response to the Motion to Enforce Debtor asserted that it was contacting the vendors to recover the funds that had been paid in contravention of the first interim cash collateral order [D. Ex. 2], and the evidence at the hearing on the Motions showed that Debtor has either recovered via cash repayment or postpetition credit all amounts that were paid on prepetition obligations, with the exception of utility payments which were authorized by Court order. [D. Ex. 3]. Debtor and APF announced a settlement of cash collateral issues and the Motion to Enforce on March 23, 2021, in favor of going forward with the present Motions. One payment was made after the Motion to Enforce was filed. Sysco was paid by automatic ACH that was initiated on March 4, 2021 but did not clear until six days later. [D. Ex. 35]. Debtor has arranged for postpetition credit from Sysco for this payment. Since March 4 Debtor has adhered to the budget. All of the items paid in excess of the line-item budgeted amounts were ordinary operating expenses owed to third party vendors.

Testimony regarding the unauthorized payments and failure to adhere to the budget indicates that when the Managers communicated the cash collateral restrictions to Ms. Caraballo and the individuals at TKG they failed to stress the importance of strictly adhering to each line-item amount or obtaining permission to exceed such amounts. The communication to those who needed to know the significance of the restrictions on use of cash collateral was slow and

incomplete. As a result of the payment excesses, Mr. Gosal made a capital contribution of $25,000 to Debtor during the week of February 20-26, 2021. [D. Ex. 17, p. 2].

### j.  Actual Performance Post Petition

Debtor's exhibit 42 provides actual revenue[18] and expenses for the period of February 19 through April 23, 2021.  The range of "rev par", that is rate per room, which is an indicator of the health of Debtor, has ranged from $12.52 in week one to a high of $27.70 for the week of April 16, with an average over that period of 21.99.  Revenue totals $433,591.29 for this time while expenses total $360,087.75.  Cumulative cash flow from operations has gone up and down as is to be expected, and as of the week of April 23 was positive $5,372.06.  When the insurance payout is included in the calculations, the net cumulative cash flow is negative $20,804.96[19]. When this is considered together with the owner's capital contribution the ending cash for the relevant period is $44,066.71.

As previously discussed, the insurance payment was originally booked by Ms. Caraballo as a reduction in expenses which had the effect of increasing cumulative cash.  In Debtor's exhibit 42 the insurance funds are included in this way, but the actual cost of repair is also included such that the $5,372.06 accounts for both the actual expense (although it appears this repair has not yet been done) and the reduction of the cost due to insurance coverage. [APF Ex. 6, p. 2]. Ms. Caraballo also testified that the Amended Schedules and SOFA are the best indication of the amount of cash on hand as of the petition date. The beginning cash balance, as reported in the Amended Schedules and SOFA, was $38,724.47. Therefore, Debtor's cash position has

---

[18] Debtor also receives $13,375 per month from a month-to-month lease from a restaurant tenant that predates Debtor's purchase of the Property.

[19] The insurance payout is for elevator and fire alarm repair (as stated in the budget line item) but is less than the amount needed to for the repairs. There was no testimony regarding fire alarm repair rather all references were to the second elevator at the hotel.

improved by $5,342.24. In contrast, Debtor projected $5,315.89 in cash from operations. [D. Ex. 23]. Debtor's accounts receivables have also increased, with new billings of $166,835 in February and $233,476 in March. [D. Exs. 11, 29, 38].

With respect to Debtor's projected expenses, while it is not disputed that prior to March 11, 2021, Debtor paid line item expenses in excess of the budget, on a going forward basis, Debtor has paid less than was projected for expenses.[20] This, the Court suspects, is due in large part to lack of consent for use of cash collateral for all budget items while the Motions were pending, but the evidence did not establish that. *See eg:* AFP Ex. 6, p. 2. So, for these purposes the Court notes that Debtor is operating while expending significantly less than budgeted.[21]

Debtor is continuing to work on the PIP renovations of the Property. Mr. Weir testified that the sixth floor is completely renovated and the fifth floor is complete with the exception of installing new vanities in some of the bathrooms. Mr. Weir oversees the renovations and manages the construction crew comprised of three of Debtor's employees. Mr. Weir does not have a formal project management plan, but Mr. Gosal assists as project manager. Mr. Gosal testified that the fifth and sixth floors are complete and that the three-person construction crew is beginning work on the fourth floor. Mr. Gosal further testified that the work was going more quickly now, as the team had worked out a system. He believes all renovations will be complete by November 2021. Debtor remains open while renovating and rents rooms on all floors except for the floor that is under renovation; currently, the fourth floor. Mr. Gosal testified that the major

---

[20] Debtor's exhibit 6 shows that Debtor spent $219,000 less than was projected.
[21] Budgeted expenses from Debtor's exhibit 41 for the period of February 3 through April 30 were $568,226.57 and actual expenses were $386,264.77 through April 17-23, the last week of actual amounts. This leaves $181,961.80 for budgeted expenses for the last week of April. The only week in which Debtor's expenses have even approached this amount is in the week that the elevator repair charge of $70,542.72 is included.

work on the roof and parking lot has been done and that Debtor has purchased all the carpet necessary for the renovation and all the big-ticket items for completion of the renovation.

### k. Capital Contribution and Commitment for Additional Amounts

As previously noted, Mr. Gosal contributed $25,000 to Debtor for operating expenses and has testified that he will make additional contributions as needed. Debtor projects that these amounts may be $126,000 pre-confirmation. Both of the Managers testified that they would continue to make capital contributions to insure Debtor's continued rehabilitation and reorganization. Mr. Johal indicated that his personal finances have been negatively impacted by the pandemic, but Mr. Gosal indicated that he still has the current ability to provide cash infusions for Debtor. In addition, both Managers testified that at least with respect to their Miami, Florida and Boulder City, Nevada properties business was recovering very quickly which makes them optimistic about Debtor's recovery. The Managers also testified that they understood their fiduciary duties to Debtor, that no intercompany transfers could be made and that contributions would necessarily have to be from their personal funds. Mr. Gosal stated that he understood Debtor had to be number one in priority.

With respect to Debtor's postpetition performance, Mr. Weir testified that the occupancy rate in each of February and March had improved to fifty-four percent (54%). The Managers were both extremely optimistic about the recovery of airline travel noting that TSA had reported that passengers going through TSA checkpoints had increased to a rate of approximately fifty percent (50%) of 2019 traffic. Mr. Johal also noted significantly improved economic projections for GDP for 2021. Debtor continues to work on its renovation, there was no evidence that Debtor's franchisor was unhappy with Debtor's progress and Debtor is prepared to file a plan that pays all creditors in full and will include cash infusions by the Managers.

## II.    CONTENTIONS OF THE MOVING PARTIES

In the Motions, the Moving Parties both argue that the Managers are not sufficiently involved in the daily operations of Debtor and that there has been a breakdown in information and communication between the daily operations of Debtor, its managers, and its management. Additionally, both Moving Parties raised concerns regarding the testimony, or lack thereof, at Debtor's meeting of creditors, the lack of involvement of the Managers, the unauthorized use of cash collateral, inexplicable or inaccurate financial reporting, and the potentially bad faith transfer to YC Fairbanks allegedly made on the eve of signing a forbearance agreement without plans for recovery. The Moving Parties conclude that Debtor is not preserving its rights to recover intercompany transfers in favor of promoting other Enterprise Entities, and the entirety of the Enterprise, over the success of Debtor and its creditors. The Moving Parties both express concern about the intercompany and family relationships, and a perceived lack of leadership all of which necessitates the appointment of a neutral third party. The Moving Parties also state that there have been seven different updates to Debtor's schedules and that DIP payments cannot be reconciled with accounting records which they argue raises issues of transparency and the question whether any creditor can be confident about the likelihood of rehabilitation through confirmation.

As for its request in the alternative for conversion to chapter 7, APF argues that the estate is experiencing a substantial or continuing loss, as Debtor has yet to make a substantial profit and is operating with a negative net income such that it is unlikely Debtor would be able to fund a chapter 11 case. The Property is significantly underwater with continued renovations required to meet the franchisor's standards, and while Debtor is sure that the hotel economy is turning around, APF argues Debtor should not be allowed to gamble at the expense of creditors.

The UST argues that mismanagement pervades this case because there is no clear management or supervision of Debtor's operations and no one is in charge such that the case should be converted.

The SBA argued in closing that there were three options: conversion, appointment of a chapter 11 trustee or leaving current management in place. While acknowledging that because of proposed equity infusions leaving the Managers in place might result in a quicker and better option for payment to unsecured creditors, on balance because of the lack of transparency and initial failures to disclose intercompany transfers, it favors the appointment of a chapter 11 trustee. With regard to conversion, the SBA was primarily concerned with the likely outcome that APF would be the only party to recover any amounts on account of their claim, with all other unsecured creditors claims' being eliminated.

## III.    AUTHORITY

### A. Conversion to Chapter 7

Both APF and the UST contend conversion is appropriate under 11 U.S.C. § 1112(b)(1), which provides:

> Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1). Both parties note that once cause has been established, use of the word "shall" by Congress in the subsection makes conversion mandatory. Establishing cause under § 1112(b)(1) is a two-step inquiry, first requiring a determination whether there has been a substantial or continuing loss to the estate, and second a determination that there is no reasonable

likelihood of rehabilitation. *Off. Comm. of Unsecured Creditors v. Moultrie (In re Moultrie)*, 586

B.R. 498, 502 (Bankr. N.D. Ga. 2018) (Drake, J.). Both elements must be satisfied. *Id.* at 503; *In*

*re Motel Props., Inc.*, 314 B.R. 889, 895 (Bankr. S.D. Ga. 2004). In *In re Motel Properties, Inc.,*

the court discussed analysis of the two components as follows:

> To determine if there is a continuing loss to or diminution of the
> estate, the Court must look beyond financial statements and fully
> evaluate the present condition of the Debtor's estate. … Courts have
> held that a post-petition negative cash flow and an inability to satisfy
> current expenses constitute a loss to or diminution of the estate.
> …[With regard to likelihood of rehabilitation, s]ome courts have
> held that short-term postpetition operating losses are not sufficient
> grounds to convert or dismiss a bankruptcy case when financial
> viability is reasonably likely in the future.

314 B.R. at 894-95 (internal citations omitted). In *Motel Properties*, the debtor continued to lose

money post-petition, failed to make any payments to its largest creditor, and accumulated

substantial debt to taxing authorities. *Id.* at 892. In addition, the debtor had already lost its hotel

franchise. *Id.* at 893. But the court did not agree that those facts doomed the debtor such that

conversion was necessary. *Id.* at 895. Even though the first prong of § 1112(b) was satisfied, the

second was not. *Id.* The court looked toward upcoming events (such as the Super Bowl and summer

tourist season) in evaluating whether there was hope of financial viability. *Id.* The court found this

negated the movant's assertions that there was no reasonable likelihood of rehabilitation. *Id.*

The court in *In re Global Emergency Resources, LLC* reached the opposite result.

*In re Glob. Emergency Res., LLC*, 563 B.R. 76, 84 (Bankr. S.D. Ga. 2016). In that case, the debtor's

business was not operating and had no employees, and in converting the case from chapter 11 to

chapter 7, Chief Judge Barrett noted,

> [t]his is not a typical liquidating plan with a § 363 sale followed by
> disbursements and conversion; rather any plan of reorganization of
> the Debtor would be funded by the note payments over 36 months.
> Debtor maintains no business and no employees. In this particular

> case, given these facts and the ongoing disputes no chapter 11
> purpose would be served by allowing this case to continue as a
> chapter 11.

*Id.* at 83.

Courts also consider the overall impact on creditors when determining whether cause exists under the two-prong test. *See In re Gillikin*, No. 09-60178, 2011 WL 7268050, at *3 (Bankr. S.D. Ga. Nov. 21, 2011) ("[I]f converted, all creditors would be paid in full by a liquidation, and possibly some residual dividend would remain for debtor. In contrast, debtor has to date earned no income to fund his ongoing expenses but has relied on property sales to fund his Plan. His inability to sell part or all of his remaining property over a two-year period suggests that a trustee, rather than the debtor, should continue that effort. The interest of creditors is best served by an orderly liquidation by an independent trustee").

With respect to the first prong of the conversion analysis, whether there has been a substantial or continuing loss to the estate, APF's argues that Debtor "continues to operate with a negative income each week" and "has yet to make a substantial profit." [Doc. 70 ¶ 48]. This argument is not supported by the evidence. Accounts receivable have increased since the filing and, as previously discussed, receipts total $433,591.29 for the period of February 3 through April 23 while the expenses for that period total $360,087.75. Thus, Debtor has positive cash flow of $5,372.06. Negative net cash flow of $20,804.96 is due to a casualty loss and repair of the elevator. The evidence is unclear whether this expense has actually been paid, but a casualty loss and partial reimbursement by insurance is not indicative of Debtor's ability to be profitable, and further, repair of the elevator does not diminish the value of the estate, it protects it.

In *Moultrie*, in which the movant satisfied the first prong of the analysis, but not the second, the debtor's only significant asset was a residence that provided no income to the

estate. 586 B.R. at 503. Here, the testimony before the Court was that not only is Debtor producing income, but that income will continue to increase as the economy and travel industry recover from the COVID-19 pandemic. Further, it is likely that the continued renovations will increase the value of the Property. While it is undisputed that the hotel is "underwater" the evidence indicates that the value of the Property will be increasing as the PIP is ongoing, many of the materials have already been purchased, the larger ticket items have been completed such that significant costs have already been incurred and the renovations will be complete sometime later this year. Therefore, the Moving Parties have not established that the first prong of the test is satisfied, and evaluation of the second prong is unnecessary.

With respect to the request for conversion, the Moving Parties have failed to demonstrate a continuing loss or diminution to the estate. Therefore, the Court will deny this request as this relief denies Debtor any potential to reorganize and is not in the best interest of all creditors and the estate. While evidentiary questions remain that will have to be answered at confirmation, such as the Managers' current ability to make contributions promised and necessary to Debtor's plan and the feasibility of a proposed plan, Debtor has stated it will file a plan and will be in a position for confirmation in August.  This timeline is reasonable, and the Court believes the evidence supports providing Debtor the opportunity to seek to perform as it has stated it will. The alternative is conversion to chapter 7 where APF would most likely get stay relief and foreclose on the Property, leaving a chapter 7 trustee to litigate claims in an effort to provide some distribution to unsecured creditors.  This result, while certainly APF's favored outcome, does not best serve the estate and its other creditors, including the SBA, with its wholly unsecured second position lien.

## B. Appointment of a Chapter 11 Trustee

APF and the UST have also sought relief under § 1104(a)(1) and (a)(2) which states:

> At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee -
>
> (1) for cause, including fraud, dishonesty, incompetence or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liability of the debtor; or
>
> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of debtor.

11 U.S.C. § 1104(a)(1), (a)(2).

The plain language of the statute is similar to that of §1112(b)(1) as it requires the Court to appoint a trustee if the Court finds cause identified in the statute or behavior similar to that set forth in § 1104(a)(1).  The Court's discretion is limited in subsection (a)(1) to the determination of whether cause exists. Under § 1104(a)(2), the Court is provided a discretionary basis upon which to appoint a trustee depending on the best interests of creditors, equity security holders and the estate. When a trustee is appointed "in the interests of creditors," it is not necessary to find that the debtor or management engaged in any misdeeds. *In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3rd Cir. 1989). Instead, subsection (a)(2) allows an "exercise of a spectrum of discretionary powers and equitable considerations, including a cost-benefit analysis[.]" *In re SunCruz Casinos, LLC*, 298 B.R. 821, 829 (Bankr. S.D. Fla. 2003) (quotation marks and citation omitted).

Debtor correctly points out that "[t]here is a strong presumption in Chapter 11 cases that the debtor-in-possession should be permitted to remain in control of the corporation absent a showing of the need for the appointment of a trustee." *In re Intercat, Inc.,* 247 B.R. 911, 920 (Bankr. S.D. Ga. 2000) (citing 7 Lawrence King, Collier on Bankruptcy §1104.02 (15th ed. 1998)). "It is well settled that the appointment of a trustee should be the exception not the rule." *Id.* (citing *Sharon Steel Corp.*, 871 F.2d at 1225). This is because a "corporation's current management is 'best suited to orchestrate the process of rehabilitation for the benefit of creditors and other interests of the estate.'" *Id.* (quoting *In re V. Savino Oil & Heating Co.,* 99 B.R. 518, 524 (Bankr. E.D.N.Y. 1989)). "While a certain amount of mismanagement of debtor's affairs prior to the filing date may not be sufficient grounds for appointment of a trustee, continuing mismanagement of the affairs of a debtor after the filing date is evidence of the need for the appointment of a trustee." *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 169 (Bankr. S.D.N.Y. 1990) (citing *In re Colby Constr. Corp.*, 51 B.R. 113, 117 (Bankr. S.D.N.Y. 1985); *In re McCorhill Pub., Inc*., 73 B.R. 1013, 1017 (Bankr. S.D.N.Y. 1987)). Thus, the Code provides that in an appropriate case appointment of a trustee is an action the Court should take.

The inquiry to determine if cause exists or if the best interests of the estate and its creditors and equity security holders is served is necessarily fact intensive and is undertaken on a case-by-case basis to assess the totality of the circumstances. *In re Climate Control Mech. Servs., Inc.*, 585 B.R. 192, 200 (Bankr. M.D. Fla. 2018).

## 1. Cause To Appoint A Trustee

Cause to appoint a trustee includes gross mismanagement of the debtor. In *Intercat*, the court identified a number of factors helpful in analyzing whether cause exists as follows: (1) materiality of the misconduct; (2) evenhandedness or lack of same in dealings with insiders or

affiliated entities vis-à-vis other creditors or customers; (3) the existence of prepetition voidable preferences or fraudulent transfers; (4) unwillingness or inability of management to pursue estate causes of action; (5) conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor; (6) self-dealing by management or waste or squandering of corporate assets. 247 B.R. at 921.

APF contends Debtor showed gross mismanagement by making unauthorized payments on prepetition debts, by the inability of the corporate representative to answer questions about Debtor at the meeting of creditors, and by the potential loss of its Clarion® flag. Additionally, the relationship between the Enterprise Entities and the intercompany transfers implicates all five of the factors identified by *Intercat.*  This is so because the Managers have historically disregarded corporate formalities in making intercompany transfers for the good of all of the Enterprise Entities. This method of operation also implicates the Managers' fiduciary duties to Debtor and raises the question whether, now that the company is a debtor in bankruptcy, the Managers are capable of fulfilling their duties of loyalty and impartiality to Debtor and its creditors and their duty to protect the assets of the estate. *In re Eurospark Ind., Inc.,* 424 B.R. 621, 627 (Bankr. E.D.N.Y. 2010) (setting forth three fiduciary duties of debtors in possession) (citations omitted).

The facts surrounding the YC Fairbanks transfers illustrate these concerns. It is not entirely clear that Debtor made the transfers out of Debtor during the time of its discussions with APF; it could be that some of these transfers occurred prior to the timeframe in which forbearance negotiations began. Regardless of APF's contentions, the transfers did contribute to Debtor's inability to pay its own debts. However, the Managers were facing total or near total loss of the season in Alaska and, based on information at the time, believed that the pandemic would shut

down the general economy for a short period such that Debtor would be able to generate revenue while YC Fairbanks would not because of the shortness of the season. Thus, the Managers decided to make the transfers even though at that point Debtor's situation was precarious. To the extent the YC Fairbanks transfers kept that entity from failing, because the Managers also own YC Fairbanks, this could be characterized as self-dealing and a breach of the duty of loyalty and impartiality. Likewise, because there was no obligation by Debtor to make the transfers when it was in a precarious position, it could be characterized as squandering of corporate assets. The transfer to YC Fairbanks is not an insignificant amount of money, violates Debtor's agreements with APF, and takes the funds outside of APF's agreements with Debtor and leaves it with only a potential fraudulent transfer claim. [APF Ex. 20, p. 103-104].  Thus, with the YC Fairbanks transfers, the Managers preferred another Enterprise Entity over Debtor.

The transfers to LaTrobe did not comport with Debtor's agreements with APF because payments to LaTrobe were to be subordinated to APF's debt. [APF Ex. 31]. Unlike the YC Fairbanks transfers the payments to LaTrobe were made for accounting and management services provided pursuant to the Management Agreement and Mr. Gosal's management of the PIP renovation. The payments may have been excessive for the services received and may have preferred an affiliate to an outside creditor (APF). Further, there is no evidence regarding the Managers' willingness or ability to recover some or all of the LaTrobe payments.

The Court does not find this, in the prepetition context and with an understanding of the not unusual structure of the Enterprise Entities, to amount to gross mismanagement. Debtor's principals made the best decision for the Enterprise Entities available at an unprecedented time and with the information available to them. The circumstances surrounding the YC Fairbanks transfers included an unanticipated and unprecedented global pandemic surrounded by scientific

and economic uncertainty and government restrictions that had significant impact on the tourism and travel industries. When compared to the circumstances and conduct in the cases relied upon by Moving Parties, there is little comparison between the egregiousness of the actions and the transfers to YC Fairbanks and LaTrobe. *See e.g. Ionosphere Clubs,* 113 B.R. 164 (trustee was appropriate when, over a 13-month period, the debtor suffered significant losses borne by unsecured creditors, failed to make reliable forecasts, wiped out the equity of its parent, and reneged on agreements with the creditors' committees such that the debtor's owner was not competent to reorganize debtor); *V. Savino Oil & Heating Co.,*, 99 B.R. 518 (cause existed to appoint trustee based solely on prepetition conduct that involved a de facto transfer of the debtor's business and customers to a new company, failing to disclose the transfer during the bankruptcy, and actively concealing the transfer); *Tradex Corp. v. Morse*, 339 B.R. 828 (D. Mass. 2006) (bankruptcy court did not abuse its discretion in appointing a trustee where debtor's sole principal and shareholder did not appear at the meeting of creditors because he asserted his Fifth Amendment rights, failed to appear for a 2004 examination, mortgaged debtor's assets to secure a loan to an affiliate and was the subject of a grand jury investigation for fraud related to debtor and affiliated entities); *In re Sharon Steel,* 86 B.R. 455 (Bankr. W.D. Pa. 1988), *affirmed by* 871 F.2d 1217 (3d Cir. 1989) (the court appointed a trustee when the debtor's management had engaged in significant avoidable transfers with related entities in the months preceding the bankruptcy filing and had not sought to recover any transfers in the nine months the case was pending, the debtor suffered postpetition losses of $2 million per month, and hostilities between management and creditors were detrimental to the estate); *In re Oklahoma Refining Co.,* 838 F.2d 1133 (10th Cir. 1988) (the bankruptcy court did not err in appointing a trustee based on the debtor's pre- and postpetition transactions with affiliates, including significantly increased sales to the affiliates

postpetition, special volume discounts for the affiliates, failure to collect receivables due from the affiliates, as well as the debtor's deposit of funds in non-lender banks to prevent setoff). Additionally, the countervailing weight of the subordination of intercompany debt to third party creditors ameliorates the materiality of the transfers to YC Fairbanks.  Mr. Johal stated the Managers would find a way to repay the YC Fairbanks transfers if necessary which indicates a recognition that recovery may be required.  When considering the payments to LaTrobe, there were services provided and a transfer back to Debtor in the amount of $60,000 that to some extent ameliorates the materiality of the transfers; however, questions remain regarding any over payment to LaTrobe.

Turning to Debtor's postpetition practices, the Court first addresses the errors and omissions in the Original Schedules and SOFA. It is undisputed that the Managers had no prior experience with bankruptcy and filed on a rushed basis. Mr. Johal testified that the intercompany transfers were initially omitted because they occupy a grey area that is neither debt nor equity. The Core Group, through LaTrobe, accounts for all intercompany transfers, but treats them as subordinated debt which are only repaid when there are excess funds in a particular entity.  This is consistent with the disclosures made in the Original Schedules and SOFA, that is third party creditors were listed, the payments to LaTrobe on account of the Management Agreement and services provided were listed and the payments to credit card companies on account of Debtor's use of TKG's and YC Anchorage's credit lines at Home Depot and Debtor's use of TKG's and the Managers' credit cards were listed while the intercompany transfers were not.

It does not appear that the fact of intercompany transfers was concealed as there are two references to the amounts of intercompany transactions in the Initial Debtor Interview ("IDI") material provided to the UST. [D. Ex. 24]. Nevertheless, the Court did wonder at various points

during the hearing whether the Managers underestimated the seriousness of the need for full and complete disclosure in preparing the Original Schedules and SOFA, including any monetary transactions with Debtor regardless of how they were viewed or characterized by management. What is clear is that the need for complete, full, and accurate disclosure was not understood by the Managers until after the 341 meeting when Mr. Johal's inability to answer questions raised a red flag for APF and the UST.  The evidence showed, however, that Debtor complied with the IDI information requirements and has responded to the UST's inquiries with additional information, although some of the requests for information, such as Home Depot invoices and credit card statements, may still be outstanding. [D. Ex. 25].

It is undisputed that Debtor exceeded the cash collateral budget and did not seek permission from APF or the Court to do so. The evidence showed that these payments were the result of a failure of communication about bankruptcy requirements and the exact provisions of the Court's order. Although such mistakes cannot be cured, Debtor has remedied the effects of these payments by reversing the payments through postpetition credits or repayment.  Further, none of the payments were to insiders. Since the March 4 ACH payment to Sysco, no unauthorized payments have been made. However, the payments do evidence a lack of clear communication from the Managers to the individuals who carry out Debtor's day-to-day financial tasks and highlight the amount of day-to-day involvement or lack thereof by the Managers. The Managers, as officers do, work from the 30,000-foot level while lower-level employees perform the daily tasks necessary for the business. Here, Mr. Weir, Ms. Caraballo, Ms. Sodhi, and to some extent, Ms. Leon handle the day-to-day processing of accounts receivable and payable. The involvement of Ms. Sodhi, who is a member of TKG but not Debtor, is not unusual in the context of a family business such as the Core Group operates but does raise questions with regard to her authority on

the DIP account and control over payables.  The Court notes that there is a complete lack of evidence that Ms. Sodhi has done anything to harm Debtor, the estate or its creditors, but in a bankruptcy case, her authority is unusual.  Additionally, the Court notes that while Debtor has not always met its revenue projections it is within a very few dollars of its projection for cash from operations as of April 23.

As further evidence of mismanagement, APF points to a number of questions that were not answered at the meeting of creditors. While concerning, Mr. Johal's inability to respond to the questions is indicative of his level of involvement in Debtor's day-to-day operations and not gross mismanagement. Further, he knew exactly where to find answers and attempted to comply with requests to do so. He did not purposefully mislead creditors or lie under oath. Again, the testimony was that this bankruptcy case was filed on an expedited basis and the Managers had, up until that point, delegated daily duties and operations to Mr. Weir, Ms. Caraballo and TKG employees. The testimony was that the principals now understand the commitment and involvement required to be a DIP and have corrected their behavior to make Debtor a priority. While unfortunate, the inability to answer all questions at the meeting of creditors is not a basis, without more, to warrant appointment of a trustee.

Next, APF makes general allegations that there is a threat Debtor could lose its Clarion® flag [Doc. 70, ¶ 46]. However, there was no evidence presented in this regard, rather the evidence that was presented was that Clarion® appears to be happy with Debtor. There is no evidence that Clarion® is threatening to revoke Debtor's license or franchise status, or that Debtor has done anything to warrant such actions. The testimony was that Clarion® was aware of the needed renovations at the time it entered into an agreement with Debtor, and the ongoing state of

renovations is anticipated. Thus, the Court does not find this to be a compelling reason in favor of appointing a trustee.[22]

The Court concludes that the evidence does not support a finding of cause to appoint a trustee under §1104(a)(1).  The Court finds it more likely than not that the initial failings in the case were attributable to numerous factors, including, the emergency nature of the filing, the inability to meet in person with counsel, the Managers' 30,000-foot view management style and a steep learning curve regarding bankruptcy as none of the individuals had any experience with bankruptcy. And, as previously stated, the prepetition transfers alone are insufficient to establish cause. The Managers have testified that they understand their fiduciary duties, that they understand there can be no intercompany transfers and that the balance owed to Debtor from the YC Fairbanks transfer will be repaid if necessary. Debtor has, after an initial misunderstanding about postpetition payments for prepetition goods and services, operated within the budget, has not made any intercompany transfers, has generated a small amount of cash in the first two and one-half months of the case and has articulated the anticipated provisions of its plan of reorganization. Thus, the evidence corroborates the Managers' understanding of the necessity of not making intercompany transfers as none have been made postpetition and their ability to place their duties of loyalty, impartiality and protection of estate assets above that of the other Enterprise Entities during this case.

## 2. Best Interests of Creditors, Equity Security Holders and the Estate

Even though there is insufficient evidence of cause to appoint a trustee, the Court must also consider whether appointment of a trustee is in the best interest of the creditors, equity security holders and the estate under § 1104(a)(2).  In the context of an (a)(2) appointment, Courts

---

[22] APF originally argued that Debtor failed to disclose a PPP loan and this constituted gross mismanagement. This was a matter of misunderstanding and APF no longer asserts this proposition.

consider: (1) the trustworthiness of the debtor; (2) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation; (3) the confidence–or lack thereof–of the business community and of creditors in present management; and (4) the benefits derived by the appointment of a trustee balanced against the cost of the appointment. *Eurospark Industries,* 424 B.R. at 627 (quoting, *Ionosphere Clubs,* 113 B.R. at 168). The standard is a flexible one and "[u]ltimately, the court should consider the 'practical realities and necessities' of the case.'" *Id.*

APF does not have confidence in the Managers because of the timing of the YC Fairbanks transfers and the negotiation of the forbearance agreement, the conflict of the Managers' fiduciary duties to the estate and its creditors and the other Enterprise Entities, the lack of day-to-day involvement in Debtor's finances and reliance on Ms. Caraballo, and Debtor's failure to follow the rules in bankruptcy. The SBA supports appointment of a trustee. While acknowledging that potential cash infusions from the Managers may make for a quicker process and may represent the only way unsecured creditors will receive any payment, the SBA favors a trustee for reasons of transparency and its impression that full disclosure was only accomplished through pressure from the UST. The SBA did note that appointment of a trustee is costly and suggested a periodic review of cost and progress to address this concern.

As discussed above, there are questions about intercompany transfers in this case and the Managers' ability, through LaTrobe, to accurately report financial information.  On the other hand, the Core Group has a 20-year track record of success and significant experience with PIP renovations, Debtor has shown a slight cash improvement since the petition date (assuming the beginning cash balance is accurate), the Managers are willing to contribute additional funds to

Debtor preconfirmation,[23] and Debtor has complied with the rules in bankruptcy after exceeding the budget prior to the Motion to Enforce.  Debtor has also stated that it intends to file a plan to pay all creditors in full that should be in a posture to be confirmed by fall.

The Court places significant weight on the SBA's analysis, as it is representative of the unsecured creditors. The lack of trust in Debtor's management and the lack of oversight of the Enterprise Entities' employees who are charged with the day-to-day management of Debtor is of concern to the Court, especially Ms. Sodhi's role in Debtor's finances.  However, the cost of a trustee is also a concern which must be weighed against the ability of Debtor to pay its creditors and the likelihood of reorganization. *See e.g., In re Cardinal Industries, Inc.,* 109 B.R. 755, 766 (Bank. S.D. Ohio 1990) (when appointment under (a)(2) is in issue "the cost of a trustee to the estate, when compared with the benefit sought to be derived, will be a significant aspect of that determination").

The operations of Debtor show an improvement in condition and the loosening of restrictions caused by the COVID-19 pandemic bode well for continued improvement.  Further, as previously noted, Debtor has had a small cash improvement, occupancy is increasing and the Managers have significant experience in the hotel industry and specifically with PIPs and the franchisor.  When weighed against the benefit of transparency with a trustee and increased confidence by the creditors, it is a very close question which is more beneficial to the estate and its creditors.  At this early time in the case when a reorganization appears in prospect and the acrimony between APF and the Managers is not so significant as to make an effective reorganization impossible, the factors weigh in favor of Debtor. *See e.g. In re Eurospark,* 424 B.R.

---

[23] The Court notes this is not without question as APF has sued the Managers on their guaranties and Mr. Gosal has been sued in Alaska by a lender. [UST Ex. 20]. Testimony indicated that the suit in Alaska was to be dismissed as an agreement had been reached with that lender.

621 (Bankr. E.D.N.Y. 2010) (trustee appointed when debtor and debtor's principal had conflicting interests in litigation to recover insurance proceeds and a neutral third party was necessary to evaluate a proposed settlement that would leave the principal with no recovery); *In re Marvel Entertainment Group, Inc.,* 140 F.3d 463, 475 (3rd Cir. 1998) (the district court did not abuse its discretion by appointing a trustee under § 1104(a)(2) when it found "the parties are sharply divided on many issues, and are presently incapable of resolving them").  Therefore, the Court does not find it appropriate to appoint a trustee under § 1104(a)(2) at this time.

However, the Court acknowledges the concerns of APF, the UST and the SBA and agrees that a further review of intercompany transfers and potential amounts owed to Debtor by the Enterprise Entities is necessary as is additional review of the tasks performed by Ms. Sodhi, and the accuracy of Debtor's accounting.  The Court believes this additional oversight is necessary to obtain a clear and objective view of intercompany transactions as well as an objective view of the day-to-day management of Debtor as there have been instances of lack of communication or miscommunication during this case.  Therefore, the Court concludes that appointment of an examiner is appropriate at this stage of the case to investigate the accuracy of the financial reporting, whether the amounts LaTrobe was paid were appropriately allocated to Debtor or whether Debtor is supporting the other Enterprise Entities, and the service provided to the Debtor by Ms. Sodhi. Based upon the examiner's report and the continued progress or lack thereof in reorganizing, there may be a necessity to appoint a trustee at that time.  *See eg: Ipnosphere,* 113 B.R. at 167 (court appointed an examiner early on in the case and then when the case had been pending 13 months appointed a trustee).

In conclusion, the Court finds that the Moving Parties did not establish, regardless of the evidentiary standard applied, cause to convert this case or to appoint a trustee.  The Court

further finds that, although the balance between the cost and the benefit of appointment of a trustee under § 1104(a)(2) is a close one, especially given the stated lack of confidence in the Managers by APF, the largest creditor in the case, at this juncture in the case, when a reorganization is reasonably in prospect, the Court will appoint an examiner to investigate transfers between Debtor and other Enterprise Entities, the accounting of Debtor and financial reporting, and the management of the Debtor, especially Ms. Sodhi's role in Debtor's finances.

For the foregoing reasons, it is,

ORDERED that the Motions are DENIED; it is further

ORDERED that pursuant to 11 U.S.C. § 1104(d), an Examiner shall be appointed upon the terms and conditions set forth herein and the United States Trustee is directed to appoint a person to serve as Examiner with respect to Debtor; it is further

ORDERED that the United States Trustee shall file an application to approve the appointment of the person selected as Examiner in accordance with the provisions of Fed. R. Bankr. P. 2007.1(c); it is further

ORDERED that the Examiner is authorized and directed to supervise and oversee the financial affairs of Debtor, and specifically to:

1. Investigate the day-to-day operations of Debtor's accounting and administrative functions;

2. Supervise and oversee the accounting treatment of all receipts and expenditures in Debtor's books and records;

3. Supervise and oversee the preparation of budgets and reports, including the Monthly Operating Reports;

4. Execute a statement accompanying each monthly operating report filed by Debtor that the report has been reviewed by the Examiner and states whether the Examiner agrees with the report or has any concerns about the report;

5. Investigate the recording of transactions in Debtors' books from November 15, 2019 forward;

6. Identify any potential avoidance actions evident from the investigation of Debtor's books and records and report any such actions to the Court and the Parties; it is further

ORDERED that the Examiner shall file a report within thirty (30) days of appointment as to actions taken, findings resulting from those actions, and any recommendation for future actions of the Examiner; it is further

ORDERED that the Examiner shall have the standing of a "party-in-interest" with respect to the matters that are within the scope of its duties and shall be entitled to appear and be heard at any and all hearings in this case and is authorized to file any motion it determines is necessary to protect the interests of creditors, equity security holders or the assets of the estate; it is further

ORDERED that the Examiner and any approved professionals it retains shall be compensated upon appropriate application in accordance with 11 U.S.C. §§ 330 and 331; it is further

ORDERED that the Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order. Nothing herein shall impede the right of any party-in-interest to request other relief; it is further

ORDERED that the Clerk of the Bankruptcy Court is hereby directed to serve this Order on Debtor, all creditors, parties-in-interest and the Examiner, as well as those persons who have filed a request for notices in this case.

**END OF ORDER**