**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **IN RE:** | : | |
| | : | |
| **YC ATLANTA HOTEL LLC,** | : | **Chapter 11 Case No. 21-50964-BEM** |
| | : | **(Jointly-Administered)** |
| **Debtor.** | : | |
| | : | |
| **IN RE:** | : | |
| | : | |
| **YC FERNLEY HOTEL LLC,** | : | **Chapter 11 Case No. 21-52543-BEM** |
| | : | |
| **Debtor.** | : | |

**DISCLOSURE STATEMENT FOR JOINT PLAN OF REORGANIZATION OF**
**YC ATLANTA HOTEL LLC AND YC FERNLEY HOTEL LLC**
**DATED JULY 6, 2021**

Ward Stone, Jr.
David L. Bury, Jr.
Thomas B. Norton
Stone & Baxter, LLP
Suite 800, 577 Mulberry Street
Macon, Georgia 31201
Counsel to Debtors and Debtors-in-Possession

**TABLE OF CONTENTS**

I.    INTRODUCTION...............................................................................................2

    A.    The Disclosure Statement ........................................................................3

    B.    Bankruptcy Court Approval of this Disclosure Statement .......................3

II.    VOTING PROCEDURES AND REQUIREMENTS ....................................3

    A.    Eligibility to Vote ....................................................................................3

    B.    Ballots and Voting Deadlines ..................................................................4

        1.    Ballots .......................................................................................... 4

        2.    Revocation of Ballots ................................................................... 5

        3.    Voting Multiple Claims ................................................................ 5

        4.    Incomplete Ballots ....................................................................... 5

    C.    Confirmation Hearing ...............................................................................5

    D.    Recommendations .....................................................................................5

III.    DEBTORS AND THEIR BUSINESSES........................................................5

    A.    Debtors .....................................................................................................5

        1.    Debtors ......................................................................................... 5

        2.    Overview of Assets and Liabilities ............................................. 6

        3.    Reasons for Filing Bankruptcy.................................................... 8

IV.    DEBTORS' CHAPTER 11 CASES................................................................9

    A.    Significant "First Day" Bankruptcy Orders.............................................9

    B.    Significant Events During the Chapter 11 Cases......................................9

        1.    The Filing of Schedules of Assets and Liabilities and Statement of
             Financial Affairs.......................................................................... 9

        2.    Meetings of Creditors under Section 341 ........................................ 10

        3.    Cash Collateral ............................................................................ 10

        4.    Motions to Convert or Appoint a Chapter 11 Trustee ........................ 10

        5.    Classification of Claims and Interests, the Setting of the Bar Date, and
             the Filing of Proofs of Claim ...................................................... 12

        6.    Avoidance of Preferential Transfers or Voidable Conveyances.......... 13

        7.    Motion to Enlarge Exclusivity Periods ............................................. 16

V.    SUMMARY OF THE PLAN ........................................................................16

    A.    Introduction..............................................................................................16

    B.    Unclassified Claims .................................................................................23

|  |  | 1. | General Administrative Claims | 23 |
|  |  | 2. | Statutory Fees | 23 |
|  |  | 3. | Fee Claims | 23 |
|  |  | 4. | Bar Dates for General Administrative Claims | 24 |
|  |  | 5. | Priority Tax Claims | 24 |
|  | C. | | Classification and Treatment of Claims and Interests | 25 |
|  | D. | | Means of Implementation of the Plan | 27 |
|  |  | 1. | Funding of the Plan | 27 |
|  |  | 2. | Reorganized Debtor | 28 |
|  |  | 3. | Management of Reorganized Debtor | 28 |
|  |  | 4. | Powers of Reorganized Debtor | 28 |
|  |  | 5. | Monthly and Quarterly Operating Reports | 28 |
|  |  | 6. | Substantive Consolidation and Statutory Merger | 29 |
|  |  | 7. | Tax Returns | 30 |
|  |  | 8. | Application for Final Decree | 30 |
|  |  | 9. | Standard of Care for Debtors-in-Possession | 30 |
|  |  | 10. | Continuation of the Examiner; Fee Requests by the Examiner. | 30 |
| VI. | | | EXECUTORY CONTRACTS | 31 |
|  | A. | | Assumption or Rejection of Executory Contracts. | 31 |
|  | B. | | Cure Cost Claims. | 31 |
|  | C. | | Rejected Contracts | 31 |
| VII. | | | PROVISIONS GOVERNING PAYMENT AND DISTRIBUTIONS | 31 |
|  | A. | | Manner of Payment | 31 |
|  | B. | | Funds and Accounts for Payment of Claims and Plan Implementation | 31 |
|  |  | 1. | Disputed Claims Reserve | 32 |
|  |  | 2. | Plan Expense Reserve | 32 |
|  |  | 3. | Management of Accounts Established Pursuant to the Plan | 32 |
|  |  | 4. | Payment of Claims and Interests | 32 |
|  |  | 5. | Unclaimed Distributions | 32 |
|  |  | 6. | Rounding of Dividend Amounts | 33 |
|  |  | 7. | Distributions to the Last Known Address | 33 |
|  |  | 8. | Assignment of Claims | 33 |
|  |  | 9. | Withholding or Other Taxes | 33 |

|  | **10.** | Setoffs | 33 |
|  | **11.** | Subordination Rights | 33 |
|  | **12.** | No Interest | 34 |
| **VIII.** | **PROVISIONS GOVERNING OBJECTIONS TO CLAIMS** | | **34** |
| A. | Disputed Claims | | 34 |
|  | **1.** | Disputed Claims Reserve per Classes | 34 |
|  | **2.** | Previously Disputed Claims that Are Subsequently Allowed | 34 |
|  | **3.** | Allowance of Claims | 34 |
| B. | Examination and Objections to Claims | | 35 |
|  | **1.** | Examination | 35 |
|  | **2.** | Objection Deadlines | 35 |
|  | **3.** | Claims Resolution | 35 |
| C. | No Distributions to Holders of Disputed Claims | | 35 |
| D. | Estimation of Claims | | 35 |
| **IX.** | **PROVISIONS REGARDING EFFECTS OF CONFIRMATION** | | **36** |
| A. | Discharge of Reorganized Debtor | | 36 |
|  | **1.** | Discharge of Reorganized Debtor | 36 |
|  | **2.** | Terms Binding | 36 |
|  | **3.** | Continuation of Pre-Confirmation Injunction or Stays | 36 |
|  | **4.** | Post-Confirmation Effects of Evidences of Claims or Interests | 36 |
|  | **5.** | *Channeling Injunction Prohibiting Collection Action Against Guarantors and Prohibiting dissipation of assets by Guarantors During Plan Consummation.* | 37 |
| **X.** | **PRESERVATION OF CAUSES OF ACTION** | | **37** |
| A. | Rights with Regard to Causes of Action | | 37 |
| B. | Representative of the Estate | | 38 |
| C. | Retention of Jurisdiction | | 38 |
| **XI.** | **MISCELLANEOUS PROVISIONS OF THE PLAN** | | **39** |
| A. | Modifications or Amendment | | 39 |
| B. | Exemption from Transfer Taxes | | 39 |
| C. | Effectuating Documents, Further Transactions and Corporate Action | | 39 |
| D. | Successors and Assigns | | 39 |
| E. | Governing Law | | 39 |

F.      Conflicts ............................................................................................................... 39

XII.    FINANCIAL INFORMATION ....................................................................................... 40

XIII.   ACCEPTANCE AND CONFIRMATION ..................................................................... 40

        A.      Acceptance of Plan .................................................................................... 40

        B.      Feasibility ................................................................................................... 40

        C.      "Best Interests of Creditors" Test ............................................................. 40

XIV.    FEASIBILITY OF THE PLAN ....................................................................................... 42

XV.     CERTAIN TAX CONSEQUENCES ............................................................................. 42

        A.      In General .................................................................................................... 42

        B.      Gain or Loss on Exchange ......................................................................... 42

                1.      Receipt of Cash ............................................................................. 43

                2.      Determination of Character of Gain or Loss ................................ 43

        C.      Receipt of Interest ...................................................................................... 43

        D.      Backup Withholding ................................................................................... 43

        E.      Tax Consequences to Interest Holders ..................................................... 44

XVI.    ALTERNATIVES TO CONFIRMATION ...................................................................... 44

        A.      Liquidation Under Chapter 7. .................................................................... 44

XVII.   SOLICITATION ............................................................................................................. 45

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| YC ATLANTA HOTEL LLC, | : | **Chapter 11 Case No. 21-50964-BEM** |
| | : | **(Jointly-Administered)** |
| Debtor. | : | |
| | : | |
| IN RE: | : | |
| | : | |
| YC FERNLEY HOTEL LLC, | : | **Chapter 11 Case No. 21-52543-BEM** |
| | : | |
| Debtor. | : | |

**DISCLOSURE STATEMENT FOR JOINT PLAN OF REORGANIZATION OF**
**YC ATLANTA HOTEL LLC AND YC FERNLEY HOTEL LLC**
**DATED JULY 6, 2021**

Ward Stone, Jr.
David L. Bury, Jr.
Thomas B. Norton
Stone & Baxter, LLP
Suite 800, 577 Mulberry Street
Macon, Georgia 31201
Counsel to Debtors and Debtors-in-Possession

**<u>NOTICE</u>**

This Disclosure Statement is the only document authorized by the Court to be used in connection with the solicitation of votes accepting or rejecting Debtors' Joint Plan of Reorganization (as it may be amended). A copy of the Plan is attached to this Disclosure Statement. No representations have been authorized by the Court concerning the Debtors or the Plan, except as set forth in this Disclosure Statement.

This Disclosure Statement contains only a summary of the Plan and is not intended to replace careful and detailed review and analysis of the Plan, but to aid and supplement such review. This Disclosure Statement is qualified in its entirety by referenced to the more detailed provisions set forth in the Plan (which is included as <u>Exhibit A</u> to this Disclosure Statement). All capitalized terms contained in this Disclosure Statement have the meaning assigned in the accompanying Plan. In the event of a conflict between the Plan and Disclosure Statement, the provisions of the Plan will govern. All holders of claims are

1

encouraged to review the full text of the Plan and to carefully review this entire Disclosure Statement before deciding whether to vote to accept or reject the Plan.

This Disclosure Statement summarizes certain provisions of the Plan, statutory provisions, documents related to the Plan, events in Debtors' Chapter 11 cases, and financial information. Although Debtors believe that the Plan and related document summaries are fair and accurate, such summaries are qualified to the extent that they do not set forth the entire text of such documents or statutory provisions. Factual information contained in this Disclosure Statement has been provided by Debtors, except where otherwise specifically noted. Debtors are unable to warrant or represent that the information contained herein, including the financial information, is without inaccuracy or omission.

The statements contained in this Disclosure Statement are made as of the date hereof, except to the extent an earlier date is specified with respect to any information. The delivery of this Disclosure Statement does not imply that the information contained herein is correct at any time subsequent to the date hereof or thereof.

No individual or entity should construe the contents of this Disclosure Statement as providing any legal, business, financial, or tax advice. Every individual or entity should consult with their own legal, business, financial, or tax advisors as to any such matters.

The Disclosure Statement has not been approved or disapproved by the Securities and Exchange Commission. The SEC has not reviewed, certified, or passed upon the accuracy or adequacy of this statements contained herein, and it is not required to do so.

As to any contested matters, adversary proceedings, and other claims, actions, or threatened actions involving Debtors or their creditors that exist, or may be made or initiated in the future, this Disclosure Statement will not constitute, nor shall it be construed as, an admission of any fact, liability, stipulation, or waiver. Instead, any material in this Disclosure Statement will be treated as a statement made in settlement negotiations, and shall not be admissible in further proceedings.

The approval by the Bankruptcy Court of this Disclosure Statement does not constitute a finding by the Court that the representations contained herein are factual, nor does such approval constitute an endorsement of any of the representations contained in either this Disclosure Statement or in the attached Plan.

The Plan will not be binding on creditors unless it is confirmed by the Bankruptcy Court at the confirmation hearing for Debtors' Plan, which will be held on at date, time, and place specified on the accompanying notice and order.

## I.    INTRODUCTION

On February 3, 2021, YC Atlanta Hotel LLC ("**YCA**") filed its voluntary Chapter 11 bankruptcy petition. YC Fernley Hotel LLC ("**YCF**") filed its Chapter 11 bankruptcy petition on March 29, 2021. The above-captioned bankruptcy cases are sometimes referred to in this Disclosure Statement as the "Cases." This Disclosure Statement provides information about

Debtors, the reasons for filing the Cases, key developments during the Cases, and an explanation of the Joint Plan of Reorganization of the Debtors (the "**Plan**").

Debtors submit this Disclosure Statement pursuant to Section 1125 of the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq.* (the "**Bankruptcy Code**"), in connection with the solicitation of acceptances of the Plan, a copy of which is attached on **Exhibit A**.

## A.    The Disclosure Statement

The purpose of this Disclosure Statement is to set forth information that (i) outlines pertinent history about Debtors and their businesses and the reasons that Debtors filed the Cases, (ii) summarizes the Plan, and (iii) is intended to assist each holder of any Claim against, or Equity Interest in, Debtors entitled to vote for acceptance or rejection of the Plan to make an informed decision of whether to vote to accept or reject the Plan. No solicitation for votes on the Plan may be made except pursuant to this Disclosure Statement, and no person has been authorized to use any other information concerning Debtors or their businesses for such purpose.

This Disclosure Statement does not purport to be a complete description of the Plan, the financial status of any Debtor, the applicable provisions of the Bankruptcy Code, or of other matters that may be deemed significant by Creditors, Interest-holders, or other parties-in-interest. The Disclosure Statement necessarily involves a series of compromises between extensive "raw data" and the legal language in documents or statutes on the one hand and considerations of readability and usefulness on the other. **Schedule 1 to the Plan provides definitions which include substantive and material provisions which apply both to the Plan and to this Disclosure Statement. The definitions should be read in conjunction with this Disclosure Statement.** For further information, you should examine the Plan directly and consult your legal, financial, and tax advisors.

## B.    Bankruptcy Court Approval of this Disclosure Statement

After notice and a hearing, the Bankruptcy Court approved this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable each Holder of a Claim against, or Interest in, the Debtors to make an informed judgment as to whether to vote to accept or reject the Plan.

## II.    VOTING PROCEDURES AND REQUIREMENTS

## A.    Eligibility to Vote

The Debtors are soliciting acceptances of the Plan from each Class of Creditors identified in the Plan as an "impaired" class (the "**Voting Classes**"). A Claim is considered "impaired" in bankruptcy unless a plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest . . . ." Therefore, notwithstanding that the Plan proposes to pay all allowed claims in full, many of the Claims which will be paid through the Plan are nevertheless "impaired" under the Bankruptcy Code and, therefore, are entitled to vote. Additionally, only the holders of "Allowed Claims" in the Voting Classes specified below are eligible to vote to accept or reject the Plan. For the purposes of the Plan, a Claim is considered an "Allowed Claim" if the Debtors' schedules filed in the Cases do

not list the claim as being "disputed, contingent, or unliquidated" or if you have filed a Proof of Claim by the Proof of Claim Bar Date. If you have filed a Proof of Claim, it will be an "Allowed Claim" unless a written objection is filed by Debtors. If you have any question concerning whether your claim is an "Allowed Claim," then contact the attorneys for Debtors at the address shown on the first page of this Disclosure Statement.

This Disclosure Statement and the accompanying Plan are being sent to all holders of Unclassified Claims, Creditors, and Interest holders, whether or not entitled to vote. Under Section 1141 of the Bankruptcy Code, the Plan, if approved ("**Confirmed**") by the Bankruptcy Court, will bind all parties, whether or not such parties are entitled to vote for or against the Plan.

**B.     Ballots and Voting Deadlines**

**1. Ballots**

Holders of Claims entitled to vote on the Plan will receive a Ballot accompanying this Disclosure Statement. All votes to accept or reject the Plan must be cast by using the Ballot enclosed with this Disclosure Statement (or manually executed copies thereof). No other votes will be counted.

Please fill out the Ballot and return it to the Bankruptcy Court as the Court instructs.

**Do not return any invoices, securities, notes, or proofs of claim with your Ballot.**

If delivery is by mail, then enough time should be allowed to ensure timely delivery to and actual receipt by the Bankruptcy Court by the Voting Deadline specified in the accompanying Order and Notice.

**As provided in the attached order of the Bankruptcy Court approving the form and content of this Disclosure Statement, in order to be counted, ballots must be completed, signed, and actually received in proper form by the Bankruptcy Court on or before the date set in the attached order (the "Voting Deadline"), or such later date to which this solicitation is extended by the Court. Ballots received after this time may not be counted unless the Court so orders. If you have any questions about procedures for voting, or if you did not receive a ballot, received a damaged ballot, have lost your ballot, or have any questions about the Plan or Disclosure Statement, then please call counsel for Debtors as set forth on the cover page of this document.**

Debtors in their sole discretion may waive objection to Ballots filed after the Voting Deadline, or related to Disputed Claims (e.g., those listed in Debtors' Schedules as disputed, unliquidated, or contingent, or for which a Proof of Claim has been filed and to which Debtors have objected). Otherwise such ballots will not be counted unless ordered otherwise by the Bankruptcy Court.

If a Ballot is signed by trustees, executors, administrators, guardians, attorneys-in-fact, officers of corporations, or others acting in a fiduciary or representative capacity, then such persons should indicate such capacity when signing.

**2. Revocation of Ballots**

Ballots to accept or reject the Plan may be revoked or changed only with the approval of the Bankruptcy Court.

**3. Voting Multiple Claims**

Persons holding Claims in more than one Class must vote in each Class.

**4. Incomplete Ballots**

Any Ballot received which is unsigned, or does not indicate either an acceptance or a rejection of the Plan, will not be counted. Incomplete ballots may be amended by the holder of the Claim on account of which the Ballot is cast to cure the deficiency, provided the amendment is filed before the beginning of the hearing on confirmation of the Plan.

**C.    Confirmation Hearing**

Pursuant to the accompanying Order, a Confirmation Hearing will be held at a date, time, and place listed in such Order before the Honorable Barbara Ellis-Monro, United States Bankruptcy Judge. The Confirmation Hearing may be adjourned from time to time by additional notice prior the hearing, or by announcement in Bankruptcy Court on the scheduled date of the hearing. At the Confirmation Hearing, the Bankruptcy Court will (i) determine whether the requisite votes have been obtained from the Voting Classes, (ii) hear and determine objections, if any, to the Plan and to confirmation of the Plan that have not been previously disposed of, and (iii) determine whether to confirm the Plan. All objections, if any, to confirmation of the Plan must be filed with the Bankruptcy Court and served pursuant to the accompanying Order.

Objections to Confirmation of the Plan may be filed by any Creditor or party in interest, regardless of whether such Creditor or party in interest is entitled to vote on the Plan.

**D.    Recommendations**

**This Plan provides that the Allowed Claims of Debtors' creditors will be paid in full from Debtors' future income and additional capital contributions. Therefore, Debtors urge creditors to vote to accept the Plan. Known alternatives would result in secured creditors getting paid less than the amount of their claims and unsecured claims receiving $0.00.**

**III.    DEBTORS AND THEIR BUSINESSES**

**A.    Debtors**

**1. Debtors**

YCF was formed on July 31, 2017. On September 10, 2019, YCF sold real property in a 1031 exchange for $1,593,122. After paying the 1031 fee, YCF used the proceeds to assist YCA, its wholly owned subsidiary, with its November 15, 2019 purchase of the Red Lion Atlanta, a

long-standing hotel located near the Atlanta's Hartsfield International Airport. Specifically, YCA purchased the Red Lion from RLH Atlanta, LLC, with the purchase price being funded by various affiliates and insiders of YCF and YCA and the remaining portion of the purchase price provided by Access Point Financial LLC ("**APF**") through a real property loan and a capital expenditure loan (as more particularly described below).

As a part of the purchase, YCA and Choice Hotels International, Inc. ("**Choice**") agreed that YCA would upgrade the hotel from a Red Lion to a Clarion Inn hotel. That upgrade required a substantial property improvement plan (a "**PIP**"), which APF agreed to fund. Essentially, the hotel shutdown during the First Quarter 2020 to complete the PIP. However, just as the hotel was about to reopen or ramp back up in late First Quarter 2020, the COVID-19 Pandemic hit and, throughout 2020, had a severe negative financial impact on the hotel. YCA is finishing the PIP now, with an estimated completion date in or about the Third or Fourth Quarter of 2021.

On the one hand, Baldev Johal and Balbir Gosal serve as the Managers of YCF and YCF. On the other hand, YCA is part of a larger, vertically integrated group of hotels across the country. Specifically, the group consists of over 12 hotels, all of which trace their ownership in some percentage back to Baldev Johal, Balbir Gosal, and Ranjit S Johal. Day to day operations, management, and accounting for the group are handled by The Kishan Group ("**TKG**") and Latrobe Management Services, LLC ("**Latrobe**"), affiliates of the Debtors. TKG, which is based in Reno, Nevada, oversees all of the hotels in the group, provides payment processing services, assists the hotels' General Managers in addressing operational issues, maintains the hotels' books and records, provides working capital to the hotels as needed, acts as a liaison between the hotels and their respective creditors—especially their lenders—and provides whatever intercompany services and oversight that the Debtors and their other affiliates need. TKG provides those services to YCA and its other affiliates without compensation.

Latrobe, which is based in Puerto Rico, serves as a compensated and more of a day-to-day and property-level manager of many of the hotels, including YCA, and provides bookkeeping and accounting services for YCA and many of its affiliates. Although the accounting functions span both TKG and Latrobe for internal control purposes, Latrobe is responsible for tracking all accounting entries and managing YCA's QuickBooks-based accounting system. For YCA, it does so under a written, pre-petition Management Agreement.

### 2. Overview of Assets and Liabilities

**Assets**

<u>YCF</u>

YCF's sole asset is its 100% membership interest in YCA, which operates the hotel. As of the Effective Date, YCF estimates that the value of the LLC Interest is $0.00 because (i) its value is determined based on the assets and liabilities of YCA, its subsidiary, and (ii) the amount of YCA's liabilities as of the Effective Date exceeds the value of YCA's assets.

<u>YCA</u>

YCA's assets consisted of the following, with all values reflecting the YCA's opinion of value of as of the Petition Date per the Amended Schedules and totaling $7,936,412.11:

- Cash and Deposits: $38,724.47

- Accounts Receivable: $69,466.56

- Vehicles: $16,022.00

- Hotel – Personal Property: $920,000.00

- Hotel – Real Property: $6,280,000.00

- Choice Hotel Franchise: Value Unknown

- Claims Against Affiliates: $244,709.00

- Property Improvement Plan (PIP) Reserve with APF: $253,948.08

- Mortgage Loan Insurance Escrow with APF: $113,542.00

**Liabilities**

<u>YCF</u>

The primary liability alleged against YCF arises from its pledge of the LLC Interest to APF as security for YCA's alleged indebtedness to APF. It is a nonrecourse pledge, meaning that YCF did not execute an unlimited and unconditional guaranty of such indebtedness.

Although the Bar Date for claims against YCF is still running, YCF is unaware of any other liabilities, including tax liabilities. The IRS recently filed an amended $0.00 Proof of Claim.

<u>YCA</u>

YCA's alleged liabilities fall into four categories. The summaries of claims below reflect amounts that were scheduled and/or alleged on filed Proofs of Claim. The Debtors' calculations of the claims as of the Confirmation Date are summarized on **Exhibit E**.

First, it has **secured creditors** with claims alleged as follows:

- Access Point Financial LLC ("**APF**") alleges that, as of the Petition Date, YCA owes APF $14,303,218.81. The Debtors dispute the amount of the APF claims.

- U.S. Small Business Administration ("**SBA**") alleges that, as of the Petition Date, YCA owes the SBA $153,883.56.

7

Second, it has **unsecured tax claims** (including priority tax claims) owing to various taxing authorities in the alleged amounts, as of the Petition Date, as follows:

- Georgia Department of Revenue: $4,526.62 (with $4,104.62 alleged as having priority). The Debtors are investigating this alleged claim.

- Internal Revenue Service: $13,013.52 (with $10,536.52 alleged as having priority). The Debtors dispute the amount of the alleged IRS claims.

- As show on Exhibit E, it also appears that YCA owes the City of College Park and Fulton County Georgia for 2020 personal property taxes.

Third, it has **non-insider unsecured creditors** (including priority amounts), primarily in the category of trade payables, with claims, as of the Petition Date, totaling approximately $102,011.86 (which amount is more particularly calculated and updated as of the Confirmation Date on Exhibit E). That does not include approximately $489,728.43 allegedly owing to Choice Hotels International, Inc. ("**Choice**") under YCA's Franchise Agreement with Choice (which amount reflects, in addition to an alleged pre-petition claim for past due franchise fees of $139,808.43, alleged rejection damages of $349,920.00 if YCA were to reject the Franchise Agreement). It also does not include the priority amounts owing to YCA's employees on the Petition Date, all of which amounts have been paid in full as authorized by the Bankruptcy Court. It does include certain utility claims that YCA scheduled as of the Petition Date but which were paid in full as authorized by the Bankruptcy Court.

Finally, it has **insider unsecured creditors** that, as of the Petition Date, could, depending on whether such claims are classified as equity or debt, total as much as $1,382,616.27.

### 3. Reasons for Filing Bankruptcy

There is no doubt that the COVID-19 Pandemic had a significant negative impact on YCA and, thus, the value of YCF's assets throughout 2020. Although YCA is improving, YCA was unable to negotiate a consensual workout of its alleged obligations to APF prior to the filing. Further, APF accelerated the indebtedness via written demand dated January 22, 2021 (the "**10-Day Letter**"), which demand YCA alleges that it received on January 25, 2021. There is a dispute about the receipt date. Given the tenor of the parties' prior discussions and the 10-day deadline in the 10-Day Letter, YCA determined that it had no choice but to seek bankruptcy protection. A little less than 2 months into YCA's Chapter 11 case, YCF made a similar determination when it found out by accident, without any notice from APF, that APF had scheduled a public auction of the LLC interest for April 8. To protect its asset, YCF filed, too. The Debtors reserve their raise the issue of whether the scheduled auction violated the automatic stay in YCA's Chapter 11 case to the extent that the withdrawal of the auction was premised by its terms on YCA paying APF all amounts alleged as owing to it by YCA.

## IV.    DEBTORS' CHAPTER 11 CASES

These cases are being jointly-administered. The Debtors continue to conduct their affairs and operate their businesses as debtors and debtors-in-possession, as authorized under Sections 1107(a) and 1108 of the Bankruptcy Code. Significant developments during the Bankruptcy Cases are described below.

### A.    Significant "First Day" Bankruptcy Orders

**YCA's Case**

At the outset of YCA's case, YCA filed motions with the Bankruptcy Court seeking both procedural and substantive relief, resulting in (1) an order authorizing YCA to retain Stone & Baxter, LLP as its bankruptcy counsel; (2) an order authorizing YCA to retain Buckhead Advisory Group, LLC as its appraiser; (3) and order establishing compensation procedures for YCA's professionals whereby the fees and expenses of YCA's professionals could be paid on a monthly basis, subject to objection by creditors and final Bankruptcy Court approval; (4) an order permitting YCA to pay pre-petition wages and related amounts owing to its employees; (5) an order permitting YCA to pay all of its pre-petition utility liabilities; (6) an order, as more particularly described below, permitting YCA to use cash collateral on an interim basis; and (7) an order permitting YCA to limit notice for certain matters. YCA also filed an application to employ GGG Partners, LLC ("**GGG**") as its financial advisor in the case. That motion is still pending on account of an objection by the United States Trustee. YCA and YCF also obtained an order jointly-administering their bankruptcy cases for procedural purposes only.

**YCF's Case**

At the outset of YCF's case, YCF also filed motions with the Bankruptcy Court seeking both procedural and substantive relief, resulting in (1) an order authorizing YCF to retain Stone & Baxter, LLP as its bankruptcy counsel; (2) an order establishing compensation procedures for YCF's professionals whereby the fees and expenses of YCF's professionals could be paid on a monthly basis, subject to objection by creditors and final Bankruptcy Court approval; and (3) as described above, an order jointly-administering its and YCA's cases for procedural purposes only.

### B.    Significant Events During the Chapter 11 Cases

### 1. The Filing of Schedules of Assets and Liabilities and Statement of Financial Affairs

On February 26, 2021 and April 19, 2021, respectively, YCA and YCF filed their Schedules of Assets and Liabilities (the "**Schedules**") and Statement of Financial Affairs ("**SOFA**"). YCA filed amendments to its Schedules and SOFA on April 2 and 5, 2021. The Schedules and SOFAs are of record in the Office of the Clerk of the Bankruptcy Court and available for inspection online and at the Clerk's Office.

The Schedules, filed under oath, list all known assets and liabilities of the Debtors as of the Petition Date. The manner in which Claims against the Debtors are listed in the Schedules is

important. Under Section 1111(a) of the Bankruptcy Code, a Proof of Claim or Interest is deemed filed for any claim or interest that appears in the Schedules, except a claim or interest that is scheduled as disputed, contingent, or unliquidated. Parties satisfied with the manner in which their claim or interest is listed in the Schedules need not file a Proof of Claim in the Bankruptcy Cases, but if there is a disagreement with the amount so scheduled, unless a Proof of Claim is filed, the amount of the claim or interest shown in the Schedules establishes the amount of the claim or interest for all purposes in the Bankruptcy Cases. The deadline for filing a Proof of Claim in the YCA case was established by the Bankruptcy Court as April 26, 2021. *See* Dkt. 40. The deadline for filing a Proof of Claim in the YCF case is July 9, 2021. *See* YCF Dkt. 22.

A Proof of Claim filed in the Bankruptcy Cases automatically supersedes the Schedules, unless objected to. The Plan provides that Reorganized Debtor will have time after the Effective Date to object to a Claim. The Reorganized Debtor will file objections to Claims, as appropriate, based on its continuing reconciliation of the Claims, including with respect to amount, classification, and validity.

As further set forth in the Plan, the Confirmation Order will also serve as a Bar Date Order for certain Claims, including Administrative Claims and Executory Contract Rejection Claims not governed by another Bar Date.

### 2. Meetings of Creditors under Section 341

Debtors attended the 341 Meeting of Creditors on March 4, 2021 for YCA (which was continued to and concluded on April 29, 2021) and on April 29, 2021 for YCF (which was concluded that day). Those meetings were preceded by Initial Debtor Interviews ("**IDI**"), with YCA's IDI occurring on February 18, 2021 and YCF's IDI occurring on April 13, 2021.

### 3. Cash Collateral

On February 8, 2021, YCA filed a motion seeking authority to cash collateral, identifying APF and the SBA as creditors claiming an interest in cash collateral (the "**Cash Collateral Motion**"). The Court granted the Cash Collateral Motion on an interim basis (the "**Interim Order**"). Although disputes arose regarding whether YCA violated the Interim Order, which disputes caused APF to file its *Emergency Motion to Enforce Compliance with the Court's Cash Collateral Order and For Related Relief* (Dkt. 53) (the "**Contempt Motion**") and later litigate those disputes as a part of the APF Conversion Motion (discussed below), YCA has been using cash collateral on an interim basis with Court authorization since February 12, 2021. As of the date of this Disclosure Statement, YCA is using cash collateral on an interim basis pursuant to the Fourth Interim Order Authorizing Use of Cash Collateral (Dkt. 161). As a part of that Order, YCA is paying APF $24,000 per month in adequate protection.

### 4. Motions to Convert or Appoint a Chapter 11 Trustee

On March 18, 2021, APF filed its *Emergency Motion to Convert to Chapter 7 or, In the Alternative, To Appoint Chapter 11 Trustee* (Dkt. 70) (the "**APF Conversion Motion**"). Similarly, on March 24, 2021, the United States Trustee filed its *Motion for Appointment of a Chapter 11 Trustee or In the Alternative Conversion to Chapter 7* (Dkt. 91) (the "**UST**

**Conversion Motion**"). As more particularly stated in the Conversion Motions, APF and the UST sought appointment of a Chapter 11 Trustee in Y CA's case under § 1104 for various pre- and post-petition alleged conduct and omissions of YCA or, in the alternative, conversion of YCA's case under § 1112(b) for various post-petition alleged conduct and omissions of YCA. The grounds for appointment included, but were not limited to, pre- and post-petition gross mismanagement of YCA. The grounds for conversion included, but were not limited to, alleged substantial and continuing losses in YCA with an absence of a reasonable likelihood of rehabilitation; unauthorized use of cash collateral by YCA that caused substantial harm to at least one creditor having an interest in cash collateral; gross mismanagement of the estate by YCA; and failure to comply with the Interim Order.

The Court conducted a hearing on the Conversion Motions. It started on April 6, carried over to April 7-8, April 23, and April 26, and concluded with closing arguments on April 28.

On May 19, 2021, the Court entered its *Order Denying Appointment of a Chapter 11 Trustee and Appointing an Examiner* (Dkt. 152) (the "**Examiner Order**") wherein it denied the Conversion Motions and, instead of converting YCA's case or appointing a Chapter 11 Trustee for YCA's case, it appointed an Examiner. The United States Trustee selected Christopher Tierney, of **Moore Colson** & Company, P.C. ("**Moore Colson**"), to serve as the Examiner. The Examiner, who has sought to employ Moore Colson as his Accountants and Stites & Harbison, PLLC as his counsel, has the following duties under the Examiner Order:

- Investigate the day-to-day operations of YCA's accounting and administrative functions;

- Supervise and oversee the accounting treatment of all receipts and expenditures in YCA's books and records;

- Supervise and oversee the preparation of budgets and reports of YCA, including its Monthly Operating Report;

- Execute a statement accompanying each monthly operating report filed by YCA that the report has been reviewed by the Examiner and states whether the Examiner agrees with the report or has any concerns about the report;

- Investigate the recording of transactions in YCA's books from November 15, 2019 forward;

- Identify any potential avoidance actions evident from the investigation of YCA's books and records and report any such actions to the Court and parties-in-interest.

As of the date of this Disclosure Statement, YCA has met with the Examiner, the Examiner has conducted a site visit of the Hotel, and the Examiner (and his professionals) and YCA (and its professionals) are communicating extensively, with YCA currently in the process of answering questions posed by and providing documents and information requested by the Examiner. YCA understands that the Examiner's initial Report is due by July 8, 2021.

11

**5. Classification of Claims and Interests, the Setting of the Bar Date, and the Filing of Proofs of Claim**

The manner in which Debtors classified their Claims against Debtors in the Schedules is important in the resolution of the Bankruptcy Cases and the payments under the Plan. Under Section 1111(a) of the Bankruptcy Code, a Proof of Claim or Interest is deemed filed for any claim or interest that appears in the Schedules, except a claim or interest that is scheduled as disputed, contingent, or unliquidated. Federal Rule of Bankruptcy Procedure 3001(c)(2) specifies that a creditor whose claim is classified as disputed, contingent, or unliquidated must file a proof of claim or that creditor will not be treated as a creditor for the purpose of voting and distributions. Creditors have the burden of checking Debtors' Schedules to determine if their Claims have been accurately scheduled.

In the YCA case, the Court set April 26, 2021 as the Bar Date for filing Proofs of Claim. In the YCF case, the Court set July 9, 2021 as the Bar Date for filing Proofs of Claim. As further set forth in the Plan, the Confirmation Order will provide Bar Dates for certain Claims, including Administrative Claims and Executory Contract Rejection Claims not governed by another Bar Date.

Parties in the YCA case and the YCF case that were or are satisfied with the manner in which YCA and YCF classified their respective claims or interests in the respective YCA and YCF Schedules were not or will not be required to file a Proof of Claim in the Bankruptcy Case for YCA and YCF. Creditors whose claims were listed as disputed, contingent, or unliquidated were or are required to file a Proof of Claim. Any person or entity that was (or in YCF's case will be) required to file a Proof of Claim on or before the applicable Bar Date, but failed to do so, is (or will be) forever barred, estopped, and enjoined from voting on or receiving a distribution under the Plan. Further, if the Bankruptcy Court confirms the Plan, then such holders will be bound by the terms of the confirmed plan and will be forever barred, estopped, and enjoined from asserting a Pre-Petition Claim against the Estates or any property of Debtors administered in the estate or transferred pursuant to the Plan.

A Proof of Claim filed in a particular Case automatically supersedes the Schedules for that particular Case, unless objected to by Debtors or Reorganized Debtor under the Plan. Except as otherwise specified herein (including, without limitation, with respect to Administrative Claims, Fee Claims, and Executory Contract Claims), objections to Proofs of Claim or claims that are deemed filed under Section 1111(a) shall be Filed with the Bankruptcy Court and served upon Creditors by the Claims Objection Bar Date; provided, however, that this deadline may be extended by the Bankruptcy Court upon motion of Debtors-in-Possession, without notice or a hearing. After an order, judgment, decree, or settlement agreement allowing a Disputed Claim becomes a Final Order, Distributions with respect to and on account of such previously Disputed Claim will be made. To date, a number of alleged general unsecured Claims and alleged secured Claims have been filed with the Bankruptcy Court. Debtors may object to a number of these claims following confirmation of the Plan. Debtors have been reviewing, and continue to review, such Claims with respect to amount, classification, and validity. Debtors will file Claims objections, as appropriate, based on their continuing reconciliation of the Claims.

### 6. Avoidance of Preferential Transfers or Voidable Conveyances

**Potential avoidable preferential transfers:** The Debtors have not yet completed their investigation with regard to potential preferential payments under Section 547 of the Bankruptcy Code, but have listed extensively in the Statement of Financial Affairs payments made to creditors within 90 days and within 1 year of the Bankruptcy Cases, if any. *See* Dkt. 118 at 1-2, 8-9 to 11-17. YFC did not make any such payments.

**If you received a payment or other transfer within 90 days of the bankruptcy filing for a particular Debtor or 1 year of the bankruptcy filing for a particular Debtor, respectively, or other transfer that is potentially avoidable under the Bankruptcy Code, then such transfer may be subject to avoidance under the Bankruptcy Code, including its Sections 544, 547, 548, and 550.** It is possible that the potential preferential transfers identified in YCA's Statement of Financial Affairs are defendable by the recipient based on, among other possible defenses, the ordinary course business defense, new value defense, and contemporaneous exchange for new goods or services defense.

For the convenience of the parties, such recipients include, at a minimum, the following, but the following list is not intended as a substitute for reviewing the Amended Schedules and Statement of Financial Affairs:

- Allbridge

- American Express

- Baldev Johal

- Bank of America

- Booking.com B.V.

- Choice Hotels International

- Citibank

- City of College Park

- Einstein's Investigations, LLC

- Extended Stay

- Georgia Department of Revenue

- Guest Supply

- Home Depot

- Internal Revenue

- Latrobe Management Services LLC

- Liberty Mutual Insurance

- Michael Marcum

- Office Depot

- Stone & Baxter, LLP

- Sysco

- The Kishan Group

- Transwest Capital, Inc.

- YC Fairbanks Hotel Group LLC

- YC Texas LLC

**Potential avoidable conveyances:** The Debtors have also not yet completed their investigation with regard to potential voidable conveyances under Sections 544, 548, and 550 of the Bankruptcy Code. According to the Examiner Order, at least two sets of transactions in the year prior to YCA's bankruptcy filing warrant further investigation, as follows.

First, YCA loaned a total of $335,000 to YC Fairbanks Hotel Group LLC ("**YC Fairbanks**"), its affiliate, during 2020, with the loans occurring on the following dates and in the following amounts, for a total loaned amount of $335,000:

- March 27, 2020: $160,000

- March 30, 2020: $25,000

- May 1, 2020: $150,000

YC Fairbanks paid back a portion of the loans on the following dates and in the following amounts, for total repayments to date of $98,000:

- April 1, 2020: $20,000

- April 3, 2020: $20,000

- April 15, 2020: $8,000

- November 13, 2020: $50,000

As of the date of this Disclosure Statement, the remaining amount owing by YC Fairbanks to YCA is $237,000. Other than corresponding journal entries on YCA's books and

YC Fairbanks' books, the loan was not documented. Generally, the expected repayment terms were that YC Fairbanks would repay the loans when it is able to repay them.

While it is possible that the loans to YC Fairbanks could be characterized as avoidable transfers, YCA's conclusion is that the loans are not avoidable transfers and that pursuing such claims would be a waste of estate resources, particularly given that the Plan proposes to pay all claims in full without depending on avoidance of those amounts and without depending on the repayment of such amounts; given that the Guarantors have pledged at least $300,000 in equity infusions as of the Effective Date to fund the Plan plus additional infusions as necessary; given that the Guarantors have also guaranteed via the Plan, jointly and severally, the repayment of the YC Fairbanks loan and any other amounts determined as owing to YCA by its Insiders and Affiliates; and given that claims owing by YCA to its Insiders and Affiliates, which could total more than $1.3 million, are being deferred for payment until all other non-Insider and non-Affiliate Allowed Claims are paid in full. Instead, the loans were intercompany loans that are to be paid back. YCA notes that the Examiner is, under the Examiner Order, investigating the loans to YC Fairbanks and will ultimately state his non-binding opinion about how the YC Fairbanks transactions should be characterized and whether they might constitute potential avoidance actions. YCA reserves all rights with respect to the loans to YC Fairbanks.

Second, from August 10, 2020 to December 15, 2020, YCA made payments to Latrobe Management Services LLC ("**Latrobe**"), its affiliate, under YCA's Management Agreement with Latrobe. The payments, totaling $114,589.44, were as follows:

- August 10, 2020: $41,709.70

- August 19, 2020: $30,810.59

- September 24, 2020: $10,014.87

- November 13, 2020: $10,293.77

- November 24, 2020: $11,727.85

- December 15, 2020: $10,032.66

There have been allegations that such payments might be avoidable or may have been improper. YCA disputes those allegations and contends that the payments were proper and for fair and reasonable value in exchange, especially given that Latrobe has always provided and continues to provide such critical management and accounting services to YCA and other of its affiliates. For the same reasons stated above for the YC Fairbanks amounts, the Debtors contend that pursuing the Latrobe amounts would be a waste of Estate resources, perhaps even more so than the pursuit of the YC Fairbanks amounts. As with the YC Fairbanks amounts, the Guarantors have guaranteed the repayment to the Reorganized Debtor any amounts that are determined to be owing by Latrobe to YCA.

YCA notes that the Examiner is, under the Examiner Order, investigating the payments to Latrobe and will ultimately state his non-binding opinion about how the payments should be

characterized and whether they might constitute potential avoidance actions. YCA reserves all rights with respect to the payments to Latrobe.

### 7. Motion to Enlarge Exclusivity Periods

On June 3, 2021, the Debtors moved to extend their exclusive time within which to file a plan and obtain acceptances. Specifically, they requested an enlargement of the time to file through October 1, 2021 and an enlargement of the time to solicit through November 30, 2021. APF objected to the motion. The motion is scheduled to be heard on July 27, 2021.

## V.    SUMMARY OF THE PLAN

**The following is a brief summary of the Plan.  Holders of claims and interests are urged to read the Plan in full. Holders of claims and interests are also urged to, and should, consult with counsel in order to understand and analyze the Plan fully. If Confirmed, the Plan will become a legally binding agreement among Debtors and all of their creditors and parties in interest.**

### A.    Introduction

In pertinent part, the Plan, which proposes the substantive consolidation and state law merger of YCA and YCF (with YCA as the surviving entity), provides for the payment in full of all Allowed Claims against Debtors. Such repayment was and/or will be made possible through a combination of the following: (i) proceeds from the regular operation of the hotel; (ii) additional operating capital from principals of the Debtors, including a minimum, guaranteed contribution from the Guarantors totaling $300,000 on the Effective Date; and (iii) a joint and several personal guaranty from the Guarantors of any amounts that are determined by the Bankruptcy Court to be payable to or avoidable in favor of the Debtors or the Reorganized Debtor.

Generally, the Plan provides for the treatment of Allowed Claims and Equity Interests. A Claim is defined by the Plan and the Bankruptcy Code to be a right to payment from Debtors, or from the property of Debtors, or a right to an equitable remedy for breach of performance, if such breach gives rise to a right to payment. The Plan defines an Allowed Claim as follows: (a) a Claim that has been listed by Debtors on their Schedules as other than disputed, contingent, or unliquidated, to the extent that it is not otherwise a Disputed Claim; (b) a Claim for which a Proof of Claim has been Filed by the applicable Bar Date or has otherwise been deemed timely Filed under applicable law, to the extent that it is not otherwise a Disputed Claim; or (c) a Claim that is allowed (i) in any Stipulation of Amount and Nature of Claim executed by Debtors and the Creditor; (ii) in any contract, instrument, or other agreement entered into in connection with the Plan; (iii) in a Final Order; or (iv) pursuant to the terms of the Plan.

The categories of Claims and Equity Interests listed below classify Claims and Interests for all purposes, including (i) voting, (ii) confirmation of the Plan, and (iii) distribution pursuant to the Plan and pursuant to Sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Classes take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Interests. A Claim or Interest will be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and will be

deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. To the extent that the holders of any Allowed Claims or Interests object to Debtors' classification scheme, such objections will be considered at the Confirmation Hearing, and, if sustained, the classifications outlined below will be deemed modified in accordance with any order sustaining such objections.

Any Class of Claims that, as of the date of the commencement of the Confirmation Hearing, contains no Allowed Claims will be deemed deleted from the Plan for purposes of determining acceptance or rejection of the Plan by such Class under Section 1129(a)(8) of the Bankruptcy Code. The classification of Claims against and Equity Interests in Debtors, and their respective voting rights, pursuant to the Plan are as follows:

| Class | Impairment | Treatment |
|---|---|---|
| **Unclassified Claims** | Unimpaired | Certain Claims may not be classified under Chapter 11 plans, including: Claims entitled to Administrative Expense Status, U.S. Trustee Fees, and Court Costs. The Plan provides for payment of Unclassified Claims on or before the Effective Date of this Plan unless otherwise agreed by the Holder of such an Unclassified Claim or otherwise provided in the Plan. Claims entitled to Priority Status under 11 U.S.C. § 507(a)(8) (certain tax claims) shall be paid in a manner authorized under 11 U.S.C. § 1129(a)(9)(C), within the times specified therein. |
| **Class 1** – Non-Tax Priority Claims | Impaired | There are no known claims in this Class. If such claims are Allowed by the Bankruptcy Court, then, except to the extent that the Holder of an Allowed Class 1 Claim agrees to other, lesser treatment, any Holder of an Allowed Class 1 Claim shall be paid in full within the later of fourteen (14) days after the Effective Date and the date of allowance of such claims, which date of payment shall be deemed to be the Effective Date with respect to any such Claims. |
| **Class 2 –** Allowed Secured Claim of | Impaired | The Allowed Secured Claim of Access |

| Access Point Financial LLC | | Point Financial LLC ("**APF**") (the "**Class 2 Secured Claim**") is alleged to total approximately **$7,567,491.08** (secured by an alleged senior lien on YCA's real property, an alleged senior lien on certain of YCA's personal property, and an alleged senior lien on reserves of YCA that are currently held by APF) as of the Effective Date (before deducting adequate protection payments) and shall be paid in full as follows: The Reorganized Debtor shall pay the Allowed amount of the Class 2 Secured Claim, together with interest at the Plan Interest - Secured rate (which shall accrue from the Confirmation Date), amortized over 300 months, in 78 monthly installments, with (i) the first 6 months of payments consisting of interest-only payments projected to be **$27,747.00** per month, commencing on the last day of the month in which the Effective Date occurs; (ii) 71 monthly payments of principal and interest projected to be **$41,634.00** per month, commencing on the last day of the month that follows the month in which the last interest-only payment is made; and (iii) a final balloon payment of the remaining balance as the 78th payment (the "**Plan Balloon Date**"), such that the Class 2 Secured Claim will be paid in full in 78 payments. The Class 2 Secured Claim will be evidenced by a new modified secured promissory note from the Reorganized Debtor in substantially the form shown on **Exhibit A** to this Plan (a "**Modified Class 2 Secured Note**"). The principal amount of the Modified Class 2 Secured Note shall equal the Allowed amount of the Class 2 Secured Claim. The Holder of the Class 2 Secured Claim shall retain the lien(s) securing the Modified Class 2 Secured Note |
|---|---|---|

| | | |
|---|---|---|
| | | until such Note is satisfied in full, and the Note may be pre-paid in whole or part at any time, without penalty. This Plan and the Budget attached with the accompanying Disclosure Statement propose that (i) the PIP Reserve currently held by APF may and shall be used by the Reorganized Debtor for purposes of completing the PIP and (ii) the Loan Insurance Reserve currently held by APF may and shall be used by the Reorganized Debtor for purposes of paying 2021 real and personal property taxes owing by the Debtor YCA. |
| **Class 3 –** Allowed Secured Claim of U.S. Small Business Administration | Impaired | The Allowed Secured Claim of the U.S. Small Business Administration ("**SBA**") (the "**Class 3 Secured Claim**") is alleged to total approximately **$153,883.56** (secured by an alleged junior lien on YCA's real property, an alleged junior lien on certain of YCA's personal property, an a senior lien on YCA's payment intangibles under the UCC) as of the Effective Date (before deducting adequate protection payments) and shall be paid in full as follows: The Reorganized Debtor shall pay the allowed amount of the Class 3 Secured Claim, together with interest at the Plan Interest - Secured rate (which shall accrue from the Confirmation Date), amortized over 72 months, in 78 monthly installments, with (i) the first 6 months of payments consisting of interest-only payments projected to be **$564.00** per month, commencing on the last day of the month in which the Effective Date occurs and (ii) 72 monthly payments of principal and interest projected to be **$2,208.00** per month, commencing on the last day of the month that follows the month in which the last interest-only payment is |

| | | |
|---|---|---|
| | | made, such that the Class 3 Secured Claim will be paid in full in 78 payments. The Class 3 Secured Claim will be evidenced by a new modified secured promissory note from the Reorganized Debtor in substantially the form shown on **Exhibit A** to this Plan (a "**Modified Class 3 Secured Note**"). The principal amount of the Modified Class 3 Secured Note shall equal the Allowed amount of the Class 3 Secured Claim. The Holder of the Class 3 Secured Claim shall retain the lien(s) securing the Modified Class 3 Secured Note until such Note is satisfied in full, and the Note may be pre-paid in whole or part at any time, without penalty. |
| **Class 4** – Allowed Unsecured Administrative Convenience Class Claims of $12,000 or Less (including those who opt-into Class 4) | Impaired | Class 4 includes the Allowed Unsecured Administrative Convenience Class Claims of $12,000 or Less and is estimated to total **$63,006.94** as of the Effective Date (including holders of Allowed Unsecured Claims in Classes 5 and 6 who are projected to elect to be included in Class 4) (collectively, the "**Class 4 Unsecured Claims**"). Holders of Allowed Unsecured Claims in Classes 5 and 6 may elect to be included in Class 4. The Reorganized Debtor shall satisfy such Allowed Class 4 Unsecured Claims by paying, within fourteen (14) days after the Effective Date, the holders of Class 4 Unsecured Claims the lesser of (i) the amount of each holder's Allowed Unsecured Claim and (ii) $12,000. Each holder of an Allowed Unsecured Claim in Classes 5 and 6 (whose alleged Claim exceeds $12,000) who elects to be included in Class 4 in lieu of receiving the treatments provided in Classes 5 and 6 agrees, as a condition of electing to be |

| | | included in Class 4, that such holder's payment under Class 4, like the other payment recipients in Class 4, shall be in full satisfaction of all Claims of the holder against Debtors and the Reorganized Debtor. |
|---|---|---|
| **Class 5** – Allowed Claims of General Unsecured Creditors (other than Allowed Unsecured Claims included in Classes 4, 6, and 7) | Impaired | Class 5 consists of Allowed General Unsecured Claims (other than Allowed Unsecured Claims included in Classes 4, 6, and 7) and is estimated to total $0.00 as of the Effective Date (exclusive of, and after deducting from Class 5, the holders of Allowed Unsecured Claims in Class 5 who are projected to elect to be included in Class 4) (collectively, the "**Class 5 Unsecured Claims**"). Holders of Allowed Class 5 Unsecured Claims may elect to be included in Class 4. The Reorganized Debtor shall pay the holders of Allowed Class 5 Unsecured Claims who do not elect to be included in Class 4 in the same manner as proposed for holders of Allowed Class 6 Unsecured Claims and Pro Rata with the holders of Allowed Class 6 Unsecured Claims (as applicable). |
| **Class 6** – Allowed Unsecured Deficiency Claims | Impaired | Class 6 consists of Allowed Unsecured Deficiency Claims (the "**Class 6 Unsecured Deficiency Claims**") and is estimated to total **$5,096,463.10** as of the Effective Date and will be paid in full as follows, with interest at the Plan Interest – Unsecured rate accruing from the Confirmation Date. **First**, the Reorganized Debtor shall make, Pro Rata to the holders of Allowed Class 6 Unsecured Deficiency Claims (and Pro Rata with any holder of an Allowed Class 5 Unsecured Claim who does not elect to be included in Class 4), quarterly interest-only payments at the Plan Interest – Unsecured rate (with the |

| | | |
|---|---|---|
| | | first such quarterly interest payment projected to be due on the last day of November 2021 and covering the accrued interest for September, October, and November 2021 and with the payment period covering the 78-month period starting on the Confirmation Date). **Second**, the Reorganized Debtor shall make annual Excess Cash Flow Payments, Pro Rata to the holders of Allowed Class 6 Unsecured Deficiency Claims (and Pro Rata with any holder of an Allowed Class 5 Unsecured Claim who does not elect to be included in Class 4), with (i) the first annual Excess Cash Flow Payment projected to be due by December 31, 2023 (and each December 31 thereafter through December 31, 2027, for a total of 5 payments, except that the last Excess Cash Flow Payment shall be due on or before the Plan Balloon Date) and with (ii) the first annual Excess Cash Flow Payment projected to cover the 12-month period starting on the first day of the month that follows the first anniversary of the Confirmation Date, and so on with each successive 12-month period. **Third**, the Reorganized Debtor shall, on or before Plan Balloon Date, make a final balloon payment of the remaining balance of the Class 6 Unsecured Deficiency Claims and the Class 5 Unsecured Claims. |
| **Class 7 –** Insider and Affiliate Unsecured Claims | Impaired | Class 7 consists of the Allowed Insider and Affiliate Unsecured Claims in Class 7 (the "**Class 7 Insider and Affiliate Claims**") and is estimated to total as much as **$1,382,616.27** as of the Effective Date. The Reorganized Debtor shall pay each of the respective Class 7 Insider and Affiliate Claims in full, together with interest at the Plan |

| | | Interest - Unsecured rate (which shall accrue from the Confirmation Date), in 60 monthly payments of principal and interest, with the first of such payments due on (and no earlier than) the date that is 12 months after the date on which all holders of Allowed Claims in Classes 1 through 6 have been paid in full as provided in the Plan, and with a like payment on the same day of each month thereafter until all of the Allowed Class 7 Insider and Affiliate Claims are paid in full. |
|---|---|---|
| **Class 8** – Equity Interests of the Debtors | Impaired | Equity Interests of Debtors shall be merged into equity interests in Reorganized Debtor in the same percentages as held in Debtors on the respective Petition Dates. |

## B. Unclassified Claims

### 1. General Administrative Claims

The Plan provides that, unless the Plan provides otherwise and except to the extent the holder of an Allowed Administrative Claim agrees to other, lesser treatment, each holder of an Allowed Administrative Claim shall be paid in respect of such Allowed Claim the full amount thereof, in Cash, by the later of (i) the Effective Date or (ii) the date on which such Claim becomes an Allowed Administrative Claim.

### 2. Statutory Fees

The Plan provides that Allowed Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid in Cash, in full, as such fees become due.

### 3. Fee Claims

Professionals having Allowed Fee Claims shall be paid in full, in Cash, by Debtors in accordance with (i) Orders entered in the Bankruptcy Cases under §§ 330 and 331 and (ii) the Order Establishing Compensation Procedures for Professionals entered in YCA's Bankruptcy Case on March 25, 2021 (Dkt. 27) and the Order Establishing Compensation Procedures for Professionals entered in YCF's Bankruptcy Case on June 14, 2021 (YCF Dkt. 38) (collectively, the "**Administrative Fee Order**"). With respect to any disputed Fee Claim, disputed Fee Claims shall be paid on the date the Bankruptcy Court order allowing such Fee Claim, if any, becomes a Final Order. Upon entry of the Confirmation Order, the Debtors shall set aside in escrow all

unpaid amounts estimated to be owed to Professionals for Fee Claims through the Effective Date (less amounts previously paid or paid on an interim basis after Confirmation as authorized by the Administrative Fee Order or similar Order) pending entry of a Final Order on each such Professionals' application for Allowance of its Fee Claim. *After the Effective Date, Professionals of Debtors shall be compensated as set forth below in the Plan; provided, however, that the Examiner and his Court-authorized professionals shall be compensated after the Effective Date as provided in Section 4.2.10 of the Plan.*

The Bankruptcy Court must rule on all Professional fees and expenses incurred from the Petition Date through and including the Effective Date before such fees will be payable, unless the order approving such Professionals' retention provides otherwise. For all Fee Claims except the statutory Clerk's Office costs of Court and U.S. Trustee's fees treated above, and unless the order approving such Professionals' retention provides otherwise, the Professional in question must file and serve a properly noticed fee application, and the Bankruptcy Court must rule on the application. Only the amount of fees allowed by the Bankruptcy Court will be payable under the Plan.

### 4. Bar Dates for General Administrative Claims

The holder of an Administrative Claim *other than* (1) a Fee Claim, (2) a Post-petition Obligation incurred and payable in the ordinary course of business by Debtors (but excluding personal injury claims and unliquidated claims – the holders of which must initiate an appropriate procedure for allowance thereof under this subparagraph of this Plan on or before the Administrative Bar Date), (3) statutory fees payable pursuant to 28 U.S.C. § 1930, (4) an Administrative Claim that has been Allowed on or before the Effective Date, and (5) a Cure Cost Claim, must File and serve on Debtors and the United States Trustee a request for payment of such Administrative Claim (a "**Request for Payment**"). Any Request for Payment must be Filed within thirty (30) days after final publication of a notice of the Administrative Bar Date by Reorganized Debtor in the designated newspaper for publication of official notices in Fulton County, Georgia. Reorganized Debtor shall cause such notice to be published once a week, for four consecutive weeks, on the usual dates of publications of legal advertisements in such newspaper (the "**Administrative Bar Date**"), which notice shall be deemed to constitute adequate notice to the holders of any such claims of the Administrative Bar Date. Any Request for Payment must include at a minimum (a) the name and address of the holder of the Claim, (b) the amount of the Claim, and (c) the basis of the Claim. *Failure to File and serve such request timely and properly shall result in the Administrative Claim being forever barred and discharged.* Objections to any Request for Payment by any party in interest must be Filed and served on the requesting party within 30 days after the Filing of the applicable Request for Payment Reorganized Debtors (the "**Administrative Claim Objection Deadline**"). *The holders of the Administrative Claims enumerated in (1) – (5) above of this paragraph shall not be required to file a request for payment of their Administrative Claims, and shall be paid as specified above.*

### 5. Priority Tax Claims

Except as otherwise provided in this Plan, each holder of an Allowed Priority Tax Claim will be paid in full, at the option of Reorganized Debtor, (a) in Cash, by the later of (i) the

Effective Date, (ii) the due date of such Claim, or (iii) the date on which such Claim becomes an Allowed Claim; or (b) payment in full with interest at 6% or such other rate of interest that is the prevailing statutory rate for the particular Allowed Priority Tax Claim, in equal annual installments commencing on the Effective Date, with a like payment due on or before each such anniversary of the Petition Date, with a last and final installment due on the fifth anniversary of the Petition Date; provided, however, that the Reorganized Debtor may, at its option, make monthly payments over such repayment period.

**C.    Classification and Treatment of Claims and Interests**

**See Chart Above**

The Debtors note the following for clarity as to certain of the Claims:

As to **Class 2**, which addresses the alleged Secured Claim of APF, the Debtors have calculated the amount of the Secured Claim ($7,567,491.08) based on an appraised value of the hotel of $7,200,000, a Property Improvement Plan ("**PIP**") reserve held by APF of $253,949.08, and a Loan Insurance Reserve held by APF of $113,542.00. That estimated secured amount does not include adequate protection payments made by the YCA, which payments the Debtors contend would reduce the amount of the Allowed Secured Claim, dollar-for-dollar, on account of APF being undersecured. The extent, validity, priority, and amount of APF's Allowed Secured Claim is subject to objection and allowance.

The proposal is that the Reorganized Debtor will pay the Allowed Secured Claim in full over 78 months, with (i) the payments to start on the last day of the month in which the Effective Date occurs; (ii) the first 6 payments being interest-only payments at the Plan Interest – Secured interest rate (stated initially at 4.40%); (iii) the next 71 payments being principal and interest payments at the same interest rate; and (iv) the last (78th) payment being a balloon payment for the remaining balance of the Allowed Secured Claim. The Plan and the attached Budget propose that the Reorganized Debtor will use the above-described reserves to finalize the PIP (with an estimated completion date of December 31, 2021) and to pay real and personal property taxes. The Debtors reserve the right to seek a turnover of such reserves.

As to **Class 3**, which addresses the alleged Secured Claim of the SBA, the Debtors have calculated the amount of the Secured Claim based on the assumption that the SBA is a junior and wholly unsecured creditor, on account of APF's senior liens, except as to the $237,500.00 amount that is owing by YC Fairbanks to YCA, an amount which the Debtors contend is a payment intangible under the UCC and that the SBA has a senior lien on. The extent, validity, priority, and amount of the SBA's Allowed Secured Claim is subject to objection and allowance.

The proposal is that the Reorganized Debtor will pay the Allowed amount in full over 78 months, with (i) the payments to start on the last day of the month in which the Effective Date occurs; (ii) the first 6 payments being interest-only payments at the Plan Interest – Secured interest rate (stated initially at 4.40%); and (iii) the next 72 payments being principal and interest payments at the same interest rate. If the Bankruptcy Court determines that the SBA has an Allowed Secured Claim of $0.00 or some figure less than the value of its total Allowed Claim, then the SBA would be, on account of the resulting Unsecured Deficiency Claim, paid Pro Rata

with APF in Class 6, but with both Deficiency Claims being paid in full on or before the Plan Balloon Date (the date on which the Reorganized Debtor refinances or otherwise must satisfy in full APF's Allowed Claim).

As to **Class 4** and **Class 5**, the Plan and the attached Budget assume that all classified, non-priority Unsecured Claims, other than any Unsecured Claims of APF and the SBA, will elect to be included in Class 4 and receive the lesser of (i) their Allowed Unsecured Claim and (ii) $12,000, on the day specified in the Claims Treatment Chart, in full satisfaction of their Allowed Claims, if any, against the Debtors and the Reorganized Debtor. If any of such creditors do not make that election, then they would be paid in Class 5 in the same manner as, and Pro Rata with, creditors with Allowed Claims in Class 6.

As to **Class 6**, which addresses Unsecured Deficiency Claims, the assumption is that APF is the only creditor who will be determined as having an Allowed Unsecured Deficiency Claim. But, as described above, it is possible that the SBA's entire claim will be determined to be an Unsecured Deficiency Claim. In that instance, the SBA would be paid Pro Rata under Class 6 with APF along with any other general Unsecured Creditors who remain in Class 5. The remainder of this paragraph will assume that APF has the lone Unsecured Deficiency Claim.

First, the Debtors calculated the estimated amount of the APF Unsecured Deficiency Claim by deducting the estimated Secured Claim of $7,567,491.08 from $12,663,954.18 (which is the Debtors' calculation of APF's estimated total Allowed Claim (inclusive of its secured and unsecured portions). The Debtors calculated the total Allowed Claim as follows:

| | |
|---|---|
| Principal | $12,014,213.76 |
| Interest (10/1/20 - 2/3/21) | $411,160.17 |
| Default Interest (10/1/20 - 2/3/21) | $238,580.24 |
| Deferred  Interest (4/1/20 - 2/3/21) (9/30/20) | $0.00 |
| Interest on Loan Interest Advance | $0.00 |
| UCC Release Fee* | $1,000.00 |
| Release of Intercreditor Agreement* | $200.00 |
| Release Prep Fees* | $400.00 |
| Recording Fees* | $300.00 |
| Late Fee | $0.00 |
| Payoff Quote Fee* | $500.00 |
| Exit Fee 1%* | $114,360.00 |
| Statutory Attorney Fees* | $1,266,445.42 |
| Total | $14,047,159.60 |

However, the Debtors dispute the allowance of the line items that are marked with an asterisk, for reasons that the Debtors will more fully articulate in a claims objection that the Debtors anticipate filing before the Confirmation Date and with enough time for the claims determination to potentially be made on or before the Confirmation Date. The disputed amounts

total $1,383,205.42 and have been deducted from the above total, resulting in an estimated Allowed Claim of $12,663,954.18.

The Allowed Unsecured Deficiency Claim, which is subject to allowance and depends on the determined extent, validity, priority, and amount of APF's Allowed Claim and its Allowed Secured Claim, is proposed to be repaid in full as described in the Claims Treatment Chart. While the Claims Treatment Chart controls, the repayment concept is clarified as follows. First, the Reorganized Debtor proposes to make interest-only payments to APF at the Plan Interest – Unsecured rate of interest that is proposed for the 72-month repayment periods. The stated rate, which is subject to Bankruptcy Court determination, is 1.08%. Second, rather than making monthly interest-only payments, the Reorganized Debtor will accrue the interest each month and then pay it on a quarterly basis. The quarterly payments are projected in the Budget. The actual timing of the first quarterly payment will depend on the Confirmation Date. Third, the Reorganized Debtor will also make Excess Cash Flow Payments, with the first Excess Cash Flow Payment being due on December 31, 2023; with the first Excess Cash Flow Payment covering the Reorganized Debtor's Excess Cash Flow for the 12-month period that starts on or about the first day of the month following the first anniversary of the Confirmation Date; with the first Excess Cash Flow Payment being equal to 80% of the Reorganized Debtor's Excess Cash Flow (i.e., net operating income minus Plan payments) over that 12-month period; and with the Reorganized Debtor making annual Excess Cash Flow payments thereafter through the Plan Balloon Date (on which date the Reorganized Debtor will satisfy in full APF's remaining Allowed Claim as of the Plan Balloon Date, via refinance or otherwise). By way of example, if the Confirmation Date occurs on August 31, 2021, then the Effective Date will be September 30, 2021 (unless extended by the Reorganized Debtor as provided in the Plan) and the first anniversary of the Confirmation Date would be August 15, 2022. Thus, for purposes of the Excess Cash Flow Payments, the first Excess Cash Flow Payment would be due on December 31, 2023 and cover the 12-month period from September 1, 2022 (i.e., the first day of the month following the first anniversary of the Confirmation Date) to August 31, 2023.

As to **Class 7**, which addresses Allowed Unsecured Claims of Insiders and Affiliates, the Claims Treatment Chart speaks for itself. However, by way of additional clarity, the Plan proposes that the Reorganized Debtor cannot make any payments on such Insider and Affiliate Claims until all other non-Insider and non-Affiliate claims are paid in full under the Plan.

As to **Class 8**, which addresses Equity Interests in the Debtors, the Plan proposes the substantive consolidation and state law merger of YCA and YCF, with YCA being the surviving entity. Thus, upon such consolidation and merger, Baldev Johal, Balbir Gosal, and Ranjit Johal will each own a membership interest in YCA in the same ownership percentages that they currently have in YCF (i.e., 25% for Baldev and Ranjit and 50% for Balbir).

## D.    Means of Implementation of the Plan

### 1.    Funding of the Plan

The Plan is a reorganizing Chapter 11 plan. The funds required for implementation of the Plan and the distributions under the Plan shall be provided from revenues from the regular operation of the Reorganized Debtor, repayment of obligations owing to the Reorganized Debtor

by its affiliates (if any and as necessary), and equity infusions and the like from the Reorganized Debtor's principals, Baldev S. Johal and Balbir S. Gosal (with such equity infusions guaranteed in the minimum amount of $300,000) (split equally between them) on the Effective Date. In addition to such $300,000 guaranteed infusion, Baldev S. Johal and Balbir S. Gosal are joining the Plan to jointly and severally guarantee the repayment of any amounts that are ultimately determined by the Bankruptcy Court to be owing to Debtor YCA by any of YCA's Insiders or Affiliates, including, without limitation, any amounts determined to be owing to YCA by YC Fairbanks Hotel Group LLC and Latrobe Management Services LLC.

### 2. Reorganized Debtor

The Plan will be administered by Reorganized Debtor, who will be vested with power and authority over all remaining assets of Debtors and the Estates, and with the obligation to administer and consummate the conveyances and distributions in accordance with the Plan. Reorganized Debtor shall be deemed as of the Confirmation of the Plan to be the general representatives of the Estate as authorized under and pursuant to the Bankruptcy Code, specifically including without limitation Section 1123(b)(3). Reorganized Debtor shall be indemnified by the Estate for fees and costs, including attorneys' fees, for any actions that it takes or fails to take, except for those done with gross negligence or malicious intent.

### 3. Management of Reorganized Debtor

Baldev S. Johal and Balbir S. Gosal shall be the Managers of the Reorganized Debtor, without compensation; provided, however, that the Reorganized Debtor will retain Latrobe Management Services, LLC to provide the same services to the Reorganized Debtor that it provided to the Debtors pre-petition. The Kishan Group will provide to the Reorganized Debtor the same services that it provides to the Debtors pre-petition, without compensation.

### 4. Powers of Reorganized Debtor

Except as otherwise provided in the Plan, Reorganized Debtor shall be vested with and shall have all rights, powers, and duties that the Debtors had immediately prior to Confirmation under Sections 1106, 1107, and 1108 of the Bankruptcy Code and otherwise, including, without limitation, with respect to the Causes of Action (whether or not commenced as of Confirmation). Reorganized Debtor shall have exclusive control of the Assets, including, without limitation, the Causes of Action. Reorganized Debtor shall have authority to authorize the sale, abandonment, or other liquidation of the Assets as further set forth in the Plan. Reorganized Debtor shall be the representative of the Estates and shall have the capacity to sue and be sued, as provided under Sections 323 and 1123(b)(3) of the Bankruptcy Code, and otherwise under the Plan or the Bankruptcy Code.

### 5. Monthly and Quarterly Operating Reports

Each of the Debtors and the Reorganized Debtor shall continue filing monthly or quarterly operating reports (as applicable) until the earlier of, as applicable, (i) the entry of an order closing a Debtor's or the Reorganized Debtor's bankruptcy case, (ii) the entry of an order converting a Debtor's or the Reorganized Debtor's bankruptcy case, and (iii) the entry of an

order dismissing a Debtor's or the Reorganized Debtor's bankruptcy case; provided, however, that, upon occurrence of the Effective Date, Quarterly Operating Reports shall be filed on each remaining bankruptcy docket, in duplicate, as consolidated Quarterly Operating Reports to the extent that the Confirmation Order authorizes the substantive consolidation of YCA and YCF.

## 6. Substantive Consolidation and Statutory Merger

The Plan contemplates and, upon the Effective Date, effectuates the "substantive consolidation" of Debtors and the statutory merger of Debtors, with "YC Atlanta Hotel LLC" as the surviving entity (the "**Reorganized Debtor**"). Reorganized Debtor shall be deemed a single entity for all of those purposes and actions associated with confirmation and consummation of the Plan, including, without limitation, for purposes of voting on Confirmation (which voting-related consolidation will occur regardless of when the Effective Date occurs), consummating the Plan, and making Distributions under the Plan. The Plan shall serve as a motion by Debtors, in addition to any related pending motion, seeking entry of an order by the Bankruptcy Court whereby the Bankruptcy Court approves the merger of Debtors, with such substantive consolidation being accomplished structurally by Articles of Merger adopted jointly by Debtors, the form of which are attached on **Exhibit D**. Specifically, the Estate of each Debtor shall be substantively consolidated for all purposes. The Articles of Merger, which are incorporated in this Joint Plan by this reference, shall be binding not only as to Debtors and Reorganized Debtor, but also binding as to all Parties-in-Interest in these Bankruptcy Cases.

On and after the Effective Date, (a) all Assets of Debtors shall be treated as though they were contributed to Reorganized Debtor such that all of Debtors' Assets will be subject to all Allowed Claims against each Debtor; (b) Allowed Claims against each individual Debtor may be satisfied from the Assets of Reorganized Debtor; (c) Reorganized Debtor will service all Allowed Claims against any Debtor in the manner provided under this Plan and Claims arising out of or related to the operation of any Debtor made against "YC Atlanta Hotel LLC"; (d) for all purposes associated with Confirmation (including, without limitation, for purposes of tallying acceptances and rejections of the Plan, distributions, and reporting under the Plan), the Estates of Debtors shall be deemed to be one consolidated Estate; (e) any guaranties of any individual Debtor of the obligations of any other Debtor(s) shall be eliminated so that any Claim against any Debtor and any guaranty thereof executed by any other Debtor and any joint and several liability of any Debtor shall be one obligation of Reorganized Debtor; (f) the Intercompany Claims, if any, will be discharged; and (g) each and every Claim filed or to be filed in the Bankruptcy Cases shall be deemed filed against all of Debtors, and shall be consolidated Claims against and consolidated obligations of Reorganized Debtor.

Upon the Effective Date, YCF will convey all real, personal, and intangible property owned by it to YCA subject to all liens and encumbrances of record, which shall be assumed by Reorganized Debtor. A certificate of merger shall be recorded with the Georgia Secretary of State, with the Nevada Secretary of State (as necessary), with the Clerk of the Superior Court of Fulton County Georgia (as necessary), and any other necessary jurisdiction, all in accordance with applicable law. Following the Effective Date, Reorganized Debtor shall file a single tax return, with any final stub tax returns covering the time ending on the Effective Date being filed as necessary. All Insurance Policies of each Debtor shall be amended as of the Effective Date to reflect Reorganized Debtor as the named insured. The Equity Interest Holders of YCF shall be

deemed to hold equity interests in Reorganized Debtor in the same percentages as they held in YCF on the Petition Date.

### 7. Tax Returns

Reorganized Debtor shall cause to be prepared and filed all federal, state, or local tax returns that, taking into consideration the effects of any confirmed substantive consolidation, are required to be prepared and filed by Debtors and Reorganized Debtor that have not been prepared or filed by the Effective Date, or which fall due thereafter.

### 8. Application for Final Decree

As soon as reasonably practicable following substantial consummation of the Plan, Reorganized Debtor shall file a final report and application for Final Decree, if not previously filed.

### 9. Standard of Care for Debtors-in-Possession

Reorganized Debtor shall perform the duties and obligations imposed on Reorganized Debtor by the Plan with reasonable diligence and care under the circumstances.

### 10.    Continuation of the Examiner; Fee Requests by the Examiner.

Notwithstanding the confirmation of the Plan or the occurrence of the Effective Date, the Examiner shall continue to serve in accordance with the terms and conditions of that *Order Denying Appointment of a Chapter 11 Trustee and Appointing an Examiner* (Dkt. 152) (the "**Examiner Order**"). The Examiner and his Court-authorized professionals shall, for all fees and expenses incurred through and including the date that the Examiner appointment concludes (the "**Termination Date**"), continue seeking payment for fees and expenses in accordance with (i) Orders entered in the Bankruptcy Cases under §§ 330 and 331 and (ii) the Administrative Fee Order. The Examiner and his Court-authorized professionals will not be subject to Section 3.1.1 of the Plan. Rather, final fee applications for the Examiner and his Court-authorized professionals shall be filed on or before the date that is 30 days after the Termination Date. Specifically, by such application deadline, the Examiner and his Court-authorized professionals must File and serve on the United States Trustee, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, or other order of the Bankruptcy Court, an application for final allowance of such Fee Claim. ***Failure to File timely and serve such application shall result in the Fee Claim being forever barred and discharged***. Objections to any Fee Claim must be Filed and served on the parties that were served with such application and the requesting party within twenty-eight (28) days after the filing of the applicable request for payment of the Fee Claim; or such later date as may be provided under future order of the Bankruptcy Court. All allowed Fee Claims of the Examiner and his Professionals that have been Allowed by the Court as of the Confirmation Date shall be paid in full on the Effective Date.

## VI.    EXECUTORY CONTRACTS

### A.    Assumption or Rejection of Executory Contracts.

On the Confirmation Date, all Executory Contracts and unexpired leases, including, without limitation, the Franchise Agreement, the Management Agreement (describe below), and all Insurance Contracts, are, if they have not already been assumed, deemed assumed, in accordance with the provisions of Sections 365 and 1123, and any other relevant provisions of the Bankruptcy Code.

### B.    Cure Cost Claims.

All Allowed Cure Costs (which are defined in the Plan as Administrative Claims) associated with the assumed Executory Contracts will be paid in accordance with Section 3.1.1 of the Plan, except that (i) the Allowed Cure Cost for Choice Hotels International, Inc. ("**Choice**") on the Franchise Agreement, estimated to be $110,833.78, shall be paid in 60 monthly payments of principal and interest (at the applicable Plan Interest – Unsecured rate for 60 month repayment durations) commencing on the last day of the month in which the Effective Date occurs, with like monthly payments on the last day of each month thereafter until such Allowed Cure Cost is paid in full and (ii) the Allowed Cure Cost for Latrobe Management Services, LLC ("**Latrobe**") under the YCA's Management Agreement, estimated to be $25,158.21 shall, unless Latrobe agrees to other, lesser treatment, be paid in 60 monthly payments of principal and interest (at the applicable Plan Interest – Unsecured rate for 60 month repayment durations) commencing on the last day of the month in which the Effective Date occurs, with like monthly payments on the last day of each month thereafter until such Allowed Cure Cost is paid in full.

### C.    Rejected Contracts

The Plan provides that no Executory Contracts will be rejected. However, the Debtors reserve the right to reject Executory Contracts, including via motion, on or before the Confirmation Date.

## VII.    PROVISIONS GOVERNING PAYMENT AND DISTRIBUTIONS

### A.    Manner of Payment

Any payment in Cash to be made by Reorganized Debtor shall be made, at the election of Reorganized Debtor, by check drawn on a domestic bank or by wire transfer from a domestic bank.

### B.    Funds and Accounts for Payment of Claims and Plan Implementation

As soon as practicable after the Effective Date, Reorganized Debtor shall establish and maintain the following funds and/or accounts to implement the Plan:

### 1. Disputed Claims Reserve

As of and after the Effective Date, Reorganized Debtor shall, if a Disputed Claim arises, establish and maintain an interest-bearing account which shall be called the Disputed Claims Reserve, into which Reorganized Debtor shall deposit the distributions that would otherwise be due to holders of Disputed Claims in accordance with the terms of the Plan. Such Disputed Claims Reserve shall be maintained by Reorganized Debtor until each Disputed Claim in each respective class has been allowed or disallowed by Order of the Bankruptcy Court. Thereafter, any excess funds in the Disputed Claims Reserve shall be transferred back to Reorganized Debtor.

### 2. Plan Expense Reserve

On the Effective Date, or as soon thereafter as reasonably practicable, Reorganized Debtor may create a reserve for plan expenses, including costs necessary to adequately fund pursuit of Causes of Action which Reorganized Debtor believe is likely to produce a recovery in excess of the costs of prosecution of such Causes of Action. Reorganized Debtor may reserve and transfer an appropriate amount of Cash into such plan account as Reorganized Debtor deems necessary and desirable to pay plan expenses efficiently and promptly.

### 3. Management of Accounts Established Pursuant to the Plan

Monies deposited into any accounts established and maintained by Reorganized Debtor under the Plan shall be invested as specified in this paragraph and need not comply with Bankruptcy Code Section 345. Any accounts established by Reorganized Debtor shall be established at a federally-insured financial institution or may be invested in government-backed securities in a brokerage account approved by the United States Trustee. For interest-bearing accounts, any interest earned upon balances on deposit in such accounts shall be used to fund the Plan. Reorganized Debtor may relocate any or all accounts to another federally-insured financial institution or approved brokerage account, from time to time, until all payments provided for under the Plan have been made. Following all distributions required herein, all remaining funds shall be property of Reorganized Debtor.

### 4. Payment of Claims and Interests

Notwithstanding any other provision of the Plan, Reorganized Debtor shall make no distribution to holders of Claims that are not Allowed Claims as defined in the Plan. Notwithstanding any other provision of the Plan, Reorganized Debtor shall have discretion to make the distributions called for under the Plan at the times specified in the Plan, or earlier if Reorganized Debtor deem such earlier distribution to be necessary or beneficial.

### 5. Unclaimed Distributions

Under the Plan, payment will be stopped on checks disbursed by Reorganized Debtor to holders of Allowed Claims if such checks remain not cashed ninety (90) days after the date of disbursement. The Cash represented by such checks shall be shall become property of Reorganized Debtor pursuant to Section 347(b) of the Bankruptcy Code, and shall be refunded to Reorganized Debtor.

**6. Rounding of Dividend Amounts**

Notwithstanding any other provision of the Plan, Reorganized Debtor shall not be required to make any distribution of less than $5.00 to the holder of any Allowed Claim, and may round all distributions to the nearest $1.00.

**7. Distributions to the Last Known Address**

Distributions to holders of Allowed Claims will be sent to the last known address set forth on such holder's proof of Claim Filed with the Court, or on the Schedules, if no proof of Claim has been filed. Holders of Claims may change the address to which distributions, if any, will be sent by furnishing written notice to Reorganized Debtor, in accordance with Article X hereof. A proper notice of change of address will be effective for a distribution if received at least 30 days in advance of such distribution date. U.S. Postal notifications of changes of address will be honored, provided that Reorganized Debtor shall have no obligation to investigate the address of the holder of an Allowed Claim following expiration of such U.S. Postal notifications.

**8. Assignment of Claims**

Notwithstanding Bankruptcy Rule 3001(e), written notice of any assignment of an Allowed Claim shall be given to Reorganized Debtor by the assignee thereof before Reorganized Debtor shall be obligated to direct distributions to such assignee. Absent receipt by Reorganized Debtor of such written notice of assignment, neither Reorganized Debtor, nor the Estate shall have any liability to any such assignee or to any other Person on account of a misdirected distribution.

**9. Withholding or Other Taxes**

Any federal, state, or local withholding or other taxes or other amounts required to be withheld under applicable law shall be deducted from distributions hereunder. All Persons holding Claims shall be required to provide any information necessary to effect the withholding of such taxes.

**10.     Setoffs**

Subject to the limitations provided in Section 553 of the Bankruptcy Code, Debtors or Reorganized Debtor, as applicable, may, but shall not be required to, setoff against any Claim and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever Debtors may have against the holder of such Claim, including, without limitation, Claims against Affiliates, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by Debtors or Reorganized Debtor, as applicable, of any such Claim or other Claims, rights, or Causes of Action that Debtors or Reorganized Debtor may have against such holder.

**11.     Subordination Rights**

All subordination rights, claims, and defenses of Debtors and Reorganized Debtor shall remain valid, enforceable, and unimpaired in accordance with Section 510 of the Bankruptcy

Code or otherwise, except as otherwise specifically provided in the Plan.

**12.        No Interest**

Except as expressly stated in the Plan or as allowed by the Bankruptcy Court, no interest, penalty or late charge arising after the Petition Date, or related expenses or disbursements arising after the Petition Date will be allowed on, or in connection with, any Claim. This provision will apply whether the distribution on such Claim is made on the Effective Date or thereafter.

**VIII.    PROVISIONS GOVERNING OBJECTIONS TO CLAIMS**

**A.        Disputed Claims**

The following provisions of the Plan apply only to Claims that are Disputed Claims.

**1. Disputed Claims Reserve per Classes**

The Plan provides that Reorganized Debtor shall deposit into the Disputed Claims Reserve the distribution which would have been due to all holders of Disputed Claims as if they were Allowed Claims.

**2. Previously Disputed Claims that Are Subsequently Allowed**

Within fourteen (14) days from the date of which any order of the Bankruptcy Court allowing a previously Disputed Claim becomes a Final Order, with no appeal pending, or if an appeal is filed, the date on which all orders affirming allowance of such claims becomes non-appealable, Reorganized Debtor shall withdraw from the Disputed Claims Reserve an amount equal to the amount deposited into the Disputed Claims Reserve on account of each previously Disputed Claim and shall then pay the holder of such previously Disputed Claim the amount due on such Claim as of the date of such distribution to its Class. No interest shall be payable on account of any delayed distribution unless such interest is a distribution of Post-confirmation Interest specifically set forth in the Plan and payable for that Class.  Any amounts in the Disputed Claims Reserve not paid to holders of Allowed, formerly Disputed Claims shall be refunded to Reorganized Debtor.

**3. Allowance of Claims**

Except as expressly provided in the Plan, Reorganized Debtor after Confirmation will have and retain any and all rights and defenses that Debtors had with respect to any Claims, whether arising before, as of, or following the Petition Date, including the Causes of Action referenced in the Plan and the Disclosure Statement and the Filing of any motions or other pleadings for estimation of the amount of Disputed Claims.

**B.      Examination and Objections to Claims**

   **1.      Examination**

   The Plan provides that the Effective Date, Reorganized Debtor shall examine all Claims not previously objected to by Debtors and shall have the responsibility of filing objections to the allowance of such Claims and continuing prosecutions of objections to Claims filed prior to the Effective Date.

   **2. Objection Deadlines**

   Except as otherwise specified in the Plan (including, without limitation, with respect to Administrative Claims, Fee Claims, and Executory Contract Claims), objections to Claims shall be Filed with the Bankruptcy Court and served upon Creditors by the Claims Objection Bar Date; provided, however, that this deadline may be extended by the Bankruptcy Court upon motion of Reorganized Debtor, without notice or a hearing. After an order, judgment, decree, or settlement agreement allowing a Disputed Claim becomes a Final Order, Distributions with respect to and on account of such previously Disputed Claim will be made.

   **3. Claims Resolution**

   Objections to Claims may be litigated to judgment, settled, or withdrawn by Reorganized Debtor. The Plan provides that the Reorganized Debtor has authority to settle any Claim without any notice or approval of any other party, unless such settlement would result in a decrease to the distribution provided to any other Allowed Claim under the Plan, in which event such settlement and impact on Allowed Claims will be noticed as provided under Bankruptcy Rule 9019, with a hearing to be conducted upon any objection filed pursuant to such notice. Any settlement may be presented for approval to the Bankruptcy Court, upon the request of the Reorganized Debtor or the holder of the formerly disputed claim.

**C.      No Distributions to Holders of Disputed Claims**

   Notwithstanding any other provision of the Plan, no Cash or other Property shall be distributed under the Plan on account of any Claim which is not an Allowed Claim.

**D.      Estimation of Claims**

   Under the Plan, Reorganized Debtor may, at any time, request that the Bankruptcy Court estimate any Claim pursuant to Section 502(c) of the Bankruptcy Code, as applicable, regardless of whether Debtors or Reorganized Debtor previously have objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during the litigation concerning any objection to any Claims, including, without limitation, during the pendency of any appeal relating to any such objection.  Subject to the provisions of Section 502(j) of the Bankruptcy Code, in the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, the amount so estimated shall constitute the Allowed amount of such Claim. If the estimated amount constitutes a maximum limitation on the amount of such Claim, Debtor or Reorganized Debtor may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned

objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

## IX.    PROVISIONS REGARDING EFFECTS OF CONFIRMATION

### A.    Discharge of Reorganized Debtor

#### 1. Discharge of Reorganized Debtor

Under the Plan, the effects of Confirmation shall be as provided under Bankruptcy Code sections 1141(a), (b), (c), and (d) and section 524(a) of the Bankruptcy Code. Debtors shall be discharged upon Confirmation of the Plan.

#### 2. Terms Binding

The Plan provides that upon the entry of the Confirmation Order, all provisions of this Plan, including all agreements, instruments, and other documents filed in connection with this Plan and executed by the Debtors or the Reorganized Debtor in connection with the Plan, shall be binding upon the Reorganized Debtor, the Plan Representative, all Affiliates, all Claim and Interest Holders, and all other Persons that are affected in any manner by the Plan and who receive notice hereof. All agreements, instruments, and other documents filed in connection with the Plan shall have full force and effect, and shall bind all parties thereto as of the entry of the Confirmation Order, whether or not such exhibits actually shall be executed by parties other than the Debtors or the Reorganized Debtor, or shall be issued, delivered, or recorded on the Effective Date or thereafter. All Pre-petition contracts, undertakings, and obligations of the Reorganized Debtor, other than to Holders of Claims in Classes that are unimpaired under this Plan, are deemed novated by the terms of the Plan. Subject to rights that creditors might have in the event of a dismissal or conversion of either of the Bankruptcy Cases, no holder of any claim against the Reorganized Debtor may exercise any right upon default with respect to the Reorganized Debtor or otherwise until the occurrence of a default under the Plan.

#### 3. Continuation of Pre-Confirmation Injunction or Stays

All injunctions or stays, whether by operation of law or by order of the Bankruptcy Court, provided for in the Bankruptcy Case pursuant to Sections 105, 362, or 525 of the Bankruptcy Code or otherwise that are in effect on the Confirmation Date or imposed by the Confirmation Order shall remain in full force and effect until the Final Decree.

#### 4. Post-Confirmation Effects of Evidences of Claims or Interests

On the Effective Date, except as otherwise provided in the Plan, all promissory notes, share certificates, warrants, membership interests, instruments, indentures, agreements, or other documents evidencing, giving rise to, or governing any Claim against or Interest in Debtors will represent only the right, if any, to participate in the distributions contemplated by the Plan.

**5.** *__Channeling Injunction Prohibiting Collection Action Against Guarantors and Prohibiting dissipation of assets by Guarantors During Plan Consummation.__*

*__The Plan proposes that, commencing as of the Confirmation Date and for so long as there is no uncured default under the Plan or until further order of the Bankruptcy Court, all Holders of Allowed Guaranteed Claims that are designated to be paid in full as provided for under the Plan shall look solely to the provisions of the Plan for payment of their Allowed Guaranteed Claims, and are to be restrained and enjoined from pursuing or continuing collection of any Allowed Guaranteed Claim against any Guarantor. The Plan further provides that, until all Allowed Guaranteed Claims provided for under the Plan which have been guaranteed by Guarantors are paid in full, or until further order of the Bankruptcy Court, Guarantors are to be restrained and enjoined from transferring any interest in real or personal property not in the ordinary course of business, for less than fair value in exchange, or not pursuant to the Plan, or otherwise through affirmative action impairing the post-judgment remedies of any Holder of an Allowed Guaranteed Claim. In furtherance of such injunction, following the Confirmation Date, no Holder of an Allowed Guaranteed Claim shall, with respect to Guarantors, make any demand, give any notice, commence or continue any civil action or garnishment, judicial or non-judicial foreclosure, levy, seizure, or sequestration of any real or personal property of Guarantors; provided, however, that no provision of the Plan shall be construed to impair the right of the Holder of any Allowed Guaranteed Claim to transfer such claim, subject to the provisions of the Plan (including, in pertinent part, Section 8.6 of the Plan), to the extent permitted by applicable law or contract.__*

The Debtors note that the Guarantors have a long history of making ordinary course contributions and infusions to the Debtors and their Affiliates in a manner that permits the Debtors and their Affiliates to succeed and be stronger as an essentially integrated group. While the Plan proposes as a condition to the Channeling Injunction that the Guarantors will be restrained from making certain transfers of real and personal property, the Debtors believe that contributions to the Affiliates during the Plan will be permitted and consistent with the Channeling Injunction provided that (i) the Guarantors are solvent at the time of such contributions and remain solvent following such contributions and (ii) at the time of such contributions, the Reorganized Debtor is in compliance with all of the terms and conditions of the Plan.

## X.    PRESERVATION OF CAUSES OF ACTION

### A.    Rights with Regard to Causes of Action

The Plan provides that upon the occurrence of the Effective Date, all Causes of Action of Debtors and the Estates will be retained and preserved for enforcement by Reorganized Debtor. Reorganized Debtor will have the power and right to commence or continue and otherwise enforce any Causes of Action of Debtors and/or the Estates, all of which will be retained and preserved hereby, notwithstanding Confirmation or consummation of the Plan.

The Plan provides that unless Causes of Action, including, without limitation, objections to allowance of claims, against a Person or Entity are expressly waived, relinquished, released,

compromised, or settled in the Plan or by any Final Order, Debtors and Post-confirmation Debtors and Estate, on behalf of themselves and holders of Allowed Claims and in accordance with Bankruptcy Code Section 1123(b)(3)(B), expressly reserve and will retain for enforcement post-Confirmation and post-consummation all Causes of Action and Unknown Causes of Action, including, without limitation, the Causes of Action described in the Plan and Disclosure Statement, as well as any other Causes of Action or Unknown Causes of Action that Debtors or the Estates had or had the power to assert immediately before Confirmation, for adjudication or later adjudication, and, therefore, no waiver or preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action upon or after the Confirmation or consummation of the Plan, solely due to such Confirmation or Consummation of the Plan.

In addition, under the Plan, Debtors and the Estates expressly reserve and retain the right to object to allowance of any Claim or pursue or adopt or otherwise enforce (and the right of Reorganized Debtor to do so) any claims. Nothing contained in the Plan or Disclosure Statement or any related document will constitute a waiver of the rights, if any, of Debtors or Reorganized Debtor or the Estates, through Reorganized Debtor, to a jury trial with respect to any Cause of Action or objection to any Claim or Interest.

## B.    Representative of the Estate

The Plan provides that, in accordance with Section 1123(b)(3) of the Bankruptcy Code, any Claims, rights, and Causes of Action that Debtors, Reorganized Debtor, or Estates may hold or have the power to commence at any time against any Person or Entity will be preserved and retained and enforced by Reorganized Debtor, and Reorganized Debtor will have the right to continue or commence or otherwise enforce, as the authorized representative of Debtors and the respective Estates and Reorganized Debtor, any and all such Claims, rights, or Causes of Action. Reorganized Debtor may pursue any and all such Claims, rights, or Causes of Action, as appropriate, in accordance with the best interests of the holders of Allowed Claims. Subject to the provisions of the Plan, Reorganized Debtor will have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such Claims, rights, and Causes of Action.

## C.    Retention of Jurisdiction

Notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date under the Plan, until such time as all payments and distributions required to be made and all other obligations required to be performed under the Plan have been made and performed by Reorganized Debtor, the Bankruptcy Court will have and retain the maximum jurisdiction as is legally permissible over the Causes of Action. The Plan sets forth in more detail the jurisdiction to be retained by the Bankruptcy Court.

## XI.    MISCELLANEOUS PROVISIONS OF THE PLAN

### A.    Modifications or Amendment

The Plan provides that it may be modified or amended prior to confirmation as allowed by the Code or Rules. Following confirmation, amendments or modifications to the Plan may be made by a voting process similar to the voting process for acceptance of the Plan. These procedures are set out in detail in Article X of the Plan.

### B.    Exemption from Transfer Taxes

Pursuant to Section 1146(c) of the Bankruptcy Code, the Confirmation Order, and any sale orders entered in the Bankruptcy Case, the transfer or making or delivery of any instrument whatsoever in furtherance of or in connection with the Plan, including, without limitation, any transfer of the Assets, subsequent transfers to creditors or purchaser(s), and any assignments, documents, instruments, and agreements and other conveyance documents executed and delivered by Reorganized Debtor in connection with the sale of the Assets in furtherance of the implementation of the Plan or otherwise, shall not be subject to any stamp, real estate transfer, personal property, recording, or other similar tax. Any conveyance of real property made as provided under the Plan or in furtherance of this plan shall include the notation: "*This instrument is exempt from Transfer Taxes by virtue of 11 U.S.C. §1146(c)*."

### C.    Effectuating Documents, Further Transactions and Corporate Action

Reorganized Debtor, all holders of Allowed Claims receiving distributions under the Plan, and all other parties in interest will, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### D.    Successors and Assigns

The rights, benefits and obligations of any Person or Entity named or referred to in the Plan will be binding on, and will inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such Entities.

### E.    Governing Law

Except to the extent that the Bankruptcy Code is applicable, the rights and obligations arising under the Plan and Disclosure Statement will be governed by and construed and enforced in accordance with the laws of the State of Georgia.

### F.    Conflicts

As provided in the Plan, to the extent any provision of the Disclosure Statement, and any documents executed in connection with the Confirmation Order (or any exhibits, schedules, appendices, supplements or amendments to the foregoing) conflicts with or is in any way inconsistent with the terms of the Plan, the terms and provisions of the Plan will govern and control.

## XII.    FINANCIAL INFORMATION

Debtors filed their Schedules with the Bankruptcy Court as required by the Bankruptcy Code. Debtors will supplement and amend their Schedules as necessary and appropriate from time to time. Reorganized Debtor will file post-confirmation quarterly operating reports after the Effective Date through the earlier of the entry of a Final Decree or court Order excusing further filings. This financial information has not been included in this Disclosure Statement, but may be examined at the Clerk's Office, United States Bankruptcy Court, Northern District of Georgia, 1340 Russell Federal Building, 75 Ted Turner Drive SW, Atlanta, Georgia, or online through PACER at http://www.pacer.gov/.

## XIII.    ACCEPTANCE AND CONFIRMATION

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of Section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of a plan are that (i) the plan is accepted by all impaired classes of Claims and Interests or, if rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (ii) the plan is feasible, and (iii) the plan is in the "best interests" of creditors and holders of Claims and Interests impaired under the plan.

### A.    Acceptance of Plan

In order for an Impaired Class of Claims or Interests to accept the Plan, (a) the holders (other than any holder designated under Section 1126(e) of the Bankruptcy Code) of at least two-thirds (2/3) in amount of the Allowed Claims or number of Interests actually voting in such Class must have voted to accept the Plan and, with respect to Claims only, (b) the holders (other than any holder designated under Section 1126(e) of the Bankruptcy Code) of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

Holders of Claims in Impaired Classes are entitled to vote to accept or reject the Plan

The Plan provides that the Plan will constitute a request that the Bankruptcy Court confirm the Plan over such rejection in accordance with Section 1129(b) of the Bankruptcy Code, the so-called "cram down" provision. Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or this Disclosure Statement, including any exhibit or attachment, if necessary to satisfy the requirements of Section 1129(b) of the Bankruptcy Code.

### B.    Feasibility

As a condition to confirmation of the Plan, Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the Plan is not likely to be followed by the liquidation of Reorganized Debtor unless such liquidation is proposed in the Plan. This requirement is addressed further below.

### C.    "Best Interests of Creditors" Test

Confirmation of the Plan also requires that each claimant either (i) accept the Plan or (ii)

under the Plan, and pursuant to Section 1129(a)(7) of the Bankruptcy Code, receive or retain property with a value, as of the Effective Date, that is not less than the value such claimant would receive or retain if Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

Under the Plan, all Classes of Claims, except Unclassified Claims, are impaired and must vote to accept the Plan. The payments proposed under the Plan will propose a dividend in excess of what could be expected if Debtor were "liquidated under Chapter 7." **Exhibit C**, attached hereto, represents the Debtors' projection of their liquidation values under Chapter 7. In order to understand the projection which follows, a short discussion of the priorities in payment of claim established by the Bankruptcy Code is in order.

In a Chapter 7 bankruptcy case, a Chapter 7 trustee administers all assets of the Debtor. The Chapter 7 trustee investigates each asset of the debtor to determine whether the asset has sufficient value to produce "equity" for general creditors. "Equity" is generally defined as an asset's realizable liquidation value significantly in excess of the aggregate amount of all claims secured by that asset. A Chapter 7 trustee's commissions, and expenses of liquidation and professional fees, further reduce the Equity. If a Chapter 7 trustee concludes that there is no Equity in any particular asset, then the asset is usually "abandoned." If a Chapter 7 trustee concludes that an asset does have potential to produce Equity, then the asset is liquidated, the secured liens against the asset are paid off, the trustee recovers his costs of administering and liquidating the asset, and any remaining proceeds are placed in a general fund for distribution to creditors in accordance with the priority scheme of the Bankruptcy Code.

Therefore, under the distribution scheme of Chapter 7 of the Bankruptcy Code, secured creditors must be paid in full from the proceeds of their collateral. Only the Equity portion of the collateral, if any, is available for Unsecured Creditors.

Once a "fund" for distribution to Creditors is established, a Chapter 7 trustee must pay claims in the order of their statutory priority under Section 507 of the Bankruptcy Code. Secured Claims and Priority Claims are entitled to payment in full before Unsecured Creditors are entitled to distribution.

If the Case were converted to a Chapter 7, then all Chapter 11 administrative expenses would be entitled to payment ahead of unsecured claims, but after the expenses of the Chapter 7 administration and a Chapter 7 trustee's professional fees. Chapter 11 administrative expenses will include any outstanding trade debt incurred since February 3, 2021 for YCA and March 29, 2021 for YCF but unpaid as of the date of any liquidation, and unpaid Professional compensation and any administrative taxes due.

In a Chapter 7 liquidation, all assets will be sold by a commissioned trustee, or abandoned to secured creditors. The Debtor believes that in a Chapter 7 liquidation the trustee would cause a "fire sale" liquidation. A Chapter 7 trustee could also abandon the estate's interest in the Debtor's Property, and allow Debtor's senior secured lender to foreclose. The Debtor projects that a Chapter 7 liquidation would result in lower payments to other creditors, including creditors holding a general unsecured claim. Therefore, the Debtor believes that the Plan is more favorable than Chapter 7 liquidation because the Plan provides for a higher payment to creditors than they would likely receive in a liquidation.

41

## Chapter 7 Liquidation Analysis

The chart attached hereto as **Exhibit C** assumes that, if the Case were converted to Chapter 7, then the Chapter 7 trustee would liquidate Debtor's properties at an auction sale. In the event the Chapter 7 trustee simply abandoned such properties to Holders of the Claims of the senior secured lender, the Debtor believes that the Chapter 7 trustee would not be able to generate sufficient recoveries to allow for full distributions to holders of Unsecured Claims or to Interests. In fact, unsecured creditors will receive $0.00 in a Chapter 7.

FOR THE FOREGOING REASONS, THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF EACH CLASS OF CREDITORS AND THAT EVERY IMPAIRED CLASS WILL RECEIVE DISTRIBUTIONS UNDER THE PLAN WHICH ARE GREATER THAN THE DISTRIBUTIONS SUCH CLASSES WOULD RECEIVE IN A CHAPTER 7 LIQUIDATION OF THE DEBTOR. IN FACT, THEY'LL BE PAID IN FULL.

## XIV.  FEASIBILITY OF THE PLAN

Debtors' budget, which Debtors reserve the right to amend prior to service of the Plan and Disclosure Statement, is attached hereto as **Exhibit B** (the "**Budget**"). The Budget projects sufficient revenues to make payments on all Allowed Claims in each Class. Because the projections are based on averages, the actual results will probably vary from the projection, but the projection should be substantially accurate over its term. Debtors believe that the Plan is fair and equitable, and provides the best potential for payment of the claims of creditors.

## XV.  CERTAIN TAX CONSEQUENCES

The confirmation and execution of the Plan may have tax consequences to holders of Claims and Interests, as well as to Debtors.

### A.   In General

The federal income tax consequences of the implementation of the Plan to a Creditor will depend in part on (a) whether the Creditor's Claim constitutes a security for federal income tax purposes, (b) whether the Creditor reports income on the accrual basis, (c) whether the Creditor receives consideration in more than one (1) tax year, and (d) whether all the consideration received by the Creditor is deemed to be received by that Creditor as part of an integrated transaction. The federal tax consequences upon the receipt of cash and notes allocable to interest are discussed in "Receipt of Interest" below.

### B.   Gain or Loss on Exchange

While Debtors do not believe that any of their trade creditor's claims or long-term obligations will constitute tax securities, certain of his long-term obligations can, in some instances, be classified as tax securities. Whether a debt instrument constitutes a security is based on the facts and circumstances surrounding the origin and nature of the debt and its maturity date. Generally, claims arising out of the extension of trade credit have been held not to be

42

securities.  Instruments with a five-year term or less rarely constitute securities.  Accordingly, a Creditor will recognize gain or loss on the exchange of his existing Claim (other than a Claim for accrued interest) for any consideration. The amount of such gain or loss will equal the difference between (a) the "amount realized" in respect of such Claim and (b) the adjusted tax basis of the Creditor in such Claim.  Pursuant to Section 1001 of the Internal Revenue Code, the "amount realized" will be equal to the sum of the cash plus the fair market value of any other property received in such exchange.

### 1. Receipt of Cash

A Creditor who received cash in full satisfaction of his claim will be required to recognize gain or loss on the exchange. The Creditor will recognize gain or loss equal to the difference between the "amount realized" in respect of such Claim and the adjusted tax basis of the Creditor in the Claim, and the tax treatment of the exchange will parallel the tax treatment set forth under "Gain or Loss on Exchange" above.

### 2. Determination of Character of Gain or Loss

In the case of a Creditor whose existing Claim does not constitute a capital asset, the gain or loss realized on the exchange will give rise to ordinary income or loss. In the case of a Creditor whose existing Claim does constitute a capital asset in his hands, the gain or loss required to be recognized will generally be classified as a capital gain or loss, except to the extent of interest. Any capital gain or loss recognized by a Creditor will be long-term capital gain or loss with respect to those Claims for which the holding period of the Creditor is more than twelve (12) months, and short-term capital gain or loss with respect to such Claims for which the holding period of the Creditor is twelve (12) months or less.

### C.    Receipt of Interest

The Bankruptcy Tax Act of 1980 reversed prior law by providing that consideration attributable to accrued but unpaid interest will be treated as ordinary income, regardless of whether the Creditor's existing Claims are capital assets in his hands and the exchange is pursuant to tax reorganization. A Creditor who, under his accounting method, was not previously required to include income accrued, but unpaid interest attributable to his existing Claims, and who exchanges his interest Claim for Cash, other property or Stock, or a combination thereof, pursuant to the Plan will be treated as receiving ordinary interest income to the extent of any consideration so received allocable to such interest, regardless of whether that Creditor realizes an overall gain or loss as a result of the exchange of his Claims.

### D.    Backup Withholding

Under the Internal Revenue Code, interest, dividends and other "reportable payments" may, under certain circumstances, be subject to "backup withholding" at a thirty-one percent (31%) rate. Withholding generally applies if the holder: (i) fails to furnish his social security number or other taxpayer identification number ("**TIN**"), (ii) furnishes an incorrect TIN, (iii) fails to report interest or dividends or (iv) under certain circumstances fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is his correct number and that he is not subject to backup withholding.

E.    **Tax Consequences to Interest Holders**

The Federal and State Income tax consequences to the individual debtor on account of the discharge contemplated in this Bankruptcy will be negligible. No undisputed debt will be discharged and phantom income from discharge of indebtedness in a bankruptcy is not recognized under Section 108 of the Internal Revenue Code, subject to a reduction in certain tax attributes not relevant to this case. On the other hand, the sale or liquidation of property under this plan will trigger capital gains tax and the rental income received by Reorganized Debtor (less deductible expenses) will be taxable as ordinary income during the execution of the Plan. Accordingly, Reorganized Debtor will reserve from the sale of properties proceeds to meet anticipated capital gains and ordinary income taxes.

**Because the final outcome depends so much on each individual creditor's or interest holder's situation, it is imperative that each creditor or interest holder seek individual tax counsel for advice on its particular situation.**

**All holders of claims and interests are urged to consult their own tax advisors with respect to any federal, state, local, and foreign tax consequences of the Plan.  This Disclosure Statement is not intended, and should not be construed, as legal or tax advice to any creditor or interest holder.**

XVI.   **ALTERNATIVES TO CONFIRMATION**

If the Plan is not confirmed and consummated, the alternatives include (a) liquidation of Debtors under chapter 7 of the Bankruptcy Code or (b) an alternative plan of reorganization. Debtors believe that if the Plan is not confirmed, then holders of Allowed Claims will receive a smaller dividend than proposed under the Plan and, for most creditors, $0.00.

A.    **Liquidation Under Chapter 7.**

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under Chapter 7 of the Bankruptcy Code. A Chapter 7 trustee would be appointed to liquidate the remaining assets of Debtors for distribution to their individual creditors in accordance with the priorities established by the Bankruptcy Code. A Chapter 7 trustee would need time to investigate Debtors' pre-petition transactions, and their assets and liabilities. A Chapter 7 trustee would retain and liquidate Debtors' remaining assets, and, if necessary, investigate and pursue Causes of Action. The liquidation of Debtors' assets would result in distressed recoveries and would therefore reduce the recovery to Unsecured Creditors. Debtors also believe that the conversion of the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code and the appointment of a Chapter 7 trustee would increase the costs of administration, and reduce and postpone any distribution to holders of Allowed Claims. **More to the point, there is no scenario where unsecured creditors would receive a distribution in a Chapter 7.**

For all of the foregoing reasons, Debtors have concluded that Creditors are likely to receive an amount under the Plan that is substantially greater than the amount such Creditors would receive under Chapter 7 liquidation.

**XVII.  SOLICITATION**

The Disclosure Statement you are reading is submitted by Debtors in compliance with their obligations under the Bankruptcy Code to provide "adequate information" to enable you to reach an informed decision regarding whether it is in your best interest to vote to accept the Plan. All Allowed Claims are to be paid in full. Thus, the Debtors urge all holders of claims and interests to carefully consider the Plan of Reorganization of Debtor and complete the attached Ballot accepting the Plan.

Debtors thank you, in advance, for your support.

G:\CLIENTS\YC Atlanta Hotel, LLC\Plan\Disclosure Statement - YCA and YCF (final for upload 07.06.21).doc

IN WITNESS WHEREOF, the undersigned have caused this Disclosure Statement to be duly executed as of the date written below, which execution may be in multiple identical counterparts.

Dated this the 6th day of July, 2021.

YC ATLANTA HOTEL LLC

By:  */s/ Baldev S. Johal*
      Baldev S. Johal, Manager

By:  */s/ Balbir S. Gosal*
      Balbir S. Gosal, Manager

YC FERNLEY HOTEL LLC

By:  */s/ Baldev S. Johal*
      Baldev S. Johal, Manager

By:  */s/ Balbir S. Gosal*
      Balbir S. Gosal, Manager

STONE & BAXTER, LLP
By:

*/s/ David L. Bury, Jr.*
Ward Stone, Jr.
Georgia Bar No. 684630
David L. Bury
Georgia Bar No. 133066
Thomas B. Norton
Georgia Bar No. 997178
577 Mulberry Street - Suite 800
Macon, Georgia 31201
(478) 750-9898; (478) 750-9899 *facsimile*
wstone@stoneandbaxter.com
dbury@stoneandbaxter.com
tnorton@stoneandbaxter.com
Counsel for Debtors

**EXHIBIT A**

**JOINT PLAN OF REORGANIZATION**

**EXHIBIT B**

**BUDGET**

**EXHIBIT C**

**LIQUIDATION ANALYSIS**

**EXHIBIT D**

**PROPOSED ARTICLES OF MERGER**

**(to be added by amendment)**

**EXHIBIT E**

**CLAIMS SUMMARY CHART**