**IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | CHAPTER 11 |
| YC ATLANTA HOTEL LLC and | ) | |
| YC FERNLEY HOTEL LLC | ) | Case No. 21-50964-BEM |
| | ) | (Jointly Administered) |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| ACCESS POINT FINANCIAL, LLC and | ) | CONTESTED MATTER |
| APF – CRE I, LLC | ) | |
| | ) | |
|     Movants. | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| YC ATLANTA HOTEL LLC. | ) | |
| | ) | |
|     Respondent. | ) | |
| _____ | ) | |

## MOTION FOR RELIEF FROM THE AUTOMATIC STAY

COME NOW, Access Point Financial, LLC ("Access Point") and APF – CRE I, LLC ("CRE", and collectively with Access Point, "Movant") and hereby submit this Motion for Relief from the Automatic Stay (the "Motion") pursuant to § 362(d)(2) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 4001(a)(1) and (a)(3) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-1 of the Local Rules for the United States Bankruptcy Court for the Northern District of Georgia ("BLR"),  respectfully showing as follows:

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this Court for this Motion pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G).

## PRELIMINARY STATEMENT

1

3.      The Court should grant Movant relief from the automatic stay under Section 362(d)(2) to pursue its state law remedies against its collateral because YC Atlanta Hotel LLC ("Debtor") (i) lacks equity in the property and (ii) cannot carry its burden to prove to this Court that a successful and effective reorganization is reasonably in prospect. Debtor is indebted to Movant in an amount exceeding $14,306,218.81. Movant's claim against the Debtor's estate is secured by a first-priority security interest in all the Debtor's assets which, according to Debtor's Schedules, has a value of $7,936,412.11. Moreover, Debtor's proposed Plan and Disclosure Statement contends that Movant has a deficiency claim of $5,096,463.10. Thus, it is undisputed and admitted that Debtor lacks equity in Movant's collateral.

4.      Additionally, Debtor cannot prove that an effective reorganization is in prospect because: (1) Debtor cannot obtain an accepting impaired class of creditors given that Movant's deficiency claim, properly classified, controls the general unsecured class of creditors; (2) Debtor's Plan is not fair and equitable with respect to the treatment of Movant's claims; (3) Debtor's Plan violates the absolute priority rule by allowing YCF's principals to retain their equity in the reorganized Debtor based on an alleged $300,000 capital infusion without exposing the equity interest to a competitive market and thereby eviscerates Movant's credit bid and lien rights on Debtor's equity; (4) Debtor's Plan is not feasible as Debtor has insufficient revenues to meet its ongoing expenses, plan obligations and capex obligations, such as paying property taxes and completing a required property improvement plan ("PIP"), much less fund a Chapter 11 plan to repay its creditors and pay its associated administrative expenses; and (5) the Plan impermissibly consolidates Debtor's estate with the estate of YC Fernley Hotel LLC ("YCF") without making any showing that substantive consolidation is necessary or appropriate and without providing any

2

value to Movant on account of its lien on YCF's ownership interest in the Debtor. Accordingly, this Court should grant the Motion and lift the automatic stay with respect to Movant's collateral.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.      The Loan Documents and Indebtedness Owed to Movant

5.      On November 15, 2019, Debtor executed that certain Promissory Note in the original principal amount of $2,200,000 payable to Access Point (the "CapEx Note") as well as that certain Promissory Note in the original principal amount of $9,236,000 payable to CRE, as successor in interest to Access Point (the "Mortgage Note", and together with the CapEx Note, the "Notes") (*See* Proof of Claim No. 4-2, Case No. 21-50964, pp. 7-15, 90-95).[1]

6.      The Notes are secured by, among other things:

    a.      That certain Equipment Loan and Security Agreement dated November 15, 2019 (the "CapEx Loan and Security Agreement") wherein Debtor granted Access Point a first-priority security interest in, among other things, all its furnishings, fixtures and equipment (the "FF&E") (*See* Proof of Claim No. 4-2, pp. 96-136);

    b.      That certain Deed to Secure Debt and Security Agreement dated November 15, 2019 and recorded in Fulton County, Georgia real property records as Instrument No. 2019-0382185, Deed Book 60817, Page 281 (the "Security Deed") encumbering, among other things, Debtor's real property located at 1419 Virginia Ave., College Park, GA 30337 (as more particularly described in the Security Deed, the "Real Property") (*See* Proof of Claim No. 4-2, pp. 16-47);

---

[1] Unless otherwise indicated, all further citations to the docket numbers or to proofs of claim are to the docket and claims registry in Case No. 21-50964.

c. That certain Assignment of Leases and Rents dated November 15, 2019 and recorded in the Fulton County real property records as Instrument No. 2019-0382186, Deed Book 60817, Page 313 (*See* Proof of Claim No. 4-2, pp. 48-56);

d. That certain Pledge Agreement dated November 15, 2019 (the "Pledge Agreement") wherein YCF granted Access Point a first-priority security interest in its 100% membership interest in the Debtor (*See* Proof of Claim 4-2, pp. 66-71);

e. That certain UCC Financing Statement filed on November 18, 2019 with the Fulton County, Georgia Clerk of Superior Court  as Instrument No. 0602019-08987 (*See* Proof of Claim 4-2, pp. 137-41);

f. That certain UCC Financing Statement filed on November 19, 2019 with the Fulton County, Georgia Clerk of Superior Court as File No. 2019-0382187 and recorded in Deed Book 606817, Page 323 (*See* Proof of Claim 4-2, pp. 164-69);

g. That certain UCC Financing Statement filed on December 5, 2019 with the Fulton County, Georgia Clerk of Superior Court as File No. 2019-0392558 and recorded in Deed Book 60884, Page 685 (Proof of Claim 4-2, pp. 170-71); and

h. That certain UCC Financing Statement filed on December 6, 2019 with the Barrow County, Georgia Clerk of Superior Court as File No. 007-2019-053875 (*See* Proof of Claim 4-2, p. 142)

i. That certain UCC Financing Statement filed on November 15, 2019 with the Nevada Secretary of State as Filing Number 2019053735-0 (*See* Proof of Claim 4-2, p. 195) (collectively, the "Security Instruments", and together with the Notes and all documents executed in connection therewith and related thereto, together with all amendments and modifications, the "Loan Documents").

7.       By and through the Security Instruments, Debtor granted Movant a first-priority security interest in the Real Property, together with the improvements thereon, and all furniture, fixtures, equipment, general intangibles, deposits, rents, income, accounts receivable, and proceeds (the "Collateral").

8.       Debtor defaulted under the Notes and Loan Documents by failing to pay monthly payments as and when due and by failing to pay the Mortgage Note upon its maturity on November 1, 2020. By a letter dated January 21, 2021, Movant notified Debtor of its defaults and demanded payment of all sums due and payable under the Notes.

9.       On February 3, 2021, Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Petition Date").

10.      On July 14, 2021, CRE filed its Proof of Claim (Proof of Claim No. 10-1) (the "CRE Proof of Claim") asserting a claim for $11,549,080.06 due and owing under the Mortgage Note as of the Petition Date. Also on July 14, 2021, Access Point filed its Proof of Claim (Proof of Claim No. 4-3) (the "Access Proof of Claim", and together with the CRE Proof of Claim, "Movant's Proof of Claim")[2] asserting a claim for $2,727,138.75 due and owing under the CapEx Note as of the Petition Date. As of the Petition Date, the total amount due and owing under the Notes is $14,306,218.81.

11.      On July 6, 2021, Debtor and YCF filed their proposed plan of reorganization (Doc. 184) (the "Plan") and disclosure statement (Doc. 185) (the "Disclosure Statement") wherein they contend that Movant's secured claim is $7,567,491.08 and that Movant's deficiency claim is $5,096,463.19. (*See* Plan, pp. 2-3; Disclosure Statement, p. 26.)

---

[2] Movant's Proof of Claim amended Proof of Claim No 4-2 filed on March 31, 2021.

B.    **Debtor's Other Creditors and PIP**

12.    Debtor's Schedules, as amended, contend that there are only two secured creditors in this case, Movant and the Small Business Administration (the "SBA"). (*See* Doc. 115, pp. 3-8.) On April 15, 2021, the SBA filed its proof of claim (Proof of Claim No. 7-1) (the "SBA Proof of Claim") asserting a claim against Debtor's estate in the amount of $153,883.56, secured by a junior security interest in all the Debtor's tangible and intangible personal property. (*See* SBA Proof of Claim, Attachment 1, pp. 2, 16-17.)

13.    Debtor's Schedules further show that there are $59,503.48 in priority unsecured claims in this case and $1,573,970.04 in general unsecured claims, of which $1,355,881.27 is allegedly owed to insiders of Debtor. (*See* Doc. 115, pp. 5-18.) Further, Debtor appears to have several outstanding invoices related to PIP expenses that are not included in its Schedules, including $11,401.21 in invoices owed to Home Depot dated from November 3, 2020 to June 2, 2021 and a $281,752.01 invoice owed to Z&Z Construction dated February 15, 2021. Debtor's Schedules also indicate that the Real Property has a value of $6,280,000 and that Debtor has other personal property worth $1,656,412.11. (*See* Doc. 121, pp. 2-8.)

14.    Pursuant to that certain Franchise Agreement and PIP with Choice Hotels International, Inc. ("Choice Hotels"), Debtor is required to make certain improvements to the Real Property within ninety days from its approval or no later than 6 months after the Opening Date, as defined in the Franchise Agreement.[3] (*See* Franchise Agreement and PIP attached to Proof of Claim No. 3-1 as Attachment 1.) The CapEx Note was intended to provide funds for Debtor to complete the PIP. Despite the CapEx Note being fully funded and the Franchise Agreement being

---

[3] "Opening Date" is the date that the Debtor begins to rent any portion of the Rental Rooms under the Franchise Agreement. (Proof of Claim No. 3-1, Franchise Agreement § 1(f).)

6

signed almost two years ago, Debtor has not completed the improvements required by the PIP.

Further, Debtor does not have sufficient cash on hand or sufficient cash flow to complete the PIP.

## ARGUMENT

### A.    Movant is Entitled to Relief from the Automatic Stay

15.    This Court should grant Movant relief from the automatic stay to allow it to pursue

its state law remedies against its Collateral because Debtor has no equity in the property and the

property is unnecessary to an effective reorganization. Section 362(d)(2) of the Bankruptcy Code

provides secured creditors relief from the automatic stay when (1) there is no equity in the

collateral and (2) such collateral "is not necessary to an effective reorganization." 11 U.S.C. §

362(d)(2)(A)-(B); *In re Teron Trace, LLC*, 2010 WL 2025530, at *1 (Bankr. N.D. Ga. Jan. 28,

2010). Although Movant has the burden to establish that Debtor lacks equity in the property,

Debtor has the burden of proof on all other issues, including the burden to show  a  "reasonable

possibility of a successful reorganization within a reasonable time." 11 U.S.C. § 362(g); *In

re Teron Trace*, 2010 WL 2025530, at *1; *In re Roswell-Hannover Joint Venture*, 149 B.R. 1014,

1017 (Bankr. N.D. Ga. 1992).

### 1.    Debtor Has No Equity in the Collateral.

16.    It is undisputed that Debtor lacks equity in the Collateral. As noted above, Debtor's

Schedules indicate that the Real Property has a value of $6,280,000 and that Debtor's personal

property is worth $1,656,412.11. (*See* Doc. 121, pp. 2-8.) Additionally, Debtor's Disclosure

Statement contends that the value of all the Debtor's assets is only $7,936,412.11 and that Movant

has a deficiency claim of $5,096,463.10.[4]  (*See* Disclosure Statement, pp. 7, 21, 26.) Thus, Debtor

admits that the value of the Collateral is substantially less than Movant's secured claim and that it

---

[4] The values of the Debtor's assets listed in the Schedules and Disclosure Statement are used for demonstrative purposes. Movant does not necessarily agree with such values.

has no equity in the Collateral.

17.    Moreover, in its Order on Movant's motion to appoint a Chapter 11 trustee, this Court noted that "[i]t is undisputed that [Movant] is undersecured" and that the Debtor's property "is worth approximately one-half of [Movant's] proof of claim amount." (*See* Doc 152, p. 16.)

18.    Consequently, Movant has satisfied the first element under Section 362(d)(2)(A).

**2.    An Effective Reorganization Is Not Reasonably In Prospect.**

19.    Because Debtor lacks equity in the Collateral, Debtor can only prevent relief from the automatic stay if it can show that the Collateral is needed for an "*effective* reorganization." 11 U.S.C. § 362(d)(2)(B) (emphasis added). To make such a showing, the Supreme Court has stated that:

> [w]hat this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect.* This means . . . that there must be "a reasonable possibility of a successful reorganization within a reasonable time."

*United Savings Assoc. v. Timbers of Inwood Forest*, 484 U.S. 365, 375-76 (1988). In *Timbers*, the Supreme Court established a two-part test, first determining if there has been a showing of a reasonable possibility of a successful reorganization, and second, whether the reorganization can occur within a reasonable time. 484 U.S. at 375-76.

20.    "The definition of 'effective reorganization' articulated by the Supreme Court in *Timbers* necessarily implicates, to a degree, consideration of the plan confirmation standards under 11 U.S.C. § 1129." *In re 499 Warren St. Assocs. Ltd. P'Ship*, 151 B.R. 307, 310 (Bankr. N.D.N.Y. 1992); *see also In re Roswell-Hanover*, 149 B.R. at 1014 (determining whether confirmation requirements of Section 1129 could be satisfied to determine whether there was "an effective reorganization in prospect"); *In re Anderson Oaks Ltd. P'ship*, 77 B.R. 108, 111-13 (Bankr. W.D. Tex. 1987) ("Where it appears from the evidence that no proposed plan could realistically

surmount the obligations imposed by Section 1129(a), it follows that no effective reorganization

is possible."). Indeed, as one bankruptcy court has aptly stated:

> To be "effective," a plan must be confirmable. To be confirmable, specific
> requirements must be met. . . .  As a result, in order to assess whether a debtor
> has met its burden under sections 362(d)(2) and 362(g), a bankruptcy court must
> weigh evidence presented against the standards imposed by section 1129 to
> determine whether the threshold requirements of that section can be met.

*In re Henrico Hotel Assocs., L.P.*, 1994 WL 16191612, at *4 (Bankr. E.D. Va. Mar. 31, 1994); *see*

*also In re Shady Grove Tech Ctr. Assocs.*, 227 B.R. 422, 426 (Bankr. D. Md. 1998) (stating that

"'[i]f the plan proposed cannot meet confirmation standards, it cannot form the basis for finding

there to be a reasonable possibility of a successful reorganization.'"); *In re Swedeland Dev. Group,*

*Inc.* 16 F.3d 552, 567 (3d Cir. 1994) ("'If no reorganization of the debtor is feasible, then no

property of the debtor can be necessary for that end.'").

21.    Debtor bears the burden of proof and persuasion in proving it has a reasonable

probability of successful reorganization within a reasonable time under Section 362(d)(2)(B). *See*

11 U.S.C. § 362(g)(2); *see also In re Roswell-Hannover*, 149 B.R. at 1017 (stating that because

creditor met its burden that the debtor lacked equity in the property, "Section 362(d) requires that

the stay be lifted unless debtor can meet its burden of demonstrating that there is an effective

reorganization in prospect in this case."); *In re Teron Trace*, 2010 WL 2025530, at *1 (stating that

"in order to prevail on the motion, Debtor had to prove . . . that the property is essential for an

effective reorganization that is in prospect.").

22.    Movant submits that Debtor cannot satisfy this burden because: (1) Debtor cannot

show that an impaired class of creditors will vote in favor of the Plan; (2) the Plan is not fair and

equitable; (3) the Plan violates the absolute priority rule; (4) the Plan is not feasible; and (5) the

Plan impermissibly consolidates the Debtor with YCF.

a.  **No Impaired Class of Creditors Will Vote in Favor of a Plan**

23.    Debtor does not have enough cash on hand to pay off the already mature Mortgage Note and the Real Property currently does not generate sufficient revenue (and has not generated sufficient revenue in the past) to enable Debtor to repay the Notes. Thus, Debtor cannot pay Movant's claim without altering Movant's contractual rights under the Notes and, as a result, Movant will be an "impaired" creditor under Section 1124 of the Bankruptcy Code. *See In re Coram Healthcare Corp.*, 315 B.R. 321, 351 (Bankr. D. Del. 2004) (stating that "if the proposed plan of reorganization does not leave the creditor's [legal, equitable or contractual] rights entirely unaltered, the creditor's claim is impaired"); *see also* Debtor's Plan at pp. 2-3 (admitting that Movant's claim is impaired).

24.    Since Movant will not consent to Debtor's Plan, Debtor cannot confirm the Plan as a consensual plan of reorganization under Section 1129(a). *See* 11 U.S.C. § 1129(a)(8) (requiring that each class of impaired claims accept a plan). Instead, Debtor can only confirm the Plan under Section 1129(b)—generally referred to as the "cramdown" provision.  To cramdown a plan under Section 1129(b), however, Debtor must show, among other things, that there is at least one class of impaired creditors, not including insiders, who will vote to accept the plan. *See* 11 U.S.C. § 1129(a)(10); *In re Roswell-Hannover*, 149 B.R. at 1017.

25.    As previously noted, Debtor's Plan provides that Movant has a deficiency claim of $5,096,463.10. (*See* Plan, p. 3; Disclosure Statement, p. 26.) If Movant's unsecured deficiency claim is properly classified with the other general unsecured creditors in this case—including the SBA's wholly undersecured claim of $153,883.56—a vote against confirmation of the Plan from Movant would mean that the general unsecured class would reject the Plan regardless of how the other creditors vote. This is the case because Movant's deficiency claim would represent more

than 33% of the total general unsecured claims, thereby preventing the general unsecured class

from voting in favor of the Plan. *See* 11 U.S.C. § 1126(c) (stating that a class of claims votes in

favor of a plan "if such plan has been accepted by creditors . . . that hold at least two-thirds in

amount and more than one-half in number of the allowed claims of such class held by creditors.").

26.    Since the only impaired classes of creditors in this case will be Movant's secured

claim and the general unsecured class, Debtor cannot obtain an accepting impaired class of

creditors as required by Section 1129(a)(10).[5] Accordingly, Debtor cannot confirm a plan under

the cramdowm procedures and cannot show that it has "a reasonable possibility of a successful

reorganization within a reasonable time." *See In re Roswell-Hannover*, 149 B.R. at 1017-20

(granting stay relief where undersecured creditor's vote against the plan would result in debtor not

obtaining the vote of an accepting impaired class, thereby rendering the plan unconfirmable."); *In*

*re Anderson Oaks (Phase I) Ltd. P'ship*, 77 B.R. 108, 111-13 (Bankr. W.D. Tex. 1987) (granting

stay relief where there was no impaired accepting class of creditors for the debtor's proposed

cramdown plan and stating that "[i]f cramdown is not available, it is pointless to further consider

a plan which requires cramdown for its success.").

27.    As demonstrated by Debtor's proposed Plan, Debtor will try to avoid the fact that

it cannot meet the Bankruptcy Code's cramdown requirements by arguing that it can obtain an

impaired accepting class by separately classifying Movant's claim from the other general

unsecured creditors. In fact, Debtor's Plan attempts to separately classify non-insider, general

---

[5] Debtor's proposed Plan contends that the SBA's claim is secured by a first-priority security interest in payment intangibles and, therefore, treats the SBA's claim under its own class. (*See* Plan, pp. 4-5; Disclosure Statement, pp. 25-26.) However, as shown by the Security Instruments, Movant has a perfected security interest in the Debtor's general intangibles which, as defined by the Georgia UCC, includes payment intangibles, and was recorded prior to the SBA's lien. (*See* the Access Proof of Claim, pp. 137-42, 170-71; *see also* O.C.G.A. 11-9-102(a)(43).) Therefore, the SBA's claim is wholly undersecured and should be treated in Class 6 along with Movant's deficiency claim.

unsecured creditors into three separate classes.[6] Such separate classification, however, is not permitted by the Bankruptcy Code as Debtor cannot gerrymander a class of impaired creditors that will vote for its plan. *See In re Holywell Corp.*, 913 F.2d 873, 880 (11th Cir. 1990) ("[T]here must be some limit on a debtor's power to classify creditors . . . The potential for abuse would be significant otherwise. If the plan unfairly creates too many or too few classes, if the classifications are designed to manipulate class voting, or if the classification scheme violates basic priority rights, the plan cannot be confirmed."); *In re Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991) ("the one clear rule that emerges from otherwise muddled case law on § 1122 claims classification [is] thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan."). Instead, Debtor must demonstrate "some business or economic reason independent of the debtor's need to separately classify a claim to confirm a plan." *In re Save Our Springs (S.O.S.) Alliance, Inc.*, 388 B.R. 202, 235 (Bankr. W.D. Tex. 2008); *see also In re Holley Garden Apartments, Ltd.*, 223 B.R. 822, 823 (Bankr. M.D. Fla. 1998) ("The majority of circuits that have examined the treatment of similar claims have held that the proponent of a plan must demonstrate a justification for its classification scheme and that the classification is not motivated by the purpose of gerrymandering an affirmative vote of an impaired class.").

---

[6] Debtor's Plan separates general unsecured claims into the following classes: Class 4 – the convenience class for claims of $12,000 or less; Class 5 – for creditors with general unsecured claims larger than $12,000 and who do not elect to be treated under Class 4; and Class 6 – for the deficiency claims of Movant and the SBA. (*See* Plan, pp. 2-8.) As explained herein, Movant contends that creditors in Class 5 and Class 6 must be placed together in a single class and that there is no legitimate business or economic reason for their separate classification. As for Class 4, the Bankruptcy Code authorizes separate classification of smaller unsecured claims "for administrative convenience." *See* 11 U.S.C. § 1122(b). However, since Debtor's Plan proposes to pay these claims in full on the effective date of the Plan, Movant contends that these claims are not impaired. Similarly, creditors with unsecured claims larger than $12,000 who elect to be treated under Class 4 are also unimpaired as the Plan provides that their election is in full and complete satisfaction of their claims. (*See* Plan, p. 5.) Finally, Debtor's Plan also classifies non-tax priority claims into Class 2, which it contends is impaired. (*Id.* at p. 2.) However, because the Plan provides that Class 2 claims will be paid in full on the effective date, they are also unimpaired. (*Id.*)

28.     Here, any justification Debtor might proffer for separately classifying general unsecured creditors from the deficiency or undersecured claims of Movant and the SBA would be a pretext for gerrymandering an accepting class as most courts have rejected distinctions between unsecured deficiency claims and claims of general unsecured creditors, such as trade claims. *See In re Boston Post Road Ltd. P'ship*, 21 F.3d 477, 483 (2d. Cir. 1994) ("the different origins of the FDIC's unsecured deficiency claim and general unsecured trade claims, claims which enjoy similar rights and privileges under the Bankruptcy Code, do not alone justify separate segregation."); *In re 455 CPW Assocs.*, 1999 WL 675972, at *3 (S.D.N.Y. 1999) (affirming a bankruptcy court's ruling that a secured creditor's "deficiency claim [was] substantially similar to the other unsecured claims."); *In re Roswell-Hannover*, 149 B.R. at 1019 (rejecting the debtor's argument that "the difference in the nature of Hancock's unsecured [deficiency] claim and the other unsecured claims justifies [] separate classification"); *In re 499 W. Warren Street Assocs. Ltd. P'ship*, 151 B.R. 307 (Bankr. N.D.N.Y. 1992) (finding that the first mortgage creditor's deficiency claim and the second mortgage creditor's "wholly unsecured" claim must be placed into the same class as general unsecured creditors because "simple invocation of the distinction between Code-created unsecured deficiency claims and other unsecured claims, without more, does not warrant separate classification of such claims."). Accordingly, because there is no legitimate "economic or business reason independent of the debtor's need . . . to confirm a plan" justifying separate classification, Debtor must classify the deficiency or undersecured claims of Movant and the SBA in the same class as other general unsecured creditors to satisfy the classification standards under Section 1122.

### b.  The Plan is Not Fair and Equitable

29.    Additionally, an effective reorganization is not in prospect because the Plan is not fair and equitable with respect to Movant's claims. *See* 11 U.S.C. § 1129(b)(1) (requiring that a plan be "fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.").

30.    Despite the Disclosure Statement contending that Debtor's assets total $7,936,412.11, the Plan values Movant's secured claim at $7,567,491.08. (*See* Disclosure Statement, p. 7; Plan, pp. 2-3.) Movant has a first priority security interest in all the Debtor's assets and, therefore, the value of Movant's secured claims treated under the Plan must equal the value of all the Debtor's assets.[7] *See* 11 U.S.C. § 1129(b)(2)(A)(i)(II).

31.    Additionally, Movant contends that the value of the Real Property is significantly higher than the $6,280,000 valuation asserted in the Disclosure Statement.[8] Rather than providing a method of valuing the Real Property and the rest of Movant's Collateral, the Plan unilaterally bifurcates Movant's secured claims without any hearing on or determination of the value of Movant's Collateral. Moreover, the Plan completely ignores Movants' lien on YCF's ownership interest in the Debtor and does not include the value of such ownership interest in Movant's secured claim. (*See* Disclosure Statement, p. 25 (valuing Movant's secured claim based only on the Real Property, the FF&E and funds held in reserve accounts with Movant).)

32.    The Plan is also not fair and equitable because it proposes to treat Movant's secured claims with interest-only payments for the first 6 months of the Plan and principal payments amortized over 300 months for the next 71 months of the Plan. (*See* Plan, pp. 2-3.) Such terms do

---

[7] Movant has two secured claims in this case—one held by CRE secured by, among other things, the Debtor's Real Property, and the other held by Access Point secured by, among other things, the Debtor's FF&E. Thus, the Plan should treat these claims separately, rather than treating them as a single claim.

[8] Movant contends that CRE's claim is fully secured due to appreciation in the Real Property since the Petition Date.

14

not resemble a commercial loan that Debtor could receive from a financial institution on the open market and, therefore, the proposed treatment is not fair and equitable. *See In re Shoaf*, 2012 WL 1194114, at *2 (Bankr. E.D.N.C. April 10, 2012) (stating that "[a] commercial loan in [C]hapter 11 must resemble a commercial loan on the open market to be fair and equitable to the creditor.").

33.    Likewise, the Plan's treatment of Movant's unsecured deficiency claim is also not fair and equitable because the Plan provides that Movant will receive quarterly interest-only payments until December 31, 2023 at which point the Debtor will begin making annual Excess Cash Flow Payments for 5 years with the remaining amount of Movant's deficiency claim being paid with a balloon payment on the 78th month of the Plan. (*See* Plan, pp. 6-7.) Because the Plan's definition of Excess Cash Flow Payments does not place any limit on the Debtor's operating or capex expenses or contain any required minimum payment, Debtor has no obligation to pay unsecured creditors anything (beyond quarterly interest payments of 1.08%) until six and a half years after the effective date of the Plan.(*See id*. at 38-39.) Even then, there is no showing that the Debtor will have the ability to make the balloon payment to unsecured creditors, which could total over $5 million. Accordingly, it is likely that Movant will receive little or no payment on its deficiency claim, which is certainly not fair and equitable.

**c.    The Plan Violates the Absolute Priority Rule**

34.    Debtor also cannot show that an effective reorganization is in prospect because Debtor's Plan violates the absolute priority of § 1129(b)(2)(B) which requires that "claims of an impaired class must be paid in full before a junior class of claims or interests is to retain any interest." *In re PHA Lightnight Design Inc.*, 2011 WL 2669204, at *2 (Bankr. N.D. Ga. May 31, 2011). Here, Debtor's Plan allows YCF's principals to retain equity interest in the reorganized Debtor despite the general unsecured class being impaired. (*See* Plan, p. 8; Disclosure Statement,

pp. 29-30.) While the Plan and Disclosure Statement contend that unsecured creditors will be paid

in full, such obligation to pay these unsecured claims is illusory. As noted above, the Plan provides

that general unsecured creditors will receive: (i) quarterly interest-only payments; (ii) five annual

Excess Cash Flow Payments beginning on December 31, 2023; and (iii) a final balloon payment

of the remaining unsecured claims on the 78th month of the Plan. (*See* Plan, pp. 6-7.) Because the

Plan's imposes no cap on the Debtor's operating or capex expenses, it is likely that general

unsecured creditors will receive little or no Excess Cash Flow Payments during the life of the Plan

and there is no showing that Debtor will have the ability to pay off the balance of the over $5

million unsecured claims through a balloon payment on the 78th month of the Plan. Accordingly,

Movants contend that retention of equity interest in the reorganized Debtor by YCF's principals

violates the absolute priority rule.

35.    While the Plan provides that the YCF's principals will contribute a $300,000 capital

infusion, and assuming this infusion of capital is in exchange for retention of equity by YCF's

principals, this is insufficient to constitute "new value." In order for a "new value" contribution to

warrant an exception to the absolute priority rule, such new value must, among other things, be

"reasonably equivalent to the value of the new equity interest in the reorganized Debtor." Here,

there is no way to determine if the equity interest in the reorganized Debtor is "reasonably

equivalent" to the $300,000 capital infusion as Debtor's Plan does not expose the equity interest

to a competitive market. Thus, Debtor's Plan does not satisfy the "new value" corollary to the

absolute priority rule. *See Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S.

434, 458 (1999) (stating that Chapter 11 "plans providing junior interest holders with exclusive

opportunities free from competition and without benefit of market valuation fall within the

prohibition of § 1129(b)(2)(B)(ii)"); *In re Glob. Ocean Carries, Ltd.*, 251 B.R. 31, 49 (Bankr. D.

16

Del. 2000) (finding that a plan "violate[d] the absolute priority rule by allowing the existing controlling shareholder to determine, without the benefit of a public auction or competing plans, who will own the equity of [the debtor] and how much they will pay for the privilege").

36.     Additionally, through substantive consolidation of Debtor with YCF and assignment of Debtor's equity interest to YCF's principals, the Plan essentially proposes a sale of the equity in the reorganized Debtor to YCF's principals for the $300,000 capital infusion. Because Movant has a lien on YCF's membership interest securing Debtor's obligations under the Notes, however, Movant is entitled to credit bid the amounts owed under the Notes for Debtor's equity. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 647 (2012) (stating that "debtors may not sell their property free of liens under § 1129(b)(2)(A) without allowing lienholders to credit-bid, as required by clause (ii)"). Since the Plan does not provide any competitive bidding for the equity in the reorganized Debtor, the Plan thus impermissibly denies Movant the value of its collateral and eviscerates Movant's credit bid and lien rights on Debtor's equity.

### d.  Debtor Cannot Show that its Plan is Feasible

37.     Debtor also cannot meet its burden of showing that an effective reorganization is in prospect because Debtor's Plan is not feasible. *See In re Annicott Excellence, LLC*, 258 B.R. 278, 284 (Bankr. M.D. Fla. 2001) ("If no reorganization of the debtor is feasible, then no property of the debtor can be necessary for that end."); *In re Bowman*, 253 B.R. 233, 239 (B.A.P. 8th Cir. 2000) (stating that for a debtor to meet its burden of showing that it has a reasonable possibility of a successful organization, it "must show that its proposed plan of reorganization is feasible and therefore, likely confirmable."); *In re 300 Washington Street, LLC*, 528 B.R. 534, 553 (Bankr. E.D.N.Y. 2015) ("For the purposes of § 362(d)(2), a realistically feasible plan capable of

implementation, as opposed to fanciful, conclusory optimism, may fairly characterize an effective reorganization."); *In re Teron Trace, LLC*, 2010 WL 2025530, at *4.

38.    Pursuant to Section 1129(a)(11)'s "feasibility requirement," a Chapter 11 plan is confirmable "only if there is a reasonable assurance that the plan will not be followed by" "a future liquidation or further reorganization of the debtor." *In re Walter Energy, Inc.*, 911 F.3d 1121, 1155 (11th Cir. 2018). Here, Debtor cannot show that its Plan is feasible because it has insufficient revenues to pay its ongoing obligations, including property taxes and PIP expenses, much less fund the Plan to pay its creditors.

39.    As evidenced by Debtor's cash collateral budget, Debtor is not escrowing for property taxes that will come due later this year. (*See* Forth Interim Cash Collateral Order, Doc. 161, p. 16 ($0 allocated for taxes for May 2021 through August 2021); *see also* Debtor's Monthly Operating Report for May 2021, Doc. 180, p. 4 (indicating that Debtor only has $3,502.18 in escrow for taxes and insurance premiums).) Based on the amounts owed by Debtor in 2020 for property taxes, Debtor will owe approximately $140,000 in property taxes for 2021.

40.    Additionally, Debtor has incurred over $100,000 in administrative expenses since the Petition Date and, pursuant to 11 U.S.C. § 1129(a)(9), these expenses must be paid in full on the effective date of the Debtor's Plan. (*See* Exhibit E to the Disclosure Statement (indicating that administrative claims total $100,000).)

41.    Finally, by Debtor's own admission, it currently has at least $174,008.75 in additional renovations that remain outstanding under the PIP. (*See* Debtor's PIP Budget attached hereto as Exhibit A.) Movant disputes that only $174,008.75 remains outstanding under the PIP or that the renovation work that Debtor has completed so far complies with the PIP.

42.     Debtor's Disclosure Statement contends that $253,948.08 of the CapEx Loan proceeds are held in a reserve account with Movant (the "PIP Reserve") and that another $113,542 is held in an insurance escrow account with Movant (the "Insurance Escrow", together with the PIP Reserve, the "Reserve Accounts"). (*See* Disclosure Statement, p. 7.) Debtor proposes to use funds in the Reserve Accounts to fund the remaining PIP renovations and pay its 2021 property taxes. However, under the terms of the CapEx Loan and Security Agreement, Movant is not obligated to disburse funds held in the Reserve Accounts to Debtor due to its pre-petition default and because Movant has a lien on funds held in the Reserve Accounts. (*See* CapEx Loan and Security Agreement, ¶¶ 3(o) (stating that payment of taxes and insurance premiums from the Tax and Insurance Escrow Fund is conditioned on "no Default or Event of Default hav[ing] occurred"); 13(a)(ii) (stating that upon default, Movant may "[c]ease making any further disbursements or advances hereunder and terminate any further obligation to do so").) Rather, Movant is entitled to setoff amounts held in the Reserve Accounts against the accelerated debt. (*See id.* at ¶¶ 13(a)(i) and (vii) (stating that upon default, Movant can "[d]eclare the entire unpaid balance of the Loan immediately due and payable" and that it can "[s]et-off, hold and apply against all amounts due to Lender hereunder or under any of the other Loan Documents, any security deposits, cash, credits or accounts of any nature whatsoever . . . maintained by or on behalf of Borrower with Lender").) Thus, Debtor cannot use funds in the Reserve Accounts to complete the PIP renovations or pay its property taxes.

43.     Based on the Debtor's Monthly Operating Reports, it is clear that Debtor does not have sufficient revenue to pay the PIP expenses, property taxes and fund a plan of reorganization. In February, Debtor reported net income of -$28,642.34 even with a $25,000 "equity infusion." (*See* Doc. 90, pp. 2-3.) In March, Debtor reported a net income of $144,698.25 but this includes a

$44,365.70 insurance payment. (*See* Doc. 135, pp. 2-3.). In April, Debtor reported a net income of

-$108,063.06. (*See* Doc. 156, p. 2.) Finally, in May, Debtor reported a net income of $56,782.16.

(*See* Doc. 180, p. 2.) Thus, Debtor's average monthly net income since the Petition Date has been

$16,193.75, without escrowing for property taxes or making debt service payments. Therefore,

Debtor does not have sufficient revenue to meet its ongoing expenses, much less fund a plan of

reorganization.

44.     The lack of feasibility of Debtor's Plan is also apparent by its reliance on an alleged

$300,000 equity infusion from the YCF's principals—Baldev Johal ("Johal") and Balbir Gosal

("Gosal"). Both Johal and Gosal, however, are guarantors of the accelerated debt owed to Movant

and defendants in a guaranty suit filed by Movant. (*See* Doc. 1, Case No. 21-cv-00908-LLM.)

Johal testified before this Court that "his personal finances have been negatively impacted by the

pandemic." (*See* Doc. 152, p. 20.) Thus, it is highly unlikely Johal and Gosal have—and there has

been no showing that they will have—the ability to provide the required equity infusion needed to

fund the Debtor's proposed Plan. Without this infusion of capital, Debtor's operating revenue is

simply insufficient to fund a plan, especially given the minimum $400,000 in expenses the Debtor

will have to pay in the coming months. Accordingly, Debtor cannot show that there is a reasonable

probability that its Plan is feasible. *See In re Aspen Village at Lost Mountain Memory Care, LLC*,

609 B.R. 536, 543 (Bankr, N.D. Ga. 2019) (stating that "[w]hile § 1129(a)(11) does not require

the debtor to guarantee success, establishing feasibility requires more than a promise, hope, or

unsubstantiated prospect of success.").

**e.    <u>The Plan Impermissibly Consolidates Debtor with YCF</u>**

45.     Finally, there is also no effective reorganization in prospect because Debtor's Plan

impermissibly merges the estates and liabilities of Debtor and YCF through substantive

consolidation. The Eleventh Circuit has stated that "[s]ubstantive consolidation should be used sparingly" and requires a showing that: "(1) there is substantial identity between the entities to be consolidated; and (2) consolidation is necessary to avoid some harm or realize some benefit." *See Eastgroup Prop. V. Southern Motel Ass'n, Ltd.*, 935 F.2d 245, 249 (11th Cir. 1991). Here, Debtor's Disclosure Statement makes no showing as to why substantive consolidation is necessary or appropriate and, instead, merely states that "[t]he Plan shall serve as a motion by Debtors" to substantively consolidate Debtor with YCF. (*See* Disclosure Statement, pp. 29-30.) Thus, the Debtor's Plan impermissibly treats the Debtor's estate as substantively consolidated with YCF's estate when no such relief has been granted and without making the required showings that would enable the Court to grant substantive consolidation. *See In re CRB Partners, LLC*, 2013 WL 796566, *13-14 (Bankr. W.D. Tex. Mar. 4, 2013) (stating that "[n]othing [] automatically permits two separate debtors with jointly administered cases to mingle their assets and obligations" and that "[i]t is therefore inappropriate for debtors who have not secured substantive consolidation from a court to draft their plan as though they had.").

46.    Further, Debtor's Plan ignores the fact that, pursuant to the Pledge Agreement, Movant has a security interest in YCF's ownership in the Debtor. The Plan provides no value to Movant on account of its lien on YCF's membership interest in the Debtor and instead, through the purported substantive consolidation of Debtor and YCF, completely wipes Movant's lien. Thus, substantive consolidation as contemplated by the Plan would significantly prejudice Movant and would, therefore, prevent a finding that any "benefits of consolidation 'heavily' outweigh the harm" to Movant. *See Eastgroup*, 935 F.2d at 249.

## **CONCLUSION**

WHEREFORE, Movant respectfully requests that this Court enter an order (i) granting Movant relief from the automatic stay so that it can exercise its state law remedies with respect to its Collateral and (ii) grant Movant such other and further relief as the Court deems just and proper.

Respectfully submitted, this 15th day of July, 2021.

   /s/ Lisa Wolgast                 
Frank W. DeBorde
Georgia Bar No. 215415
Lisa Wolgast
Georgia Bar No. 773399
Morris, Manning & Martin, LLP
1600 Atlanta Financial Center
3343 Peachtree Road NE
Atlanta, Georgia 30326
(404) 233-7000
fwd@mmmlaw.com
lwolgast@mmmlaw.com

**Attorneys for Access Point Financial, LLC and APF – CRE I, LLC**

22

**IN THE UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | CHAPTER 11 |
| YC ATLANTA HOTEL LLC and | ) | |
| YC FERNLEY HOTEL LLC | ) | Case No. 21-50964-BEM |
| | ) | (Jointly Administered) |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| ACCESS POINT FINANCIAL, LLC and | ) | CONTESTED MATTER |
| APF – CRE I, LLC | ) | |
| | ) | |
| Movants. | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| YC ATLANTA HOTEL LLC. | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

<u>**CERTIFICATE OF SERVICE**</u>

I certify that I have this day served a true and correct copy of the within and foregoing **MOTION FOR RELIEF FROM THE AUTOMATIC STAY** with the Clerk of Court by using the Court's CM/ECF system, which will serve as notice to all counsel.

This 15th day of July, 2021.

Respectfully submitted,

**MORRIS, MANNING & MARTIN, LLP**

By: /s/ Lisa Wolgast_____
    Frank W. DeBorde
    Georgia Bar No. 215415
    Lisa Wolgast
    Georgia Bar No. 773399